# 24-1209(L),

## 24-1200, 24-1210, 24-1213, 24-1218, 24-1223, 24-1360

### United States Court of Appeals
#### *for the*
#### Second Circuit

AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., NOVORIVER S.A., 683 CAPITAL PARTNERS, LP, ADONA LLC, EGOZ I LLC, EGOZ II LLC, MASTERGEN, LLC, ERYTHRINA, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, WASO HOLDING CORPORATION,

*Plaintiff-Appellants,*

and

APE GROUP SPA, ROMANO CONSULTING SPA, ICARO SRL, ELAZAR ROMANO,

*Plaintiff-Appellants-Cross-Appellees*,

v.

REPUBLIC OF ARGENTINA

*Defendant-Appellee.*

————

**On Appeal from the United States District Court for the Southern District of New York**

### FINAL FORM BRIEF OF PLAINTIFF-APPELLANTS AND PLAINTIFF-APPELLANTS-CROSS-APPELLEES

**[Counsel listed on following page]**

Michael R. Huston
Matthew M. Riccardi
H. Rowan Gaither, IV
Jacob J. Taber
PERKINS COIE LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036
(212) 261-6863

*Counsel for Plaintiff-Appellant*
*683 Capital Partners, LP*

Matthew S. Salerno
Michael E. Bern
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Plaintiff-Appellant*
*Adona LLC, Egoz I LLC, Egoz*
*II LLC, Mastergen, LLC,*
*Erythrina, LLC, AP 2016 1,*
*LLC, AP 2014 3A, LLC, AP*
*2014 2, LLC, WASO Holding*
*Corporation*

Javier Bleichmar
Evan A. Kubota
BLEICHMAR FONTI & AULD LLP
300 Park Avenue, Suite 1301
New York, NY 10022
212-789-1340

*Counsel for Plaintiff-Appellant*
*Novoriver S.A*

Roy T. Englert, Jr.
Matthew M. Madden
Zachary N. Ferguson
Paul Brzyski
KRAMER LEVIN NAFTALIS
   & FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500

Lawrence S. Robbins
Edward A. Friedman
Daniel B. Rapport
Michael S. Palmieri
FRIEDMAN KAPLAN SEILER
   ADELMAN & ROBBINS LLP
7 Times Square, 28th Floor
New York, NY 10036
Tel: (212) 833-1100

*Counsel for Plaintiff-Appellants*
*Aurelius Capital Master, Ltd.*
*and ACP Master Ltd.*

Eric Joseph Grannis
LAW OFFICES OF ERIC J.
   GRANNIS
11 Broadway, Suite 615
New York, NY 10004

*Counsel for Plaintiff-*
*Appellants-Cross-Appellees Ape*
*Group SPA, Romano*
*Consulting SPA, Icaro SRL,*
*Elazar Romano*

## CORPORATE DISCLOSURE STATEMENT

Aurelius Capital Master, Ltd. is an exempted company with limited liability organized under the laws of the Cayman Islands. The following entities are shareholders of Aurelius Capital Master, Ltd.: Aurelius Capital International, Ltd., Aurelius Capital International II, Ltd., and Aurelius Capital GP, LLC. No publicly held corporation owns 10% or more of the stock of Aurelius Capital Master, Ltd.

ACP Master, Ltd. is an exempted company with limited liability organized under the laws of the Cayman Islands. Aurelius Capital Master, Ltd. owns 100% of the stock of ACP Master, Ltd. No publicly held corporation owns 10% or more of the stock of ACP Master, Ltd.

Novoriver S.A. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

683 Capital Partners, LP has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, and AP 2014 2, LLC have no parent corporation, and no publicly held corporation owns 10% or more of their stock.

i

The 100% owner of WASO Holding Corporation is WASO Holdings, LLC, a Limited Liability Company registered in the Cayman Islands. No publicly held corporation owns 10% or more of the stock of WASO Holding Corporation.

Ape Group SpA has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Romano Consulting SpA has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Icaro SRL has no parent corporation, and no publicly held corporation owns 10% or more of their stock.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... vi

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION .......................................................... 4

ISSUES FOR REVIEW ........................................................................ 5

STATEMENT OF THE CASE ................................................................ 5

    A.   Argentina exchanged defaulted sovereign debt for new bonds and GDP-linked securities ............................................ 6

    B.   Argentina owes payments on its GDP Securities when specified conditions are met, and every holder has the right to enforce those payments ................................................. 8

    C.   Argentina refused to make a 2013 payment on its GDP Securities after discontinuing publication of a contractually required GDP statistic ..................................... 13

    D.   Overview of this action ................................................... 17

    E.   Overview of the parallel English action ................................ 21

SUMMARY OF ARGUMENT ................................................................ 25

ARGUMENT ..................................................................................... 29

I.   The Global Security authorizes Plaintiffs' action to enforce Argentina's payment of the 2013 Payment Amount ..................... 29

    A.   Section 11 of the Global Security gives Plaintiffs the right to sue Argentina to enforce its payments .............................. 34

        1.   Section 11 applies to Payment Amounts ..................... 34

2. Section 4.9 of the Indenture does not cabin Section 11's right to enforce payments due under the Global Security ................................................................ 38

B. Alternatively, Payment Amounts are payments of principal or interest under Indenture section 4.9 ............... 48

1. The Indenture and Global Security treat Payment Amounts as principal and interest ............................... 49

2. The district court's conclusion that Payment Amounts are not principal or interest is erroneous .... 52

3. The Republic has repeatedly described the Global Security's Payment Amounts as being interest .......... 55

4. Industry custom confirms that conditional payments are principal and interest ............................ 58

C. In all events, the Republic forfeited and waived any no-action defense ........................................................ 60

II. Argentina's failure to make a 2013 payment, and its unilateral attempt to modify the Global Security to excuse that failure, breached the contract ..................................................................... 68

A. The Global Security required Argentina to adjust for its rebasing by using and publishing real GDP in constant 1993 prices ............................................................. 70

B. After Argentina's rebasing decision, it failed to apply the Adjustment Provision as written by refusing to publish and use Actual Real GDP in constant 1993 prices ............... 76

1. The Republic has a contractual obligation to use Actual Real GDP in constant 1993 prices in the Adjustment Fraction, and therefore to publish that required statistic ........................................................ 78

2. Argentina cannot avoid payment by preventing the satisfaction of a payment condition ............................. 85

iv

3.    The Republic's attempts to read the Adjustment
      Fraction as not requiring its ongoing use of Actual
      Real GDP in constant 1993 prices are unavailing ......87

4.    The Republic's unilateral attempt to modify the
      Adjustment Provision was itself a breach of
      contract ........................................................................89

CONCLUSION ...........................................................................91

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.,*
   307 F.3d 24 (2d Cir. 2002) ..................................................... 39

*African Minerals Limited v Renaissance Capital Ltd.*
   [2015] EWCA Civ 448 ........................................................ 43

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008) ........................................................... 32

*Allan Applestein TTEE FBO D.C.A. Grantor Tr. v. Province*
   *of Buenos Aires,*
   415 F.3d 242 (2d Cir. 2005) ..................................... 61, 63, 64

*Allstate Life Ins. Co. v. Robert W. Baird & Co.,*
   2011 WL 5024269 (D. Ariz. Oct. 21, 2011)......................... 63

*In re Bankers Tr. Co.,*
   450 F.3d 121 (2d Cir. 2006) ................................................. 86

*Brash v. Richards,*
   195 A.D.3d 582 (2nd Dep't 2021)......................................... 65

*Chesapeake Energy Corp. v. The Bank of New York Mellon*
   *Trust Co.,*
   773 F.3d 110 (2d Cir. 2014) ................................................. 36

*Cole v. Macklowe,*
   99 A.D.3d 595 (1st Dep't 2012).......................................... 45

*Collymore v. Myers,*
   74 F.4th 22 (2d Cir. 2023).................................................... 69

*Contant v. AMA Capital, LLC,*
   66 F.4th 59 (2d Cir. 2023).................................................... 41

*Contemporary Mission, Inc. v. Famous Music Corp.,*
   557 F.2d 918 (2d Cir. 1977) ................................................. 80

## TABLE OF AUTHORITIES—Continued

Page(s)

*Demolition Contractors, Inc. v. Westchester Surplus Lines Ins. Co.*,
  2009 WL 929014 (W.D. Mich. Apr. 3, 2009) ....................................... 66

*Dobson v. Hartford Fin. Servs. Grp., Inc.*,
  389 F.3d 386 (2d Cir. 2004) ...................................................... 82, 83

*Duncan v. Walker*,
  533 U.S. 167 (2001) ................................................................... 44

*Dupree v. Younger*,
  598 U.S. 729 (2023) ................................................................... 69

*EM Ltd. v. Republic of Argentina*,
  473 F.3d 463 (2d Cir. 2007) .......................................................... 6

*Entis v. Atl. Wire & Cable Corp.*,
  335 F.2d 759 (2d Cir. 1964) ........................................................ 80

*FDIC v. Horn*,
  2015 WL 1611995 (E.D.N.Y. Apr. 8, 2015) ......................................... 62

*FDIC v. Murex LLC*,
  500 F. Supp. 3d 76 (S.D.N.Y. 2020)................................................. 62

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*,
  2021 WL 1946756 (S.D.N.Y. May 14, 2021). ...................................... 64

*Greenfield v. Philles Recs., Inc.*,
  98 N.Y.2d 562 (2002)................................................................. 80

*Hauser v. Western Grp. Nurseries, Inc.*,
  767 F. Supp. 475 (S.D.N.Y. 1991)................................................... 44

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) .................................................................. 39

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Jin Ming Chen v. Ins. Co. of the State of Pa.*,
  36 N.Y.3d 133 (2020) .............................................................. 41

*John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*,
  119 F.3d 1070 (3d Cir. 1997) ................................................. 43

*Krauth v. Exec. Telecard, Ltd.*,
  890 F. Supp. 269 (S.D.N.Y. 1995) ........................................ 57

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
  2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ........................ 63

*Maryland Cas. Co. v. W.R. Grace and Co.*,
  128 F.3d 794 (2d Cir. 1997) ................................................... 37

*Mazzella v. Mazzella*,
  204 A.D.3d 1114 (3d Dep't 2022) .......................................... 81

*MeehanCombs Glob. Credit Opportunities Funds, LP v.
  Caesars Ent. Corp.*,
  80 F. Supp. 3d 507 (S.D.N.Y. 2015) ...................................... 47

*Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*,
  56 N.Y.2d 175 (1982) .............................................................. 66

*Nat'l Credit Union Admin. Bd. v. U.S. Bank N.A.*,
  898 F.3d 243 (2d Cir. 2018) ................................................... 51

*N.Y.C. Transit Auth. v. Express Scripts, Inc.*,
  588 F. Supp. 3d 424 (S.D.N.Y. 2022) .................................... 83

*OfficeMax Inc. v. W.B. Mason Co.*,
  2011 WL 2173789 (D. Vt. June 2, 2011) ............................... 35

*Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon L.P.*,
  840 F. Supp. 770 (D. Or. 1993) ............................................. 57

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Palladian Partners L.P. v. Republic of Argentina,*
[2024] EWCA Civ. 641 ............................................................ *passim*

*Postlewaite v. McGraw-Hill, Inc.,*
411 F.3d 63 (2d Cir. 2005) .................................................. 80

*Quackenbush v. Allstate Ins. Co.,*
517 U.S. 706 (1996) .............................................................. 69

*Quadrant Structured Prods. Co. v. Vertin,*
23 N.Y.3d 549 (2014)...................................................... 11, 46

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA,*
10 F.4th 87 (2d Cir. 2021)..................................................... 62

*Rusch Factors, Inc. v. Fairview Mfg. Co.,*
34 A.D.2d 635 (1st Dep't 1970) .......................................... 67

*Sherrill v. Grayco Builders, Inc.,*
64 N.Y.2d 261 (1985)..................................................... *passim*

*Sony Music Ent., Inc. v. Werre,*
26 Misc.3d 1240(A), Slip Op. (N.Y. Sup. Ct. Mar. 17, 2010) ............. 86

*Spinelli v. NFL,*
903 F.3d 185 (2d Cir. 2018) .................................................. 44

*St. Christopher's, Inc. v. JMF Acquisitions, LLC,*
2021 WL 6122674 (2d Cir. Dec. 28, 2021)........................................ 87

*Sutton v. E. River Sav. Bank,*
55 N.Y.2d 550 (1982).................................................... 81, 83

*Tractebel Energy Mktg. v. AEP Power Mktg., Inc.,*
487 F.3d 89 (2d Cir. 2007) .................................................. 80

*UMB Bank, N.A. v. Sanofi,*
2018 WL 3300658 (S.D.N.Y. Apr. 12, 2018) ...................................... 58

## TABLE OF AUTHORITIES—Continued

Page(s)

*UMB Bank, N.A. v. Sanofi*,
No. 15-cv-8725 (May 26, 2016) ..................................................58, 60

*United States v. George*,
946 F.3d 643 (4th Cir. 2020) ................................................. 35

*United States v. Jordan*,
810 F.2d 262 (D.C. Cir. 1987) ................................................ 35

*United States v. LaFaive*,
618 F.3d 613 (7th Cir. 2010) ................................................. 35

*Vector Media, LLC v. Golden Touch Transp. of NY, Inc.*,
189 A.D.3d 654 (1st Dep't 2020) ............................................ 85

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
127 F. Supp. 3d 156 (S.D.N.Y. 2015) .................................... 62

*Wieder v. Skala*,
80 N.Y.2d 628 (1992) ............................................................ 83

*Wood v. Lucy, Lady Duff-Gordon*,
222 N.Y. 88 (1917) ................................................................ 81

*Worbes Corp. v. Sebrow*,
2023 N.Y. Slip Op. 50205(U), (N.Y. Sup. Ct. Bronx Cty.
Mar. 17, 2023) ...................................................................... 67

## Statutes and Rules

15 U.S.C. §§ 77aaa-77bbbb.........................................................58

15 U.S.C. § 77ddd .......................................................................59

15 U.S.C. § 77ppp .......................................................................59

28 U.S.C. § 1291..........................................................................5

28 U.S.C. § 1330..........................................................................4

# TABLE OF AUTHORITIES—Continued

Page(s)

Fed. R. Civ. P. 9 ............................................................... *passim*

N.Y. C.P.L.R. § 205 ............................................................ 66

N.Y. C.P.L.R. § 213 ............................................................ 65

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .................................. 53

Bristol-Myers Squibb Co., CVR Agr. (Form 8-K, Ex. 4.1)
  (Nov. 20, 2019) .............................................................. 59, 60

Goncalo Pina, *State-Contingent Government Debt: A New
  Database*, 55 Credit and Capital Markets 57 (2022) .............. 55

Illumina, Inc., CVR Agr. (Form 8-K, Ex. 4.1) (Aug. 18, 2021).... 58, 59, 60

*Investor Bulletin: What Are Corporate Bonds?*, U.S.
  Securities & Exchange Commission at 2 (June 2013) .............. 57

IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr. 18, 1994) ................. 49

The Oxford English Dictionary (3d ed. 2010) .......................... 54

Republic of Argentina, Annual Report (Form 18-K) (Oct. 10,
  2008) ............................................................................. 55

Republic of Argentina, Annual Report (Form 18-K) (Sept. 30,
  2010) ............................................................................. 56

Republic of Argentina, Amended Annual Report (Form 18-
  K/A) (Apr. 9, 2010) .......................................................... 56

Republic of Argentina, Annual Report (Form 18-K) (Sep. 30,
  2011) ............................................................................. 56

Republic of Argentina, Annual Report (Form 18-K) (Feb. 26,
  2019) ............................................................................. 56

xi

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

Selecta Biosciences, Inc., Agr. & Plan of Merger (Form 8-K, Ex. 2.1, Ex. E) (Nov. 13, 2023), .......................................... 60

SiriusPoint Ltd., CVR Agr. (Form 8-K, Ex. 4.2) (Feb. 26, 2021) ................................................................................. 60

U.S Securities & Exchange Commission Investor Glossary ................. 57

11 Williston on Contracts § 31:7 (4th ed. 1999) ...................................... 83

11 Williston on Contracts § 32:6 (4th ed. 2024) ...................................... 37

5A Wright & Miller, *Federal Prac. & Proc.* § 1295 (4th ed. 2024 update)............................................................ 64, 65, 66

## INTRODUCTION

Argentina issued debt securities that linked payments to its gross domestic product (GDP). Argentina has tried to evade paying billions of dollars on these GDP-linked debt securities by simply refusing to publish and use a GDP statistic that is essential to the securities' contractually prescribed payment formula—and then by blocking holders from bringing suit.

The GDP securities' contract expressly guarantees that holders have an "absolute and unconditional" right to sue for "any" amounts due under those securities. Yet the district court accepted Argentina's argument—made for the first time four years into this litigation—that holders have no right to sue here, notwithstanding that guarantee. That was wrong. English trial and appellate courts assessing virtually identical and contemporaneously issued securities ruled resoundingly against Argentina, holding that the Republic had wrongfully withheld payments due on the securities and that the security holders have the right to sue for those payments.

Argentina issued the debt securities at issue in 2005 and 2010 as part of a restructuring of its sovereign debt. The debt securities, referred

1

to here as the GDP Securities, obligated Argentina to make payments when, in any of the ensuing 30 years, the country's real GDP met certain contractually specified benchmarks. The 2005 and 2010 restructurings were beneficial to Argentina's economy, so Argentina made payments on the GDP Securities for six of the first eight years covered by the contract.

But Argentina has sought to evade paying the billions of dollars that are owed for 2013. It did so by refusing to publish and use real GDP measured in constant 1993 prices—a statistic that is required, under the plain language of the contract—to calculate whether a payment is due. When the securities were issued, their benchmarks were stated in constant 1993 prices, which is how Argentina measured real (*i.e.*, inflation-controlled) GDP at the time. The contract provided a clear formula to be used in the event Argentina later "rebased" GDP, *i.e.*, changed the base year. That formula compares real GDP measured in constant prices of the new base year to real GDP measured in constant 1993 prices. The contract thus makes it impossible to calculate whether a payment is owed unless Argentina continues to publish real GDP *in constant 1993 prices*.

After years of making payments on the GDP Securities, Argentina rebased GDP but deliberately stopped publishing real GDP in constant

2

1993 prices for 2013. Argentina relied, instead, on a *different* GDP statistic and a *new* adjustment methodology that—voilà—showed much lower GDP growth. On that contrived basis, and contrary to the terms of the contract, Argentina declared that the GDP growth benchmark hadn't been met, and that it owed nothing for 2013.

The Plaintiffs, all beneficial owners of GDP Securities, brought suit to collect the payments due them for 2013. In the course of four years of litigation, Argentina filed two motions to dismiss, after which the parties conducted extensive discovery—including the production of 648,000 pages of documents, the taking of 36 depositions, and the service of 12 expert reports. Both sides then sought summary judgment.

But the district court avoided the merits and granted Argentina summary judgment based solely on a threshold defense that Argentina raised for the first time in its summary-judgment briefing: that a "no-action" clause supposedly precludes Plaintiff holders here from bringing suit. That was incorrect. A no-action clause is a relatively common type of provision that limits the ability to bring certain lawsuits relating to a security, but that does not disturb holders' right to bring suit to enforce their *core entitlement* to payment under the security. And *this*

contract's no-action clause, as is typical, contains an express carve-out preserving every holder's right to sue the debtor for nonpayment: "each Holder of Debt Securities shall have the right, which is absolute and unconditional," to institute a suit "to enforce the payment of any amounts due hereunder on any Payment Date." Moreover, Argentina forfeited and waived its no-action defense by electing to proceed in this litigation for four years, and then by raising it for the first time in its opening summary judgment brief.

The English courts, asked to consider the same issues, correctly held that the no-action clause is no bar to suit and that Argentina breached its contract with the holders. This Court has everything it needs in the record to determine that Argentina breached the contract as a matter of law. This Court should reach the same conclusions, reverse the judgment below, and remand for entry of judgment for Plaintiffs.

## STATEMENT OF JURISDICTION

The district court properly exercised jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1330 because the Republic explicitly and irrevocably waived sovereign immunity for any action with respect to the Global Securities. Plaintiffs timely appealed from the district court's final

judgment on April 29, 2024. *See* ECF No. 1, 24-1209, 24-1200, 24-1210, 24-1213, 24-1218, 24-1223. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES FOR REVIEW

1.     Whether, in light of Plaintiffs' explicit contractual right in the relevant GDP Security "to enforce the payment of any amounts due hereunder," and Argentina's tardiness in raising the issue, the district court erred when it granted summary judgment to Argentina on the ground that Plaintiffs have no such right to pursue this lawsuit seeking to enforce payment of amounts due under the contract.

2.     Whether the Republic breached the contract governing its GDP Securities when Argentina failed to publish and use a contractually required GDP statistic and pay the Payment Amount due for 2013.

## STATEMENT OF THE CASE

This appeal arises from a ruling granting summary judgment based on Plaintiffs' supposed lack of contractual standing to sue. It was not until summary judgment briefing that the Republic—for the first time after *four years* of litigation in the district court—even raised any objection to Plaintiffs' contractual standing. When it finally did raise the

5

point, Argentina devoted only two of its opening brief's 50 pages to that new argument, which had already been rejected by the court in England. The merits, by contrast, were debated at length by both sides. And both sides agreed that the case could be resolved as a matter of law and without a trial, even while disagreeing about what that resolution should be. Both sides requested oral argument, which the district court declined.

The district court entered judgment in favor of Argentina based on its contractual-standing objection and did not reach the merits. This appeal seeks reversal of the grant of summary judgment based on the text of the parties' contract. Moreover, the existing record provides all the information this Court needs to resolve the merits as a matter of law and order entry of summary judgment for Plaintiffs.

## A. Argentina exchanged defaulted sovereign debt for new bonds and GDP-linked securities

As this Court has observed, the Republic of Argentina has a long history of not meeting its debt obligations. *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007). In 2001, Argentina defaulted on more than $80 billion of debt, in what was then the largest sovereign default in history. JA1841/SJA682. The economic depression

that followed paralyzed economic activity. JA1842/SJA683. The Republic desperately needed debt relief to resume its economic growth.

Between 2003 and 2005, the Republic held many meetings with creditors and institutional stakeholders, such as the IMF and the World Bank, to develop a path forward on debt restructuring. JA1853/SJA694. One challenge was that many of Argentina's creditors believed that the Republic was understating its capacity for economic growth, and therefore its ability to pay its debts.

A creative solution emerged: In exchange for debt relief, Argentina would issue securities to bondholders that would allow them to share in the economic growth that the parties hoped a restructuring would unleash. JA1855/SJA696. And so, in 2005 and 2010, holders of more than 91% of the outstanding amount of the Republic's defaulted bonds exchanged them for new bonds—but at a steep "haircut" on the amount of debt holders were owed and the interest coupon to which they were entitled. JA2076(¶62)/SJA917(¶62). As a sweetener, holders who agreed to the haircut also received other debt securities—GDP Securities—that promised future payments if the performance of Argentina's GDP exceeded certain agreed-upon benchmarks. JA2054–55(¶23),_2076

7

(¶62)/SJA895–96(¶23),_917(¶62). Exchanging holders thus provided Argentina many billions of dollars of debt relief in return for some participation in the resulting rejuvenation of its economy.[1]

### B. Argentina owes payments on its GDP Securities when specified conditions are met, and every holder has the right to enforce those payments

1. The GDP Securities at issue in this litigation are governed by either of two substantially similar Global Securities. One corresponded to the 2005 debt exchange (JA1309–49 (2005)), the other to the 2010 exchange (JA1350–74 (2010)). We refer to them together to as the "Global Security," with citation to the 2005 version.[2]

Argentina's GDP Securities and new, conventional bonds are all covered by a Trust Indenture dated June 2, 2005 (as amended in April 2010, the "Indenture"). JA1517–1643 (2005 Trust Indenture); JA1490–

---

[1] Initially, the GDP Securities were attached to the new bonds issued to exchanging holders. But, 180 days after the exchange, the GDP Securities detached from the bonds and could be traded separately in the secondary market. JA1864/SJA705.

[2] Like the district court, this brief refers to the key contractual language in Section 11 of the Global Security, which is a reference to Section 11 of the **2005** Global Security (JA1327). The same provision also appears in the **2010** Global Security, but there as Section 9 (JA1364). No aspect of this case turns on any differences between the 2005 and 2010 instruments.

8

97 (2010 First Supp. Indenture). The Indenture defines both the GDP Securities and the new, conventional bonds as "Debt Securities" subject to its terms. The Global Security states, however, that its terms "shall control" the GDP Securities in the event of any "conflict" between those terms and the Indenture. Glob. Sec. § 1(a).

Under the Global Security, it is the performance of the Argentine economy, measured against contractual GDP benchmarks, that dictates whether and in what amount a payment is due on the GDP Securities for a given calendar year (each called a "Reference Year"). For each year through 2035, Argentina must pay a "Payment Amount," calculated as directed by the Global Security, if three payment conditions are satisfied. Glob. Sec. § 2(b). Payment for a Reference Year is due on December 15 of the next year (the "Payment Date"). Glob. Sec. § 1(e).

2. If the Republic fails to pay some or all of a Payment Amount on a Payment Date, then the Global Security expressly authorizes individual beneficial owners—including Plaintiffs—to sue the Republic to enforce payment. Section 11 of the Global Security guarantees "the right

9

of any Holder of a Security *to enforce the payment of any amounts due hereunder* on any Payment Date" (emphasis added).[3]

Section 11 of the Global Security also includes a customary provision, called a no-action clause, that limits other kinds of legal actions that might be instituted by holders. For *some* kinds of legal actions—those that are *not* brought to enforce the amounts of payments due—the GDP Securities' no-action clause requires pre-suit satisfaction of five conditions, including that a majority of holders or beneficial owners do not oppose the action.

No-action clauses are fairly common in securities contracts; their purpose is to "make[] it more difficult for individual bondholders to bring

---

[3] Plaintiffs are "beneficial owners" of GDP Securities represented by the Global Security. Each Global Security is formally held by a nominal record holder (each a "Holder"), but the economic interests belong to the many beneficial owners based on their market purchases and sales. Section 11 makes clear that beneficial owners—including Plaintiffs— enjoy the same enforcement right that a holder has. *See* Glob. Sec. § 11 ("The Republic expressly acknowledges, with respect to the right of any Holder to pursue a remedy under the Indenture, the GDP-Linked Securities Authorization or the Securities, the right of any beneficial owner of Securities to pursue such remedy with respect to the portion of this Global Security that represents such beneficial owner's interest in this Security as if Certificated Securities had been issued to such beneficial owner."). For convenience, this brief refers to the enforcement rights of any "holder" without prejudice to the corresponding rights of every beneficial owner.

suits that are unpopular with their fellow bondholders" by imposing conditions on holders' ability to bring lawsuits that could impair the other holders' recovery. *See Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 565–66 (2014) (cleaned up). The purpose of a no-action clause is *not*, however, to disturb the right of every individual holder to sue on its own right to payment—the core entitlement guaranteed to holders by a security. *Id.* at 565–67. A claim to enforce one holder's right to payment under a security does not require anyone else's consent because it seeks merely what is already owed to that holder. And that is just how the Global Security's no-action clause functions: it expressly carves out actions that a holder might commence to recover "any amounts due."

The Global Security's no-action clause mirrors the one in Section 4.8 of the Indenture, which applies to all of the debt securities that Argentina issued in its 2005 and 2010 debt exchanges, including (but not limited to) the GDP Securities. The right to sue found in Section 4.9 of the Indenture, which is extended by Section 11 of the Global Security, is titled "Unconditional Right of Holders to Receive Principal and Interest." Section 4.9 reads in its entirety as follows:

11

> Notwithstanding Section 4.8, each Holder of Debt Securities **shall have the right, which is absolute and unconditional,** to receive payment of the principal of and interest on its Debt Security on the stated maturity date for such payment expressed in such Debt Security (as such Debt Security may be amended or modified pursuant to Article Seven) and **to institute suit for the enforcement of any such payment**, and such right shall not be impaired without the consent of such Holder.

Indenture § 4.9 (emphasis added).

Section 11 of the Global Security tailors this "absolute and unconditional" right to the characteristics and terminology of the GDP Securities, as distinguished from the conventional bonds also issued under the Indenture. It creates an express exception to the no-action clause that carves out any actions against the Republic to enforce payment of the Payment Amount: the no-action clause applies "*[e]xcept* as provided in Section 4.9 of the Indenture with respect to the right of any holder of a Security *to enforce the payment of any amounts due hereunder* [*i.e.*, due under the Global Security] on any Payment Date." Glob. Sec. § 11 (emphasis added). In other words, every holder of GDP Securities can enforce *its own* payment, due under the Global Security's terms, without first meeting the no-action-clause conditions.

12

3. This case involves Argentina's GDP Securities denominated in U.S. dollars and subject to the laws of the State of New York. *See* Indenture § 12.7. Under the same Indenture and a substantially similar global security, Argentina also issued GDP Securities denominated in euros and subject to the laws of England and Wales. *See id.* As discussed below, *see infra* pp. 21–25, the English Court of Appeal recently affirmed a €1.3 billion judgment (plus prejudgment interest) for holders of Argentina's euro-denominated GDP Securities on the same breach-of-contract claim that Plaintiffs assert here.

### C. Argentina refused to make a 2013 payment on its GDP Securities after discontinuing publication of a contractually required GDP statistic

Argentina made payments to holders of its GDP Securities for six of the first eight Reference Years: 2005–2011, excepting 2009 and 2012. On the dollar-denominated GDP Securities at issue here, those payments totaled approximately $2.9 billion. JA2101(¶96)/SJA942(¶96).

For each of those first eight Reference Years, Argentina continued to report its Actual Real GDP (*i.e.*, controlled for inflation) measured in constant 1993 prices. In 2013, the Republic likewise published real GDP figures measured in constant 1993 prices for the year's first three

13

quarters. Those quarterly real GDP figures (in constant 1993 prices) yielded annualized real GDP growth of 3.05%, 8.26%, and 5.53%, respectively. JA2108(¶104),_2110(¶109)/SJA949(¶104),_951(¶109). And, for October, November, and December 2013, the Republic's monthly index of estimated economic activity (its "EMAE Index," also measured in constant 1993 prices) correspond to annualized GDP growth of 3.18%, 2.22%, and 2.72%, respectively. JA2111–12(¶¶111–13)/SJA952–53(¶¶111–13). The EMAE Index, which is published provisionally before being later revised to match actual GDP figures, serves as an early and accurate indicator of later-published GDP figures. JA2089–90(¶80)/SJA930–31(¶80). Indeed, the EMAE Index's provisional figures had never deviated from Actual Real GDP by more than 0.1% in the four years preceding 2013. JA2083–84(¶¶73–74),_2089–90(¶¶79–80)/SJA 924–25(¶¶73–74),_930–931(¶¶79–80). Accordingly, for Reference Year 2013, Actual Real GDP Growth in constant 1993 prices was 4.9%, well above the Base Case GDP Growth. JA2058(¶30),_2091(¶84)/SJA899 (¶30),_932(¶84).

In 2013, therefore, the country's GDP was large enough, and growing quickly enough, to require a substantial payment on the GDP

Securities. All three payment conditions had been easily satisfied. In fact, shortly after the year's end, Argentina's Ministry of the Economy forecasted an expected 2013 payment on all of its GDP Securities, in all denominations, equivalent to $2.8 billion. JA2116(¶120)/SJA957(¶120).

On March 27, 2014, however, the Republic announced that it was changing how it measured GDP. JA2124–25(¶134)/SJA965–66(¶134). The Republic declared it was "rebasing" and would begin publishing Actual Real GDP measured in constant 2004 prices instead of constant 1993 prices. *Id.* As discussed below, the contracting parties had anticipated that GDP would be episodically rebased. And they agreed on a mechanism for adjusting the Global Security's benchmarks—which are stated in constant 1993 prices—to reflect any rebasing. That key mechanism (which the parties have called the "Adjustment Fraction") required, as one of its inputs, the continued publication of Actual Real GDP measured in constant 1993 prices. Glob. Sec. at R-3.

But when Argentina declared, three months after 2013 had ended, that it would begin reporting real GDP in constant 2004 prices, it also declared that it would no longer publish GDP in constant 1993 prices for

15

the fourth quarter of 2013 or for the full year 2013. JA2124–25(¶134)/SJA965–66(¶134).

The Republic's National Institute for Statistics and Censuses ("INDEC") instead published real GDP for the fourth quarter of 2013, and for the entire year, measured *only* in constant 2004 prices. Having made that change, the Republic then claimed that 2013 Actual Real GDP Growth, measured using the new GDP in 2004 constant prices, was only 3.0% (later revised to 2.925%). JA2099(¶93),_2127(¶137)/SJA940 (¶93),_968(¶137); JA1954/SJA795. Argentina then parlayed that different statistic for real GDP growth—using incorrect interpretations of the Global Security that the district court later soundly rejected—into a baseless claim that no payment was owed for Reference Year 2013.

But Actual Real GDP Growth was much higher for 2013 when measured using the original 1993 index instead of the rebased one, and the Global Security controls for the impact of rebasing through the adjustment mechanism. Applying that mechanism as written shows that all payment conditions were still met, and that a large payment was due on account of the GDP level and growth in 2013. But the Republic refused

16

to apply the adjustment mechanism as written, and declared that no payment was due for 2013.

### D. Overview of this action

1. Plaintiff Aurelius Capital Master, Ltd., filed the first complaint in this action in 2019 (the "Original Complaint"). Though the GDP Securities' terms are intricate, the one-count claim for breach of contract was straightforward: The three payment conditions were satisfied in 2013, so a Payment Amount was due. Yet Argentina refused to pay.

The Original Complaint supported its calculation using the published Actual Real GDP figures for the first three quarters and the EMAE Index for the fourth quarter of 2013, all of which were measured in constant 1993 prices. JA36–37. The Original Complaint did not use the fourth quarter's EMAE Index to replace Actual Real GDP, but instead as evidence from which the court would be able to determine what was the actual GDP figure that Argentina had failed to publish.

Argentina moved to dismiss the Original Complaint for failure to state a claim in April 2019. Notably though, that motion did *not* argue that the Global Security's no-action clause barred the lawsuit. *See* JA145–53.

17

The district court granted the Republic's dismissal motion without prejudice. JA154–75. Even though the district court agreed with Plaintiff that the Adjustment Fraction applies as written—and rejected Argentina's "atextual" interpretation and application of the fraction—the court reasoned that holders had not "bargained for . . . flexibility" in a circumstance where the Republic simply "fails to publish Actual Real GDP data" necessary to make the calculations that the contract *requires* the Republic to make. JA171_n.6,_172. In other words, rather than conclude that Argentina's failure to publish and use the required data was a breach of contract, the district court instead held that the Republic's failure *precluded* Plaintiff's claims. JA155,_164,_172.

2. Aurelius Capital Master, Ltd., as well as other beneficial owners of GDP Securities who had filed related cases, filed amended complaints restating the breach-of-contract claim (the "Amended Complaints"). The Amended Complaints explained that Argentina's failure to publish and use 2013 Actual Real GDP measured in constant 1993 prices to make the Global Security's required, post-rebasing adjustments, and its unilateral modification of those adjustments without holder consent, breached the contract. The Amended Complaints also alleged, in the alternative, that

18

Argentina had breached the contract's implied covenant of good faith and fair dealing by refusing to publish real GDP in 1993 prices in order to frustrate holders' rights to a 2013 payment. And the Amended Complaints alleged Plaintiffs' damages resulting from these breaches. Specifically, the Amended Complaints again used contemporaneous evidence—the Republic's own quarterly real GDP figures and EMAE Index measured in constant 1993 prices—to show what payments would have been owed but for the breaches.

Argentina again moved to dismiss in June 2020. It argued that the Amended Complaints still failed to state a claim. But once again it did *not* seek dismissal on the ground that the no-action clause barred Plaintiffs' lawsuits. *See* JA231–48.

This time the district court denied the Republic's motion. The court agreed with Plaintiffs that the Global Security requires post-rebasing adjustments and calculations to be made using Actual Real GDP measured in constant 1993 prices. JA301,_306–07. Even so, the court held that Argentina had no contractual duty to publish the statistic that the Global Security required it to use. JA308. But to make the required adjustments and calculations any other way, the court held, the Republic

19

would have needed to obtain 75% holder consent under the modifications provision in Section 22(f) of the Global Security. JA306–07. The Republic's undisputed failure to obtain the required consent stated a claim for breach of contract. *Id.* The district court also held that Plaintiffs had "clearly" stated their alternative, good-faith-and-fair-dealing claim against the Republic. JA312.

Nevertheless, the district court held that Argentina had no duty to publish the required statistic for the required calculation.

3. Following extensive discovery, both sides moved for summary judgment. It was at that point that the Republic raised a brand-new threshold objection asserting, for the first time, that Plaintiffs' *four-year-old* lawsuit had actually been barred all along by the no-action clause in Section 11 of the Global Security. JA1241–42/SJA459–60.

The district court agreed and declined to reach the merits. The court reasoned that, although the no-action clause in Section 11 of the Global Security explicitly confirms "the right of Holders to enforce the payment of any amounts due hereunder on any Payment Date," that confirmation is "cabin[ed]" by the earlier reference to Section 4.9 of the Indenture, which addresses holders' rights to receive and sue to collect

20

payments of the "principal" of or "interest" on the securities issued under the Indenture. JA2528,_2531. In other words, the district court held that the Global Security authorizes holders to sue *only* for "principal" or "interest" outside of the strictures of its no-action clause.

But, said the district court, payments under the Global Security, linked to Argentina's GDP, are not "principal" or "interest," JA2531–33. The sum of those rulings was to render meaningless the clear and unambiguously guaranteed right to sue for "the payment of any amounts due" under the Global Security. The district court acknowledged, but declined to follow, the English trial court's contrary decision rejecting the same no-action objection. JA2535. We turn next to that decision, and its unanimous affirmance on appeal after the district court here had ruled.

### E.   Overview of the parallel English action

Litigation in England over Argentina's refusal to pay the 2013 Payment Amount on its euro-denominated GDP Securities has been ongoing since 2019. JA1429(¶10). Argentina's euro-denominated and U.S.-dollar-denominated GDP Securities all are issued under the same Indenture and governed by Global Securities that are identical in all pertinent respects.

21

1. Holders of Argentina's euro-denominated GDP Securities sued the Republic for nonpayment in violation of the Global Security. On April 5, 2023, an English trial court issued a lengthy ruling in holders' favor and entered judgment for €1.33 billion plus pre-judgment interest. JA1488(¶306).

First, the trial court held that "[i]t is obvious" that the Global Security authorizes individual holders to enforce their rights to payment on the GDP Securities. JA1483–88(¶¶277–305). It rejected the argument that such suits are prohibited by Section 4.9 of the Indenture unless payments qualify as either "principal" or "interest." The court emphasized that Section 11 of the Global Security "refers not to principal and interest but to '*the payment of any amounts due hereunder on the Payment Date.*'" JA1487(¶299). That text *must* authorize a suit for Argentina's failure to make a Payment Amount due under the Global Security on a Payment Date, because otherwise "it would mean that section 4.9 [of the Indenture] could never apply to the [GDP Securities]." *Id.* The court reasoned that the fact that Section 11 itself starts with the words "'Except as provided in Section 4.9 of the Indenture" is strong

22

evidence that Section 11 does *not* read Section 4.9's right to sue out of the Global Security where GDP Securities are concerned.

The English court found it instructive that the corresponding—and otherwise identical—text in the Form of Global Notes for bonds concurrently issued under the Indenture *does* use the words "principal and interest," whereas the Form of Global Security for the GDP Securities refers to "the payment of any amounts due hereunder." JA1487(¶301). And the "correctness of this conclusion" is further "confirmed," the court explained, by other provisions of the Indenture that "refer to principal and interest rather than Payment Amount," but that "must obviously be treated as applying to the latter rather than the former" when they are applied in the context of the Global Security. JA1487(¶303).

No party appealed that part of the trial court's decision.

2. The English trial court also held that holders were entitled to a 2013 Payment Amount. JA1429–82(¶¶7–276). It concluded that the Adjustment Fraction works exactly as holders in that case (and Plaintiffs in this case) contend. And it used Argentina's quarterly GDP figures and

23

EMAE Index for 2013 measured in 1993 prices to calculate the amount of the large resulting 2013 payment that was due.

Argentina *did* appeal that part of the decision.

3. After two full days of oral argument, England's Court of Appeal unanimously affirmed on June 12, 2024. In its lengthy decision, the appellate court emphasized the contract's plain language. *See Palladian Partners L.P. v. Republic of Argentina*, [2024] EWCA Civ. 641 ¶¶59–63 ("U.K.App.Op."). The court found it "obvious" that the Global Security contains "an implied term . . . that the Republic is required to publish such data as is necessary for the Securities to be operable in accordance with their express terms," specifically including Actual Real GDP measured in constant 1993 prices which is "of central importance to the Securities." U.K.App.Op._¶¶64,_77. It is "fallacy," the court emphasized, for the Republic to argue that it has no contractual obligation to publish the economic statistic that it agreed to use under a key provision of the Global Security. U.K.App.Op._¶78.

The appellate court also agreed with holders' position about how those adjustments are supposed to work under the Global Security. The plain text, the court held, "is simply irreconcilable with the Republic's

24

construction," U.K.App.Op._¶81, which rests on "a false premise," U.K.App.Op._¶84.[4]

## SUMMARY OF ARGUMENT

Plaintiffs have contractual authority to bring this action, and have demonstrated the Republic's breach of contract. This Court should remand for entry of judgment for Plaintiffs. At a minimum, the Court should correct the district court's mistaken construction of the contracts in its motion-to-dismiss rulings, and remand for trial or other further proceedings on that basis.

I. The Global Security explicitly authorizes Plaintiffs "to enforce the payment of any amounts due hereunder." That is precisely what this action seeks to do, and the district court erred by nevertheless holding that Plaintiffs *cannot* enforce a payment due under the Global Security without satisfying its no-action clause.

A. Section 11 of the Global Security provides that holders may sue "to enforce the payment of any amounts due hereunder on any Payment Date."

---

[4] As of the filing of this brief, Argentina is seeking discretionary review by the United Kingdom's Supreme Court.

25

The district court erred in two ways. *First*, it implausibly held that a "Payment Amount" due under the Global Security is not an "amount due hereunder." *Second*, it misread the reference to Section 4.9 of the Indenture, in Section 11 of the Global Security, as *limiting* the kinds of payments that are "amount[s] due hereunder," rather than as *applying* the right to sue in Section 4.9 "with respect to" payments due under the Global Security. The correct application of that text is reinforced by the use of similar language in various other provisions in the Global Security. By contrast, the district court's reasoning would make the first 45 words of Section 11 a nullity.

B. Even if, somehow, Section 11's broad right "to enforce the payment of any amounts due" were limited to payments of "principal and interest," Plaintiffs *still* could sue because Payment Amounts under the Global Security qualify as principal or interest.

The Indenture explicitly identifies the GDP Securities as "Debt Securities" and repeatedly affirms the Republic's obligation to pay principal and interest on *all* Debt Securities. In Section 3.1, "the Republic covenants and agrees that it will duly and punctually pay or cause to be paid the principal of and interest . . . on each of the Debt Securities,"

26

*including* the GDP Securities. Section 4.9's unconditional right to enforce principal and interest applies to "each Holder of Debt Securities," further underscoring this point.

The district court's holding rests entirely on its reading of the legend on the face of the Global Security, preceding the operative provisions. That legend merely underscores that payments of principal and interest under the Global Security are contingent and are based on the payment formula, not the notional amount of the securities. Regardless, any proper definitions of the terms "principal" and "interest" encompass the Payment Amounts due under the Global Security. Indeed, the Republic itself has repeatedly described the Payment Amounts as "interest."

C. Last, the Republic forfeited and waived its objection. Through four years of litigation and multiple motions to dismiss, the Republic never asserted its supposed right not to be sued by individual holders seeking to enforce Argentina's payment obligations. Lack of contractual standing to sue is a threshold defense and must be raised in a motion to dismiss or an answer. And the Republic waived its contractual right through litigation conduct.

27

II. Had the district court reached the merits, it should have awarded judgment in Plaintiffs' favor. This Court can and should reach the merits and remand for entry of judgment.

The Republic breached the Global Security by failing to publish the Actual Real GDP statistic in constant 1993 prices and use it to make the contractually required calculations to determine whether a payment was due. As a result, the Republic failed to make a payment that was clearly owed according to all available 2013 data.

A. The Republic promised to pay the Payment Amount in accordance with the instrument's terms. Those terms expressly govern what the Republic must do if it rebases its GDP: adjust the Base Case GDP number for the Reference Year by an Adjustment Fraction that requires GDP in constant 1993 prices as an input. The Global Security obligates Argentina to follow those clear terms and make payments accordingly.

B. The Republic failed to apply the Adjustment Provision as written for Reference Year 2013. It did not publish the required 1993 GDP statistic and asserted that no payment was owed for 2013. The Republic's principal excuse is to claim that INDEC was under no contractual

28

obligation to publish the constant 1993 price data. But Argentina agreed, under multiple express provisions, to make specific calculations using the Adjustment Fraction if GDP was rebased, and thus agreed to continue to make those data available to apply the agreed-upon Adjustment Fraction.

Under the prevention doctrine, moreover, Argentina cannot claim that one of the payment conditions was not satisfied when it *caused* that condition's non-occurrence. Argentina's attempts to avoid these problems by modifying the Global Security's adjustment provisions, so that they do not require the data that it refuses to publish, are baseless. Those modifications, having been imposed without holder consent, are also breaches of contract in their own right.

## ARGUMENT

## I. The Global Security authorizes Plaintiffs' action to enforce Argentina's payment of the 2013 Payment Amount

Plaintiffs brought this suit to enforce their contractual right to the 2013 Payment Amount under the Global Security. Section 11 of the Global Security explicitly guarantees the right to bring that action: it assures "the right of any Holder of a Security to enforce the payment of any amounts due hereunder on any Payment Date."

29

Four years into this case—after multiple motions to dismiss and full discovery—the Republic objected for the first time *at summary judgment* to Plaintiffs' contractual standing to enforce the Republic's payment of amounts due to them under the Global Security. *See* JA1241–42/SJA459–60. Even then, the Republic's opening brief devoted *only two* of its 50 pages to lodging this new objection—which the English court had by then easily rejected. *Id.* The district court should not have entertained that way-too-late objection at all. *See infra* pp. 60–68. And there is a good reason why the Republic waited so long to make this argument and devoted so little space to it: It is dead wrong.

The opening paragraph of Section 11 consists of one long sentence that provides as follows:

> Enforcement. Except as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder on any Payment Date (as this Security may be amended or modified pursuant to Paragraph 22), no Holder of a Security shall have any right by virtue of or by availing itself of any provision of the Indenture, the GDP-Linked Securities Authorization or the Securities to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Indenture, the GDP-Linked Securities Authorization or the Securities, or for any other remedy hereunder or under the GDP-Linked Securities Authorization or the Indenture, unless [five conditions, not at issue on this appeal, are met].

30

The Republic convinced the district court that Section 11's absolute and unconditional right to "enforce the payment of any amounts due hereunder" is actually utterly meaningless. Because Section 4.9 of the Indenture provides a right to pursue payment of "principal and interest," the Republic claims that Section 11's reference to Section 4.9 limits the phrase "any amounts due," in Section 11, to mean only "any amounts due *that are principal and interest*."

In the Republic's view, however, *no* payments due under the Global Security qualify as principal and interest. So, in Argentina's telling, Section 11 is a dead letter: holders do not have any right to enforce any payment obligation *at all* even though Section 11 expressly preserves the "right of any Holder of a Security to enforce the payment of *any amounts due hereunder*" (emphasis added).

The district court's summary-judgment ruling adopting that construction was legal error. JA2530–36. The court reached its decision on thin briefing by the Republic, without oral argument, and despite an English court's rejection of the same argument, under the same documents, in a decision since appealed only on other grounds and

affirmed. *See* JA2535. The decision below should be reversed for any one of three reasons:

*First*, as the English court held, Section 11 means what it says. It starts with an "[e]xcept[ion]" to its no-action instruction that explicitly gives holders of GDP Securities "the right . . . to enforce the payment of *any amounts* due" (emphasis added) under the Global Security on a Payment Date. "Any" means "any." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219–20 (2008). The drafters of Section 11 undoubtedly had in mind Payment Amounts, which are *the payments* that are due under the Global Security on Payment Dates. It is nonsensical to read Section 11 as *prohibiting* individual holders from enforcing their right to *the* payment that is their core entitlement under the Global Security, when Section 11 expressly incorporates the right—conferred by Section 4.9 of the Indenture—to sue to enforce the payment of any amounts due under that Security. Section 11 refers to Section 4.9 of the Indenture not to *limit* that enforcement right, but rather to recognize explicitly that the right to sue provided in Section 4.9 *includes* holders' enforcement of Payment Amounts due under the Global Security.

32

*Second*, even if the Republic could somehow overcome the powerful textual indications that the drafters chose the operative language in Section 11's no-action "[e]xcept[ion]" precisely to *avoid* the need to ask whether Payments Amounts are "principal" or "interest," it would still be the case that Payment Amounts qualify as payments of principal or interest in these instruments. The Indenture defines the GDP Securities as a "Debt Security," and then repeatedly affirms the Republic's obligation to pay "principal" and "interest" on *all* Debt Securities, without excluding the GDP Securities. Moreover, the Payment Amounts are due annually, on fixed dates, when the payment conditions have been satisfied, and so fit comfortably within the definitions of "principal" and "interest" used by the district court. Indeed, the Republic itself has repeatedly called payments on the GDP Securities "interest," "interest expenses," and "interest due on GDP-Linked Securities."

*Finally*, the Republic's woefully late objection to Plaintiffs' contractual standing had long since been forfeited and waived by the time the Republic first raised it at summary judgment.

## A. Section 11 of the Global Security gives Plaintiffs the right to sue Argentina to enforce Plaintiffs' right to payments

The district court held that Section 11 of the Global Security does not give holders the right to enforce Argentina's obligation to pay the Payment Amounts for two reasons: first, because Section 11 does not use the defined term "Payment Amounts"; and, second, because the court believed that Section 11's right to sue is "cabin[ed]" by Section 4.9 of the Indenture to cover only principal and interest payments. Both rationales are wrong.

### 1. Section 11 applies to Payment Amounts

The district court held that the phrase "any amounts due hereunder on any Payment Date" could not be read to include Payment Amounts due under the Global Security on a Payment Date. JA2532. In the district court's view, "had the drafters intended the meaning Plaintiffs assert, they presumably would have used the defined term of 'Payment Amount'" in this part of Section 11. *Id.*

That's wrong for a few reasons. The first is the plain text. It cannot be seriously disputed that Payment Amounts are "amounts due hereunder on any Payment Date," especially considering the capacious "any" modifier the drafters appended to that already-broad phrase. To belabor

34

that straightforward point, (i) a Payment Amount is defined as "an *amount* equal to" the result of a certain formula (Glob. Sec. at R-8); (ii) it is "due hereunder" because the Global Security's first paragraph requires its payment (*id.* at R-1); and (iii) it is due "on any Payment Date" because it is made "payable on" the date defined as such (*id.* R-1, R-8).

It thus makes no difference whether the drafters could have said the same thing using different, fewer, or even defined terms. It does not matter that "one can imagine more precisely-worded contracts" between the parties; that is "not a sound basis for refusing to effectuate the plain meaning of the contract as actually written." *OfficeMax Inc. v. W.B. Mason Co.*, 2011 WL 2173789, at *4 (D. Vt. June 2, 2011).[5]

In fact, using the term "any amounts due hereunder" instead of the defined term "Payment Amounts" in this sentence was useful to make clear that a holder's enforcement rights encompass *all* payments due

---

[5] *Cf. United States v. George*, 946 F.3d 643, 646–47 (4th Cir. 2020) ("[T]he fact that Congress could have drafted the statute differently does not negate the plain meaning of the statute as enacted." (internal citation marks omitted) (quoting *United States v. LaFaive*, 618 F.3d 613, 618 (7th Cir. 2010)); *United States v. Jordan,* 810 F.2d 262, 268 (D.C. Cir. 1987) ("That Congress could have expressed its meaning in clearer or simpler language . . . does not deprive of meaning the language that Congress chose.").

from the Republic on a Payment Date. If Argentina made only a partial payment of a Payment Amount due, for example, the contractual language unambiguously confirms the holder's right to bring an action for the shortfall, even if Argentina objected that the action was not for a full "Payment Amount."

What is more, Section 11 isn't the only place where the words "any amounts due hereunder," or others like them, show up in the Global Security. Section 14, for example, covers prescription, and it applies to "[a]ll claims against the Republic for *any amounts due hereunder* (including Additional Amounts)" (emphasis added). No one—and especially not the Republic—would say that the "any amounts due hereunder" in Section 14 do not include Payment Amounts.[6]

Because the phrase "any amounts due hereunder" is used more than once in the Global Security, it was error for the district court to give it a meaning in Section 11 that clearly *cannot* be its meaning elsewhere in the same document. *See Chesapeake Energy Corp. v. The Bank of New*

---

[6] *See* JA2867–69, *Ape Grp. SpA v. Republic of Argentina*, 1:20-cv-10409-LAP (May 19, 2021) (arguing that certain parties' claims against the Republic for payment of the 2013 Payment Amount were prescribed by Section 14).

36

*York Mellon Trust Co.*, 773 F.3d 110, 116 (2d Cir. 2014); *Maryland Cas. Co. v. W.R. Grace and Co.*, 128 F.3d 794, 799 (2d Cir. 1997) ("Terms in a document . . . normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended."); 11 Williston on Contracts § 32:6 (4th ed. 2024) ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.").

There are many other examples of the Global Security similarly referring to payments generally instead of using the defined term "Payment Amount" (all emphasis added):  Section 1(e) defines a "Final Payment" as "***any payment due hereunder*** on the Expiration Date." That provision necessarily includes any Payment Amount that is due when the GDP Securities expire. Section 2(c) says that "***[a]ny payment required to be made*** on a Payment Date that is not a Business Day" may be made on "the next succeeding Business Day." That, too, applies squarely to the payment of a Payment Amount. Section 2(b) likewise describes when holders are "entitled to receive ***any payment pursuant to this Security***." And on and on throughout the Global Security.

37

The district court's erroneous reading of Section 11's phrase "any amounts due hereunder" simply cannot be squared with the clear meaning of those same words and closely related phrases throughout the Global Security.

### 2. Section 4.9 of the Indenture does not cabin Section 11's right to enforce payments due under the Global Security

The district court further erred by holding that the enforcement right granted by Section 11 of the Global Security is "cabin[ed]" to only payments of principal and interest by the text's reference to Section 4.9 of the Indenture. JA2531. It doesn't matter whether Payment Amounts qualify as principal and interest (although they do, *see infra* pp. 48–60). Section 11 could hardly be clearer that each holder's unconditional right to enforce payment, under Section 4.9 of the Indenture, applies "with respect to" *any* payments that are due under the Global Security on a Payment Date—not just principal and interest.

(a.) For starters, this too is clear from the text. Section 11 states that its no-action provision applies to holder claims "[e]xcept *as provided* in Section 4.9 of the Indenture *with respect to* the right of any Holder of a Security to enforce the payment of any amounts due hereunder on any

Payment Date" (emphasis added). That phrasing takes as given that Section 4.9's payment exception to the Indenture's no-action clause applies "with respect to" holders' right to enforce payments due under the Global Security. *See, e.g., ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 30–33 (2d Cir. 2002) (Sotomayor, J.) (interpreting phrase "with respect to" in arbitration provision).

That is not language of *limitation*—it is language of *application*. The payment-enforcement exception to Section 11's no-action clause is not "*to the extent* provided in Section 4.9," which would constitute words of limitation, but instead "*as* provided in Section 4.9 . . . *with respect to* the right" to enforce payment. In other words, the procedural guarantee preserved in Section 4.9—holders' "absolute and unconditional" right "to institute suit for the enforcement" of principal and interest—is extended through Section 11 with respect to suits to enforce holders' right to "any payments due [under]" the Global Security. *Cf. Jennings v. Rodriguez*, 583 U.S. 281, 319–21 (2018) (Thomas, J., concurring in part and concurring in the judgment) (explaining that language in prefatory clause that a statute applies "with respect to review of an order of removal" did not limit the plain meaning of the subsections or narrow

39

their scope because "the phrase 'with respect to' means 'referring to,' 'concerning,' or 'relating to'"(cleaned up)).

The English trial court agreed. It explained that Section 4.9 must be "interpreted in a way which is consistent with [Section] 11, and so on the basis that it refers to a right to claim the Payment Amount." JA1487(¶302).

(b.) The full context of the Agreements—unacknowledged by the district court's opinion—makes this point even clearer. The Global Note—which governs the conventional bonds that Argentina issued under the Indenture—has an enforcement provision corresponding to Section 11 of the Global Security. Both the Form of the Global Security and the Form of the Global Note are exhibits to, and part of, the Indenture (Exhibits C and G, respectively) and are the specific governing documents for those securities, expressly prevailing in the event of a conflict with the Indenture.

The relevant language in the Global Note and the Global Security is importantly different:

| Global Note (Bonds), Section 9 |
| --- |
| "Except as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security **to enforce the payment of the principal of and interest on its Security on the stated maturity date** . . ." |

| Global Security (GDP Securities), Section 11 |
| --- |
| "Except as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security **to enforce the payment of any amounts due hereunder on any Payment Date** . . ." |

The drafters' use of different language in the Global Note and the Global Security must have *some* significance. "Under New York law, . . . the use of different terms in the same agreement implies that they are to be afforded different meanings." *Contant v. AMA Capital, LLC*, 66 F.4th 59, 67 (2d Cir. 2023) (cleaned up) (quoting *Jin Ming Chen v. Ins. Co. of the State of Pa.*, 36 N.Y.3d 133, 140 (2020)).

It is obvious what that significance is. The parallel construction indicates that the parties intended to afford the same enforcement rights

41

with respect to "principal and interest" under the Global Note and "any amounts due" under the Global Security. In other words, regardless of whether the payments are characterized as principal, interest, or otherwise, the Global Security affirms the right of the individual holder, which is absolute and unconditional, to bring suit for Payment Amounts due—such as amounts due and owed to Plaintiffs.

The upshot is that the enforcement right carved out from the no-action clause by Section 4.9 applies with respect to the payments that are due under both instruments *as they are described in those instruments*. Holders can sue individually to enforce payments of "principal" and "interest" due on a "maturity date" under the Global Notes, and to enforce "any amounts due" on a "Payment Date" under the Global Security. Unlike the district court, the English trial court took heed of that distinction and held that, because "any amounts due" in Section 11 of the Global Security is purposefully different "from the specimen wording contained in Exhibit C to the Indenture" for use in the Global Notes for

42

conventional bonds, it is plainly "tailored to meet a claim under the [GDP Securities] for the Payment Amount." JA1487(¶301).[7]

(c.) There is yet another fatal problem with the district court's construction of Section 11: It renders the carve-out in Section 11 wholly ineffective surplusage. According to the district court, because holders have the right to sue only for principal and interest, and because the payments at issue here are not principal or interest, the exception to Section 11's no-action clause is a meaningless nullity. The district court's construction effectively reads the first 45 words out of Section 11 and treats the no-action clause as though it had no exception at all.

That is not a supportable reading of the provision under New York law. The district court's erasure of the first 45 words of Section 11 violates the "cardinal rule of contractual interpretation that a court shall not

---

[7] Relevant English contract law on this point is indistinguishable from New York contract law. *See, e.g.*, *African Minerals Limited v Renaissance Capital Ltd.* [2015] EWCA Civ 448 ¶ 41 (when parties use "different words" in related agreements, "it is to be presumed that they intended a different meaning"). Argentina has never asserted otherwise, and so the Court can assume that principles of English contract law and New York contract law are similar. *See, e.g.*, *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (Alito, J.) (because parties "ma[de] little reference to English contract law," the court "base[d] its] decision on general contract law principles").

43

interpret an agreement in a way which leaves a part meaningless or ineffectual." *Hauser v. Western Grp. Nurseries, Inc.*, 767 F. Supp. 475, 488 (S.D.N.Y. 1991) (applying New York law); *see also, e.g., Spinelli v. NFL*, 903 F.3d 185, 200 (2d Cir. 2018) (rejecting interpretation of agreement that would render "exception[]" to contract term "superfluous," contrary to New York contract law).

That "cardinal" rule against nullity applies with particular force here, where the language being construed concerns holders' core right to payment. *Cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001) (rule against treating statutory language as surplusage applies "especially . . . when the term occupies" a "pivotal . . . place in the statutory scheme"). It is simply implausible that holders participating in Argentina's debt exchange would have accepted—much less desired—a *reduced* ability to enforce Argentina's payment obligations under the GDP Securities than under the bonds they received in the exchange, which were issued under the *same* indenture, were part of the *same* package of consideration, and were issued pursuant to the *same* restructuring of Argentina's sovereign debt.

44

That is why the English trial court recognized that "it makes no sense (commercial or otherwise)" to interpret Section 11's enforcement exception "as having no application at all." JA1487(¶300). New York law, like English law, provides "that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." *Cole v. Macklowe*, 99 A.D.3d 595, 596 (1st Dep't 2012).

The English trial court continued: "It is obvious, in the circumstances, that section 4.9 [as applied by Global Security Section 11] ought to be regarded as referring to a claim for the *Payment Amount*. . . . [S]ection 4.9 should be interpreted in a way which is consistent with [Section] 11, and so on the basis that it refers to a right to *claim the Payment Amount*." JA1487(¶¶300–02) (emphasis added). If instead the drafters had intended Indenture Section 4.9 *not* to apply to the Global Security, and for holders not to have any payment-enforcement right outside the confines of Section 11's no-action clause, then Section 11 presumably would not have stated any exception at all.

At no point in either the U.S. or English action has Argentina ever identified any legal difference between English and New York law that

45

necessitated a contrary reading of those materially identical documents in each jurisdiction. Instead, the Republic speculated to the district court that, maybe, the first 45 words of Section 11 were intended to lie in wait just in case the Global Security were ever *modified* to include payments that Argentina deems principal and interest. *See* JA2231/SJA1060. That's a fanciful dodge of the surplusage problem. Argentina never explained how or why the Global Security—which was intended solely to provide payments conditioned on Argentina's annual economic performance—would ever be modified to provide for non-contingent payments that, in its eyes, qualify as principal or interest. Nor has Argentina even tried to explain why Section 11 would, at the outset, contain language anticipating that modification, rather than being amended later to reflect the modification, should it ever occur.

(d.) The district court's decision also fundamentally misapprehends the purpose of no-action clauses. Under New York law (as elsewhere), a no-action clause is meant to prevent "strike suits" by a bondholder that would be "unpopular with [its] fellow bondholders." *Quadrant*, 23 N.Y.3d at 565–66. No-action clauses thus typically require that a critical mass of holders agree to commence an action against the issuer that would affect

46

the security itself, as applied to all holders. An ill-advised and unsuccessful breach-of-fiduciary-duty suit, for example, could cause an issuer needlessly to incur legal expense that may diminish other holders' ability to receive payment from the issuer.

But no-action clauses routinely *carve out* (that is, preserve without condition) suits in which a holder seeks to enforce the issuer's payment obligations *to that holder*. *See, e.g.*, *MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Ent. Corp.*, 80 F. Supp. 3d 507, 517–18 (S.D.N.Y. 2015). The reason is simple: If any individual holder succeeds in enforcing its own right to payment, that outcome would not diminish other holders' ability to enforce their own entitlement to payments that they are owed on their bonds. And whatever minimal burdens might be created by a holder's suit to enforce the core payment obligation, those burdens are clearly outweighed by the importance to all holders that they have the unconditional right to enforce those payments when the issuer has defaulted on making them

The Global Security—and the Global Note—both follow this classic formula: The Global Security generally conditions suits bearing on all holders' rights under the Global Security on agreement of the holders,

47

but it expressly *preserves* individual holders' right to enforce Argentina's core obligation under the Security to render payments when due. The district court erred in reading Section 11 to *defeat* holders' right to bring this lawsuit rather than guarantee it.

### B. Alternatively, Payment Amounts are payments of principal or interest under Indenture Section 4.9

The district court's holding contained a one-two punch: the unconditional right to enforce payment applies only to "principal" or "interest," *and* Payment Amounts do not constitute principal or interest. Both holdings cannot possibly be right, for the overarching reason that together they would render Section 11's right to enforcement of payments due under the Global Security wholly illusory.

As explained above, the text of Section 11's first 45 words, and their surrounding context, demonstrate that they were intended to obviate inquiry as to whether "any payments due hereunder" are payments of principal or interest. It simply doesn't matter, and this Court can reverse the district court's contractual-standing holding for that reason alone. But the district court's decision could also be reversed because Payment Amounts due under the Global Security *do* qualify as payments of principal or interest as those terms are used in this contract.

48

### 1. The Indenture and Global Security treat Payment Amounts as principal and interest

Section 1.1 of the Indenture defines the term "Global Security" as a "a Debt Security."[8] A "debt security" is a type of security that typically pays principal and interest. *See, e.g.*, IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr. 18, 1994) (listing factors for distinguishing between debt and equity instruments for tax purposes, including "whether holders of the instruments possess the right to enforce the payment of principal and interest").

The Indenture repeatedly affirms the Republic's obligation to pay principal and interest on *each* of the "Debt Securities," without excluding the GDP Securities. For example, Section 3.5 of the Indenture addresses the procedures by which the Republic "provide[s] for the payment of principal of and interest on the Debt Securities," without distinguishing the GDP Securities and Payment Amounts due on them under the Global Security. The Indenture is replete with other provisions about "principal"

---

[8] *See also* Indenture at 1 (first "Whereas") (identifying GDP Securities as "Debt Securities"). Moreover, the Global Security (at § 13) states that Argentina's future issuance of other securities having the same terms and conditions as the GDP Securities would constitute its issuance of "additional debt securities."

49

and "interest" due on the Debt Securities that do not in any way distinguish or exclude the Global Security. *See, e.g.*, Indenture § 3.1 ("The Republic covenants and agrees that it will duly and punctually pay or cause to be paid the principal of and interest (including Additional Amounts) on each of the Debt Securities . . . .").[9] These provisions, which extensively deal with Argentina's core obligation to make payments, must apply to the GDP Securities because no other provisions do. It is inconceivable that the parties would have devoted many sections of the Indenture to describing the Republic's obligations *only* with respect to Global Notes, while remaining utterly silent about the Republic's corresponding obligations with respect to the GDP Securities.

---

[9] *See also* Indenture § 3.5(a) ("[T]he Republic hereby agrees to pay or to cause to be paid to an account of the Trustee . . . an amount which . . . shall be sufficient to pay the aggregate amount of interest or principal or both and any other amounts, as the case may be, becoming due in respect of such Debt Securities on such Payment Date."); *id.* § 3.5(b) ("At least five Business Days prior to the first date for payment of interest on each Series of Debt Securities . . . the Republic shall furnish the Trustee with a certificate . . . specifically instructing the Trustee as to any circumstances in which payments of principal of or interest on such Debt Securities due on such date shall be subject to deduction or withholding" for taxes); *id.* § 4.13 (prescribing "[a]ll claims against the Republic for payment of principal of or interest on or in respect of the Debt Securities of any Series"); *id.* § 11.4 (providing for return of "any monies deposited with the Trustee for the payment of the principal of or interest on any Debt Security" to the Republic under certain conditions (cleaned up)).

The Republic's obligation to pay principal and interest on *all* Debt Securities is crystallized in Indenture Section 4.9, which provides that "*each* Holder of Debt Securities shall have the right, *which is absolute and unconditional*, to receive payment of the principal of and interest on its Debt Security on the stated maturity date . . . and to institute suit for the enforcement of any such payment." Indenture § 4.9 (emphasis added). That section states an enforcement exception to the Indenture's no-action clause in Section 4.8. And by its plain terms the exception applies to *all* Debt Securities—including the GDP Securities—without limitation.[10]

As already discussed above (*see supra* pp. 34–48), Section 11 of the Global Security emphasizes this by providing that Section 4.9's absolute and unconditional right to payment applies "with respect to the right of any Holder of a Security *to enforce the payment of any amounts due here-*

---

[10] Moreover, the authorization for the GDP Securities, attached to the Indenture, expressly provides that *certain* Indenture provisions "shall not apply to GDP-Linked Securities." Indenture at E-1. Those provisions include Indenture Sections 4.1, 4.2, and 4.3, but *not* Section 4.9. The omission of Section 4.9 from this express exclusion further confirms the drafters' intent that Section 4.9 *would* apply to the GDP Securities, as Section 11 of the Global Security makes clear. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank N.A.*, 898 F.3d 243, 254 (2d Cir. 2018) (applying "the standard canon of contract construction, *expressio unius est exclusio alterius*," to indenture agreement).

51

*under* on any Payment Date" (emphasis added). *See* JA1487(¶302). ("[S]ection 4.9 should be interpreted in a way which is consistent with [Global Security Section] 11, and so on the basis that it refers to a right to claim the Payment Amount.").

### 2. The district court's conclusion that Payment Amounts are not principal or interest is erroneous

The district court's threadbare analysis seized on a single piece of text—the legend on the face of the Global Security—to justify its cramped interpretation of "principal and interest." The legend reads:

> The only amounts payable in respect of this security are the payments contingent upon and determined on the basis of the performance of the gross domestic product of the Republic of Argentina referred to herein. The notional amount of this security set forth below will be used solely to allocate these payments among holders of this Security. Holders of this security are not entitled to receive principal in the amount of, or interest based on, such notional amount.

Glob. Sec. at 1 (all-capitalization and defined term omitted). According to the district court, the legend "makes clear that the GDP-Linked Securities do not contemplate paying principal or bearing interest." JA2533.

Not so. What the legend makes clear is that holders of the Global Security are not entitled to principal *in the amount of*, or interest *based*

52

*on*, the Securities' "notional amount." *See* Glob. Sec. at 1. That much is obvious from the Global Security's terms, which specify that Payment Amounts are calculated according to a GDP-linked formula and not at a fixed interest rate or payment on a maturity based on the Securities' notional amount. The legend also delinks any payment amounts from the Global Security's notional amount because the notional amount is far higher than the total of all possible payments (if made when due) under the Global Security's payment cap (the "Payment Cap"). *See* Glob. Sec. §§ 1(e), 2(b) (defining the "Payment Cap" and limiting aggregate payments to it). But the legend *does not* say that the payments that *are* due under the Global Security are not payments of principal or interest.

The district court's perfunctory discussion of the terms "principal" and "interest" is equally unsound. The court summarily concluded that the Payment Amounts do not fit the dictionary definitions of "principal" and "interest." JA2533. But "principal," as even the district court defined it, refers to "the amount of a debt, investment, or other fund, not including interest, earnings, or profits." JA2532. (quoting Black's Law Dictionary (11th ed. 2019)). Payment Amounts due under the Global Security reflect some return of amounts originally owed on defaulted

bonds tendered in exchange for GDP Securities—in other words, the amount of that prior debt or investment. Moreover, payments under the Global Security are subject to the Payment Cap, which, once exceeded, relieves the Republic of its obligation to make further payments. The Payment Cap reflects the fact that investors' "return" on the GDP Warrants is tied to the amount initially invested—upside is not limitless, even if Argentina's GDP were to experience decades of record growth. Once the holders receive repayment of the principal (that is, hit the Payment Cap) further payments cease.

The district court defined "interest" to mean "money paid regularly at a particular rate for the use of money lent, or for delaying the repayment of a debt." JA2532–33 (citing The Oxford English Dictionary (3d ed. 2010)). Payment Amounts fit comfortably within that definition too: Payments under the Global Security are made on a "regular[]" date—*i.e.*, the Payment Date—and at a "particular rate"—*i.e.*, the formula set by the Global Security. *See* Glob. Sec. at R-4 ("Payment Amount"). And Payment Amounts are paid "for delaying the repayment of a debt"

54

because, again, they were originally issued in exchange for defaulted notes on which money was lent and not repaid.[11]

The Payment Amounts due under the Global Security can thus be construed as principal and interest under the dictionary definition of those terms, contrary to the district court's pronouncement.

### 3. The Republic has repeatedly described the Global Security's Payment Amounts as being interest

Treating Payment Amounts as principal or interest, if necessary to reconcile Section 11 of the Global Security with Section 4.9 of the Indenture, is also consistent with how the Republic itself has described those payments for years. The Republic's annual SEC filings regularly describe Payment Amounts as "***interest due*** on GDP-linked Securities" and part of the Republic's "***interest expense***" or "***interest***" paid.[12]

---

[11] The payment formula is also consistent with other GDP-linked securities, which are sometimes structured with interest rates tied to a country's economic performance. *See* Goncalo Pina, *State-Contingent Government Debt: A New Database*, 55 Credit and Capital Markets 57–58 (2022) (describing securities issued by Singapore that "earned annual dividends of at least 3% plus the real GDP growth rate of the preceding calendar year" and GDP-linked treasury certificates issued by Portugal that paid a "fixed rate step up structure for the base interest rate and additional payments linked to real GDP growth")

[12] *See* Republic of Arg., Annual Report (Form 18-K), at 151 (Oct. 10, 2008), https://perma.cc/8SFP-3USR ("In 2007, interest on Argentina's peso-denominated debt increased 55.2 % (U.S.$1.9 billion), or 35.4 % of

Indeed, the Republic itself has stated that its "interest" expenses were reduced when it did not make the payments at issue in this case. *See* Republic of Arg., Annual Report (Form 18-K), at D-138 (Feb. 26, 2019) ("In 2013, **interest payments** as a percentage of total expenditures decreased . . . primarily due to the fact *that no payments under the GDP-Linked Securities were due*." (emphasis added)). Argentine officials, including officials at the Ministry of Economy, have likewise referred to

---

total interest, to Ps.5.8 billion. This increase was primarily due to adjustments based on the CER and *the increase in **interest due on GDP-linked Securities*** caused by the increase in Argentina's GDP." (emphasis added)); Republic of Arg., Amended Annual Report (Form 18-K/A), at 165 (Apr. 9, 2010), https://perma.cc/7CDT-BVLB ("In 2008, interest on Argentina's peso-denominated debt increased by 14.6% to Ps.6.7 billion (U.S.$2.1 billion, or 37.3% of total interest). This increase was primarily due to *the increase in **interest due on GDP-linked Securities*** caused by the increase in Argentina's GDP, and the increase in interest due on Bonar and on Treasury notes." (emphasis added)); Republic of Arg., Annual Report (Form 18-K), at 179 (Sept. 30, 2010), https://perma.cc/42DP-983A (same); Republic of Arg., Annual Report (Form 18-K), at 170 (Sep. 30, 2011), https://perma.cc/5H3S-5Y8C ("***Interest expense*** on foreign currency denominated debt decreased in 2010 by U.S.$559.4 million from U.S.$3.6 billion in 2009 to U.S.$3.0 billion in 2010. This decrease was primarily due to the fact that *payments **under the GDP-Linked Securities*** were not triggered given the level of GDP growth for the 2009 reference year." (emphasis added)); Republic of Arg., Annual Report (Form 18-K), at D-138 (Feb. 26, 2019) ("In 2013, *interest payments* as a percentage of total expenditures decreased to 6.0%, and also decreased by 6.7% in nominal terms, primarily due to the fact *that no payments **under the GDP-Linked Securities*** were due*." (emphasis added)).

56

Payment Amounts due as "**coupon[s]**," *see* JA1278,_1501,_1507, a term generally used to refer to installments of interest due on a debt.[13]

Current litigating position aside, the Republic's accurate characterization of Payment Amounts paid on the GDP Securities as "interest" is telling and persuasive to determine the best (and most natural) interpretation of the contract terms. *Cf., e.g.*, *Krauth v. Exec. Telecard, Ltd.*, 890 F. Supp. 269, 294 n.5 (S.D.N.Y. 1995) (statements made in company's Form 10-Q were "strong evidence" regarding contested issue); *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon L.P.*, 840 F. Supp. 770, 778 n.7 (D. Or. 1993) ("[Form 10-Q] is a statutorily mandated admission, which defendants are estopped to dispute the accuracy of."). This Court should not accept the Republic's made-for-litigation about-face.

---

[13] *See Investor Bulletin: What Are Corporate Bonds?*, U.S. Securities & Exchange Commission at 2 (June 2013), https://tinyurl.com/y6psbxm7 ("Interest payments [on a bond] are called coupon payments, and the interest rate is called the coupon rate."); *Coupon*, U.S Securities & Exchange Commission Investor Glossary, https://perma.cc/VL8X-9MAW ("A feature of a bond that denotes the amount of interest due and the date that the payment will be made.").

### 4. Industry custom confirms that conditional payments are principal and interest

Treating Payment Amounts as principal or interest is also consistent with how payments under similar debt securities, known as contingent-value rights ("CVRs"), are treated under the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb ("TIA"). Like the GDP Securities, CVRs are securities that entitle their holders to payment if certain contingencies materialize, *e.g.*, on the completion of certain milestone events. *See, e.g.*, *UMB Bank, N.A. v. Sanofi*, 2018 WL 3300658, at *1 (S.D.N.Y. Apr. 12, 2018). And, also like the GDP Securities, such payments are typically referred to in CVRs' governing documents using terms *other than* "principal" or "interest," such as "amount" or "pro rata portion."[14]

TIA Section 316(b) protects "the right of any holder of any [covered security] to receive payment of the principal of and interest on such . . . security" "[n]otwithstanding any other provision" of the applicable

---

[14] *See, e.g.*, ECF 40-1 (CVR Agr.) § 3.1(c), *UMB Bank, N.A. v. Sanofi*, No. 15-cv-8725 (May 26, 2016) ("[T]he Trustee shall promptly . . . pay to each Holder of record . . . an amount equal to the product of [the payment formula] . . . ."); Illumina, Inc., CVR Agr. (Form 8-K, Ex. 4.1), § 2.2(d)(1) (Aug. 18, 2021), https://perma.cc/XBP4-WVPC ("[T]he Trustee shall pay each Holder a Pro Rata Portion of such Covered Revenues Payments . . . .").

indenture, and prohibits impairment of that right unless the holder has consented. 15 U.S.C. § 77ppp(b). CVR agreements generally (and without known exception) implement Section 316(b) by including provisions akin to Section 4.9 of the Indenture that exempt from the CVR agreement's no-action provision the right of each holder to enforce its entitlement to CVR payment amounts—just as Section 4.9 of the present Indenture purports to do. TIA Section 316(b) applies only to "principal of and interest on" debt securities, and yet CVR agreements explicitly claim (in their TIA reconciliation tables) to implement Section 316(b) even though they typically entitle holders to payments of sums not referred to as "principal" or "interest."[15] The seemingly universal practice of treating TIA Section 316(b) as applicable to CVR payments lends further support that payments under contingent debt securities, such as the GDP

---

[15] Like all TIA-compliant indentures, CVR agreements typically include a "reconciliation and tie" table indicating the agreement's incorporation of TIA provisions. *See, e.g.*, Bristol-Myers Squibb Co., CVR Agr. (Form 8-K, Ex. 4.1), at iv-v (Nov. 20, 2019), https://perma.cc/QLK5-GAN3; Illumina, Inc., CVR Agr. (Form 8-K, Ex. 4.1), at iv (Aug. 18, 2021), https://perma.cc/XBP4-WVPC. However, because debt securities issued by foreign governments are exempt from the TIA, 15 U.S.C. § 77ddd(a)(6), neither the Indenture nor the Global Security contains such a table.

Securities, constitute principal or interest even when they are not explicitly labeled as such by the contract.[16]

## C.  In all events, the Republic forfeited and waived any no-action defense

In addition to the substantive problems with the Republic's no-action defense, it also has a dispositive procedural problem: The Republic forfeited any threshold contractual-standing argument by electing not to assert it in a motion to dismiss or answer, and knowingly waived the defense by electing to proceed through extensive litigation for four years.

The Republic moved to dismiss one or more of these actions three times—in 2019, 2020, and 2021. JA2523–24_n.11. Yet the Republic never

---

[16] ECF 40-1 (CVR Agr.) § 8.7, *UMB Bank, N.A. v. Sanofi*, No. 15-cv-08725 (May 26, 2016) ("Notwithstanding any other provision in this CVR Agreement and any provision of any Security, the right of any Holder of any Security to receive payment of the amounts payable in respect of such Security on or after the respective due dates expressed in such Security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder."); Bristol-Meyers Squibb Co., CVR Agr. (Form 8-K, Ex. 4.1), § 8.7 (Nov. 20, 2019), https://perma.cc/QLK5-GAN3 (same); SiriusPoint Ltd., CVR Agr. (Form 8-K, Ex. 4.2), § 8.7 (Feb. 26, 2021), https://perma.cc/WSP2-3K7G (same); Illumina, Inc., CVR Agr. (Form 8-K, Ex. 4.1), § 7.7 (Aug. 18, 2021), https://perma.cc/XBP4-WVPC (same); Selecta Biosciences, Inc., Agr. & Plan of Merger (Form 8-K, Ex. 2.1, Ex. E), § 8.7 (Nov. 13, 2023), https://perma.cc/EXP3-36A2 (same).

once objected that Plaintiffs could not sue for not having satisfied the no-action clause. The Republic likewise failed to include any affirmative defense based on the no-action clause in its answers. Instead, it waited until after discovery was complete, to assert for the first time in its opening summary judgment brief that Plaintiffs lacked contractual standing to sue. By then, these cases had been pending for nearly half a decade, and a final decision on the merits was nigh. The district court correctly observed that this timing was "curious to say the least." JA2523–24_n.11.

It is more than curious. It precludes deciding Plaintiffs' suit on this ground. The Republic's years-belated assertion of its no-action defense is fatal and presents an independent ground for reversal.

(a.) The Republic argues that Plaintiffs do not "have the right to assert their claims," under the Global Security, by operation of the contract's no-action clause. JA2222/SJA1051; *see also* JA2244–45/SJA1073–74. This argument challenges Plaintiffs' contractual standing to bring their claims, and contractual standing is a "threshold defense[] . . . that must be raised and disposed of at the outset of the suit" under Federal Rule of Civil Procedure 9(a)(2). *Allan Applestein TTEE*

61

*FBO D.C.A. Grantor Tr. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005) (quoting 5A Charles Alan Wright & Arthur Miller, *Federal Prac. & Proc.* § 1295 (3d ed. 2004)).

Capacity to sue "is non-jurisdictional in nature, and can be waived." *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 98 (2d Cir. 2021) (cleaned up). Capacity defenses must be raised "by a specific denial," Fed. R. Civ. P. 9(a)(2), in other words, in the motion to dismiss or answer, *FDIC v. Horn*, 2015 WL 1611995, at *9 (E.D.N.Y. Apr. 8, 2015) ("[W]here a party seeks to raise a 'standing' defense that, at its essence, challenges the plaintiff's lack of capacity to sue, that defense may be 'waived' if not asserted in a responsive pleading."). The related concept of "contractual standing"—the right to seek a remedy under a contract—is closely analogous to capacity and is treated the same way for pleading purposes. *FDIC v. Murex LLC*, 500 F. Supp. 3d 76, 97 (S.D.N.Y. 2020) (whether plaintiff's assignment of contract rights is "rightly cast as involving 'contractual standing' or 'legal capacity,'" such a defense "is subject to waiver if not raised promptly"); *see also Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 169 (S.D.N.Y. 2015) ("Under both federal and New York state law, challenges to [contractual]

standing must be raised in a party's answer or pre-answer motion to dismiss.").

Because the no-action clause concerns either the capacity of holders (as opposed to the Trustee) to sue or their contractual standing to do so, Rule 9(a)(2) required the Republic to raise the defense in its responsive pleading. *Applestein*, 415 F.3d at 245 (argument that indenture limits right to sue to holders and not beneficial owners is "an assertion of a party's incapacity to sue"); *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at \*14 (S.D.N.Y. Mar. 29, 2022) (no-action clause affects a plaintiff's contractual standing to sue).[17]

Plaintiffs' alleged noncompliance with the no-action clause is a paradigm of a "threshold defense" that must be "raised and disposed of at the outset of the suit." *Applestein*, 415 F.3d at 245 (cleaned up). As Professors Wright & Miller explain in the section of their treatise quoted in *Applestein*, such defenses must be promptly asserted or waived "because of the waste of judicial and litigant resources that would result

---

[17] Courts outside this Circuit agree that a no-action clause that "prohibits certain Bondholder actions unless particular conditions are met" goes to a party's "legal capacity to sue and be sued" or contractual standing to sue. *Allstate Life Ins. Co. v. Robert W. Baird & Co.*, 2011 WL 5024269, at \*2–3 (D. Ariz. Oct. 21, 2011).

from the dismissal of a suit as late as the trial when one of the parties lacks the requisite legal existence, capacity, or authority to sue or be sued," and because plaintiffs could be prejudiced "if the defendant first asserted [its] objection under Rule 9(a) after the statute of limitations had run." 5A Wright & Miller, *Federal Prac. & Proc.* § 1295 (4th ed. 2024 update) ("Wright & Miller § 1295").

Thus, in *Focus Products Group International, LLC v. Kartri Sales Co.*, the district court applied the rule articulated in *Applestein* to the analogous doctrine of prudential standing in a patent infringement case. 2021 WL 1946756, at *2 (S.D.N.Y. May 14, 2021). Because the defendants had "numerous opportunities to assert" their defense that the plaintiff was not the proper assignee of the patent over "the first five years of [the] litigation," it would have been grossly unfair to allow the defendants to raise it for the first time on "the brink of trial." *Id.; see also id.* at *3 ("Defendants have utterly failed to explain their abject failure to raise these defenses years ago, and their delay in doing so until the 11th hour in this litigation.").

The Republic's no-action clause defense is the very same kind of "threshold defense[]" that the *Applestein* and *Focus Products* courts held

should have been raised at the outset of litigation. Indeed, the Republic itself has repeatedly characterized its no-action objection as a "threshold defense." JA1219,_1241,_1247/SJA437,_459,_465; JA2221,_2222,_2228/ SJA1050,_1051,_1057.

There can likewise be no question that the Republic's belated assertion of the defense, even if it were correct, "waste[d] . . . judicial and litigant resources" by protracting this litigation longer than needed. Wright & Miller § 1295. It also prejudiced Plaintiffs: the Republic asserted this defense only *after* the statute of limitations for Plaintiffs' claims had run, thus attempting to deny to Plaintiffs the opportunity to seek to comply with the no-action clause's requirements.[18] This too

---

[18] *See* N.Y. C.P.L.R. § 213(2) (six-year statute of limitations). The Republic filed its first motion to dismiss on April 18, 2019, less than five years after Plaintiffs' claims accrued on December 15, 2014, JA42–153, and it filed its second motion to dismiss on June 8, 2020, JA206–49, still within the six-year statute of limitations. In neither of those motions did the Republic raise its no-action defense. Moreover, in response to the COVID-19 pandemic, Governor Cuomo issued a series of executive orders tolling the statute of limitations for claims under New York law, which extended Plaintiffs' limitations period an additional 228 days to August 1, 2021. *Brash v. Richards*, 195 A.D.3d 582, 582–84 (2nd Dep't 2021). Thus, even the Republic's *third* motion to dismiss—filed on May 19, 2021—was filed within the limitations period. *See* JA2859–71. But the Republic inexplicably—or perhaps strategically—waited until after the statute of limitations had run to assert its threshold no-action defense.

counsels in favor of forfeiture. Wright & Miller § 1295 (capacity objections should not "be preserved through the trial stage" because "[a]llowing preservation of a defense of this character could operate to the plaintiff's prejudice if the defendant first asserted his objection under Rule 9(a) after the statute of limitations had run").[19]

(b.) In addition to waiving its defense under Rule 9, the Republic's decision to litigate this case through fact and expert discovery to summary judgment without ever asserting it has *also* resulted in waiver under ordinary principles of New York contract law. No-action clauses, like any other contractual provision, may be waived by intentional conduct. *See Demolition Contractors, Inc. v. Westchester Surplus Lines Ins. Co.*, 2009 WL 929014, at *4 (W.D. Mich. Apr. 3, 2009). "[W]aiver requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982).

Contractual rights can be waived through litigation conduct that effects the voluntary relinquishment of a known right. For example, the

---

[19] Notwithstanding this prejudice, Plaintiffs intend to file an action under New York CPLR § 205 that complies with the no-action clause, even under the district court's erroneous ruling.

failure to invoke a contract's arbitration provision early in litigation can sometimes waive any later invocation of the right to arbitrate. *See, e.g.*, *Rusch Factors, Inc. v. Fairview Mfg. Co.*, 34 A.D.2d 635, 635 (1st Dep't 1970) (per curiam); *Worbes Corp. v. Sebrow*, 2023 N.Y. Slip Op. 50205(U), at *3 (N.Y. Sup. Ct. Bronx Cty. Mar. 17, 2023) (a party loses the ability to compel arbitration when it uses "the judicial process to [an] extent which is clearly inconsistent with its later claim that the parties were obligated to settle their differences by arbitration" (cleaned up)). Aggressive litigation conduct "manifest[s] a preference clearly inconsistent with" the party's later claim that the suit must be resolved for some threshold reason—be it an arbitration provision or a lack of contractual standing. *See Sherrill v. Grayco Builders, Inc.*, 64 N.Y.2d 261, 272 (1985) (cleaned up).

Here, the Republic failed to assert, at the outset of this case, that Plaintiffs' suits were foreclosed by the no-action clause. Instead, the Republic chose to bide its time and "draw on the judicial process for a particular advantage," for example by obtaining "pretrial disclosure" from Plaintiffs that would not have been available outside of the litigation. *Id.* at 273–74. And only then—after repeatedly and for years

manifesting its intention to resolve the parties' dispute through this litigation and allowing Plaintiffs to incur considerable expense and other burdens—did the Republic claim that the last four years never should have happened. Indeed, the Republic asserted its no-action-clause defense only after losing the English case (and perhaps seeing the writing on the wall in this one).

Having forfeited the defense under the Federal Rules of Civil Procedure by not raising it at the outset, and then having knowingly and voluntarily waived the contractual right through four years of litigation conduct, the Republic cannot at the eleventh hour (and after expiration of the statute of limitations) "recapture[]" a contractual right that it had already "lost." *Sherrill*, 64 N.Y.2d at 274.

## II. Argentina's failure to make a 2013 payment, and its unilateral attempt to modify the Global Security to excuse that failure, breached the contract

Once this Court reverses the district court's erroneous conclusion that Plaintiffs lack contractual standing to pursue this suit at all, the Court can and should further hold that Argentina is liable as a matter of law for breach of contract because it failed to make its 2013 payment. That's just what the trial and appellate courts in England concluded. The

Global Security's plain terms expressly require Argentina to perform the calculations needed to determine the payment conditions using GDP data measured in constant 1993 prices. It failed to do so by refusing even to publish, let alone use, the contractually required data. The Republic has offered no plausible basis to escape the plain language of the contract.

Plaintiffs' straightforward breach-of-contract claim is ripe for this Court to adjudicate. Plaintiffs' entitlement to relief, and the Republic's defenses, involve competing interpretations of the Global Security as a matter of law. This Court can now correct interpretative errors, in two district court decisions regarding Plaintiffs' pleadings, by construing the Global Security and remanding with instructions to enter judgment in Plaintiffs' favor. [20] As for Plaintiffs' alternative good-faith-and-fair-dealing theories, this Court would need to address them only if it declines

---

[20] Generally, "an appeal from final judgment opens the record and permits review of all rulings that led up to the judgment." 15A Charles Alan Wright & Arthur Miller, *Federal Prac. & Proc.* § 3905.1 (3d ed. 2022), *quoted in Dupree v. Younger*, 598 U.S. 729, 734 (2023); *see also Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712 (1996) (similar). Here, the district court's (erroneous) grant of summary judgment also brings before this Court the prior rulings on motions to dismiss. *See, e.g.*, *Collymore v. Myers*, 74 F.4th 22, 26–27 (2d Cir. 2023) (appeal from final judgment on amended complaint allows review of dismissal of initial complaint).

to instruct the entry of judgment, and then to hold only that a triable question exists on the Republic's liability.

We proceed as follows: *First*, we explain how the Global Security functions under its plain terms. *And second*, we show why Argentina's failure to pay the 2013 amount is irreconcilable with the plain language of the contract.

### A. The Global Security required Argentina to adjust for its rebasing by using and publishing real GDP in constant 1993 prices

1. Under the Global Security, Argentina promised, in exchange for value received, to pay a formulaically described Payment Amount in accordance with its terms. Glob. Sec. at 2. Argentina breaches that promise when it "fails to pay any Payment Amounts payable . . . when due and such failure continues for a period of 30 days." Glob. Sec. at R-9.

For each Reference Year, the Global Security requires a payment if three conditions are met. Those conditions, which are set out in Section 2(b) of the Global Security, are as follows:

- *First*, that Argentina's Actual Real GDP for the Reference Year, as published by the Republic's INDEC, exceeds the Base Case GDP for that year defined by the Global Security (the "Level Condition").

70

- *Second*, that Actual Real GDP Growth from the prior year to the Reference Year exceeds Base Case GDP Growth from the prior year to the Reference Year (the "Growth Condition").

- *Third*, that total payments made when due have not exceeded the Payment Cap.

2. A brief background on how GDP gets measured and reported aids in understanding. GDP measures a country's economic output of goods and services. *See* Expert Report of Marshall B. Reinsdorf ("Reinsdorf Report"), JA1383(¶14). Argentina measures GDP by defining and assigning relative weights to a basket of goods and services the economy's production of which it will estimate to determine an amount of nominal GDP. *See* JA1383–84(¶¶16–17),_1388–89(¶¶30–33).

Nominal GDP measures economic output in current prices and rises with inflation. Reinsdorf Report, JA1385(¶19). GDP can also be measured to control for price inflation by using constant prices to determine what is called real GDP. *Id.* For instance, if a country produced only 10 widgets at $10 per widget in Year 1, then its nominal GDP would be $100. If in Year 2 it produced only 10 widgets at $11, then its nominal GDP would increase to $110, even though the actual number of units sold

71

is identical. *See* JA1385–86(¶21). To determine its real GDP, and control for price inflation, the country could measure both Year 1's and Year 2's output at Year 1's price of $10 per widget, which would show that real GDP is unchanged at $100. *See id.* In that real GDP calculation, Year 1 is known as the base year, and its prices are the base-year prices. *See* JA1385(¶20).

As a country's economy evolves over time, it may decide to update the base year against which it adjusts for inflation when converting from nominal to real GDP. Such a "rebasing" also allows a country to modify the basket of goods and services considered, their relative weights within that basket, and other measurement methodologies. JA1388–90(¶¶28,_30–34). So, returning to our example, when Year 15 rolls around the country might decide to rebase its real GDP calculations to use constant Year 10 prices when adjusting for inflation (and a modified mix and weightings of goods and services) instead of constant Year 1 prices (and the mix and weightings previously in use). *See id.*

3. For each Reference Year, the Global Security defines a Base Case GDP (which sets the Level Condition) and then defines a Base Case GDP Growth as "the percentage change in Base Case GDP for such Reference

Year, as compared to Base Case GDP for the immediately preceding Reference Year" (which sets the Growth Condition). Glob. Sec. at R-3. The Global Security could have defined, but did not define, Base Case GDP Growth as an express percentage. Instead, it must be calculated each year using the Base Case GDP chart.

The Global Security anticipates that, during the life of the GDP Securities, Argentina might rebase its Actual Real GDP measurement to use the constant prices of a base year other than 1993. And so it provides a mechanism—called the "Adjustment Provision"—to handle a rebasing. The Adjustment Provision reads:

> [P]*rovided that,* if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP ***for each Reference Year shall be adjusted*** to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP ***for such Reference Year*** (as set forth in chart above) by a fraction, the numerator of which ***shall be*** the Actual Real GDP ***for such Reference Year*** measured in constant prices of the Year of Base Prices, and the denominator of which ***shall be*** the Actual Real GDP ***for such Reference Year measured in constant 1993 prices***.

Glob. Sec. at R-3 (emphasis added). That formula converts Base Case GDP measured in 1993 prices (as stated in the chart) to Base Case GDP measured in the new Year of Base Prices (post-rebasing). In other words,

73

if Argentina rebases how it measures its Actual Real GDP, then the contractual definition of Base Case GDP *requires* the figures stated in constant 1993 prices (in the chart) to be adjusted, for each Reference Year, in response to the rebasing.

The Adjustment Provision is explicit, unambiguous, and mathematically appropriate. After Argentina rebases to a Year of Base Prices "other than the year 1993," a new Base Case GDP "for each Reference Year" "shall be" determined by multiplying the Base Case GDP "for such Reference Year" listed in the chart by the following fraction:

$$\frac{\text{Actual Real GDP for such Reference Year}\ \textbf{\textit{measured in constant prices for the new Year of Base Prices}}}{\text{Actual Real GDP for such Reference Year}\ \textbf{\textit{measured in constant 1993 Prices}}}$$

The Adjustment Fraction's logic is simple: It ensures that, in a given reference year, if Actual Real GDP in the new Year of Base Prices is twice Actual Real GDP for the same year measured in constant 1993 prices, then the Base Case GDP for that year will likewise be twice what it originally was.

By altering Base Case GDP for each year, the Adjustment Provision also alters Base Case GDP Growth for each year since it is calculated

74

using the Base Case GDP for that year and the previous year. Any adjustment to Base Case GDP thus necessarily will adjust Base Case GDP Growth.

The Adjustment Provision as written requires that a new Adjustment Fraction be calculated and applied for "each Reference Year." Glob. Sec. at R-3 This, in turn, requires the Republic to continue publishing Actual Real GDP in constant 1993 prices so that the Adjustment Fraction can be calculated for each Reference Year. That makes sense because any rebasing of real GDP will have non-linear effects from one year to another. *See* JA1442(¶81),_1471(¶¶211–15). For example, in a given year real GDP under the new index might be 2.00 times that under the 1993 index, and in the next year it might be 1.96 or 2.04 times, a variation of 2% from the first year's ratio. That 2% may seem minor when considering real GDP, but it will have a very magnified impact on real GDP growth between the two years.[21] Because it is calculated anew for each Reference

---

[21] For instance, Argentina's Actual Real GDP Growth for 2011 and 2012 measured in constant 1993 prices were 8.87% and 1.90%, respectively, but were 8.55% and .95%, respectively, when measured in constant 2004 prices. Reinsdorf Report, JA1392(¶39). This difference in statistics measuring the same economic output results from myriad differences in weightings and methodology between the original and the new GDP indices.

75

Year, the Adjustment Fraction thus controls for any variable impact that rebasing might have year to year.

### B. After Argentina's rebasing decision, it failed to apply the Adjustment Provision as written by refusing to publish and use Actual Real GDP in constant 1993 prices

Argentina violated the Global Security's plain commands about how it must adjust Base Case GDP after its rebasing.

By the end of 2013, all signs pointed to a payment being due for Reference Year 2013. The Republic had published real GDP in constant 1993 prices for each of Q1, Q2, and Q3 of 2013. Growth for those three quarters was so strong the Level and Growth Conditions would be easily satisfied unless the fourth quarter's growth was deeply negative. *See* JA2108(¶104),_2110(¶109)/SJA949(¶104),_951(¶109). But the Republic's EMAE Index for the last three months of the year showed solid growth in the fourth quarter as well, proving that a payment would be due on the GDP Securities.

In March 2014, Argentina published rebased numbers using constant 2004 prices instead of constant 1993 prices. But, critically, and contrary to the Global Security's express requirement for any re-basing, Argentina released full-year real GDP for 2013 measured in constant

2004 prices *only*. The Republic announced that it would no longer publish any real GDP statistics measured in constant 1993 prices, including statistics for 2013. Without those statistics, as explained above, the Republic could not apply the Adjustment Fraction as written to Reference Year 2013 (or to any Reference Year thereafter), and hence could not perform the calculations it was obligated to perform under the contract.

Claiming that the Growth Condition had not been satisfied for 2013, Argentina asserted on December 12, 2014, that no payment was due on the Payment Date for any 2013 Payment Amount. JA2151(¶168)/SJA992(¶168). But the Republic did not disclose its calculation or explain how such calculation could even have been performed without the required GDP figures in constant 1993 prices. JA2152(¶170)/SJA993(¶170). Only through this litigation did Plaintiffs finally learn that the Republic based its payment calculation not on the clear and explicit Adjustment Provision, but rather on a so-called "constant" adjustment fraction that has no basis in the Indenture or Global Security. JA2163–64(¶187)/SJA1004–05(¶187).

### 1. The Republic has a contractual obligation to use Actual Real GDP in constant 1993 prices in the Adjustment Fraction, and therefore to publish that required statistic

On the pleadings, the district court correctly held that the Global Security requires Argentina to use Actual Real GDP measured in constant 1993 prices to make the contractually mandated adjustments after a rebasing. JA306. The Republic nevertheless contends that it has no obligation *to keep publishing* that information for its required use. The district court agreed, effectively holding that, even though the Global Security requires *use* of Actual Real GDP in constant 1993 prices, Argentina had no duty to *generate* that statistic. *Id.* The district court thus held that holders are "stuck" because the contract doesn't explicitly state what should happen if the Republic stops publishing the necessary statistic. JA155. The court refused to afford Plaintiffs any opportunity to prove, such as through data Argentina did publish as well as other evidence since procured during discovery, what Actual Real GDP in 1993 prices would have been if published for 2013, and thereby to establish that they were entitled to payments on their GDP Securities for that year. *Id.*

78

That is—with respect—an indefensible reading of the contract that would render it effectively inoperative at the Republic's whim. The Republic expressly agreed, in the Global Security, to use the Adjustment Fraction in the event that it decided to rebase its real GDP. A key input of that Adjustment Fraction is Actual Real GDP measured in constant 1993 prices. The Adjustment Fraction doesn't work without it.

(a.) Actual Real GDP is published by INDEC, which the Global Security explicitly defines as an instrumentality "of the Republic of Argentina." Glob. Sec. at R-4. The parties' unmistakable intent therefore was that the Republic (through INDEC) would continue to make available the data needed to make the agreed-upon Adjustment Fraction work according to its terms. As the English appellate court aptly put it, the parties "agreed that whatever is necessary will be available." U.K.App.Op._¶77.

Plaintiffs thus are entitled to establish liability and damages for the Republic's breach of its obligations by relying on near-perfect proxies for annual GDP measured in constant 1993 prices that the Republic *did* publish: GDP data for the first three quarters of 2013, and the EMAE

Index for the fourth quarter. The Republic's failure to meet its contractual obligations has consequences.[22]

(b.) "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002). The parties did not intend to give Argentina the right to render the GDP Securities worthless at its whim by choosing not to publish GDP data; they intended to create a valuable instrument that would allow holders to participate in the growth of Argentina's economy through 2035 (subject to the Payment Cap). *See Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d

---

[22] When a non-breaching party seeks to recover money that a breaching party had agreed to pay under a contract, "[t]he plaintiff need only show a 'stable foundation for a reasonable estimate'" of the damage incurred as a result of the breach. *Tractebel Energy Mktg. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110–11 (2d Cir. 2007) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)). "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." *Entis v. Atl. Wire & Cable Corp.,* 335 F.2d 759, 763 (2d Cir. 1964); *see also Tractebel*, 487 F.3d at 112 ("New York courts have significant flexibility in estimating general damages once the fact of liability is established. To the extent certain variables must be assumed in order to arrive at a reasonable estimate, the district court may do so, unless evidence is presented that undermines the basis for the assumption." (citing multiple federal and New York decisions))

Cir. 2005) ("Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract.").

Contract interpretation always requires reading the interstices of express contract provisions and drawing logical conclusions from them. *See Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 555 (1982) ("[N]ot merely literal language, but whatever may be reasonably implied there-from must be taken into account."); *Mazzella v. Mazzella*, 204 A.D.3d 1114, 1115 (3d Dep't 2022) ("A court is not limited to the literal language of the agreement, but should also include a consideration of whatever may be reasonably implied from that literal language." (cleaned up)). More than 100 years ago, the New York Court of Appeals, speaking through Justice Cardozo, explained why the advertising agent Otis Wood's exclusivity contract with celebrity Lady Duff-Gordon obliged Wood "to use reasonable efforts to bring profits and revenues into existence," even though their contract did not *literally* require Wood to do anything at all. *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 92 (1917). Justice Cardozo reached that conclusion by examining the "[m]any other terms of the agreement." *Id.* at 91.

81

So too here. The Global Security does not contain a separate term *explicitly* requiring the Republic's INDEC to publish Actual Real GDP measured in constant 1993 prices when necessary to apply the Adjustment Fraction. Neither does it contain a separate term that explicitly states that Argentina must publish any GDP statistics at all. But *of course* those terms nevertheless exist—the Republic's obligation to continue publishing quite obviously follows from the requirements Argentina agreed to in other terms, as well as the fact that the parties clearly intended for the GDP Securities to function.[23]

More recently, in *Dobson v. Hartford Financial Services Group, Inc.*, 389 F.3d 386 (2d Cir. 2004), this Court affirmed the principle that "failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction [because] [c]ontracting parties often express their agreements imprecisely or incompletely." *Id.*

---

[23] This is different from Plaintiffs' alternative theory that the Republic has an implied duty of good faith and fair dealing to exercise any discretion it has under that contract in a way that does not, after a rebasing, destroy holders' expected benefits and the parties' fundamental bargain. That is true too, but the point here is that the Republic *lacks* discretion to refuse to publish Actual Real GDP measured in constant 1993 prices after deciding to rebase, and it lacks discretion to refuse to perform the calculations required under the contract.

at 399. "In such cases, if the interpreting court can discern from the contract as a whole what the parties 'must have intended,' it should enforce that intention despite a lack of express terminology." *Id.* (quoting 11 Williston on Contracts § 31:7, at 321 (4th ed. 1999)); *see also Wieder v. Skala*, 80 N.Y.2d 628, 637 (1992) (recognizing that contracts embed "essential compact[s,]" meaning "understandings or expectations that were so fundamental that [the parties] did not need to negotiate about those expectations" (cleaned up)); *Sutton*, 55 N.Y.2d at 556 (construing agreement in accordance with the parties' "broad concern" in the absence of express language).

Here, we have far more than contractual silence. The Global Security contains a litany of *express provisions* that assign to the Republic the obligation to perform certain mechanical functions of the securities, including the calculations and generation of data for those calculations. Glob. Sec. at R-2–R-4. The scope of those duties encompasses any obligations that fall within their necessary scope. *See N.Y.C. Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 435–38 (S.D.N.Y. 2022) (even though the contract did not contain an explicit

fraud-detection provision, that function fell within the scope and basic import of the contracts' other, express provisions).

The Global Security expressly requires use of Actual Real GDP "measured in constant 1993 prices." It also recognizes that only GDP statistics produced by the Republic's INDEC—defined by the contract as its statistical agency—can be used in performing calculations. *See* Glob. Sec. at R-3 ("All calculations necessary to determine Excess GDP based on the information published by INDEC . . . ."). As the one assigned the duty to perform the calculations, Argentina had to go get that number from its own agency, and make it available (to itself and to holders). Otherwise the required calculations cannot be performed.

For these reasons, the English appellate court called it "obvious" that Argentina must continue publishing the necessary statistics. U.K.App.Op._¶77. It labeled the Republic's alternative reading a "fallacy." U.K.App.Op._¶78.[24]

---

[24] To illustrate the fallacy of the district court's contrary conclusion, it bears emphasizing that the literal terms of the Global Security do not require the Republic to publish GDP data in *any* year, irrespective of whether a rebasing has occurred. Thus, if the district court were correct, the Republic could simply instruct INDEC not to publish GDP data in any given year in which payment would otherwise be due, thereby

In fact, once upon a time, this contractual duty to publish was also obvious *to the Republic*. In a January 2005 presentation to bondholders that the Republic was courting to participate in the first debt exchange, Argentina made repeated assurances that it was inconceivable Argentina would ever fail to make the required GDP data available. JA2079–80(¶67)/SJA920–21(¶67). And to put investors further at ease, the Republic assured them that if it ever tried to stop publishing the data necessary to determine whether a payment is due—the very thing Argentina has now done—that would breach the contract. *Id.* And it did.

## 2. Argentina cannot avoid payment by preventing the satisfaction of a payment condition

The district court's holding was flawed for the additional reason that, under the prevention doctrine as developed in New York law, "[i]f a promisor himself is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure." *Vector Media, LLC v. Golden Touch Transp. of NY, Inc.*, 189 A.D.3d 654, 655 (1st Dep't 2020) (cleaned up). The Republic's liability under the Global Security depends on Argentina's performing specific

_____

excusing itself from its express contract obligations. That clearly was not the parties' intent.

calculations showing whether or not the three conditions have been satisfied. For Reference Year 2013, the Republic itself prevented those calculations from being performed by refusing to publish a necessary statistic that only it could generate. And Plaintiffs have pleaded and established that, had the necessary statistic been published, it would have shown that the conditions were satisfied for 2013.

Argentina's attempts below to avoid the prevention doctrine were meritless. The doctrine is not limited to conditions precedent to contract formation. *Sony Music Ent., Inc. v. Werre*, 26 Misc.3d 1240(A), Slip Op. at 3 (N.Y. Sup. Ct. Mar. 17, 2010) (explaining that the prevention doctrine "applies when there is a binding contract in effect that contains the condition precedent in question"). Nor does the doctrine apply only where Party A argues that Party B prevented *Party A*'s performance. *See In re Bankers Tr. Co.*, 450 F.3d 121, 127 (2d Cir. 2006) (per curiam) (prevention doctrine applied to party trying to avoid *its own* performance obligation). The doctrine exists so that a party cannot benefit from its own conduct preventing satisfaction of a contractual condition. Where such an ill-gotten benefit is sought, it does not matter whether the would-be beneficiary is the party whose performance is subject to the condition.

86

*See also St. Christopher's, Inc. v. JMF Acquisitions, LLC*, 2021 WL 6122674, at \*4 (2d Cir. Dec. 28, 2021) (plaintiff obstructed defendant's ability to obtain government approvals that were conditions precedent to defendant's performance). Its application here is straightforward.

### 3. The Republic's attempts to read the Adjustment Fraction as not requiring its ongoing use of Actual Real GDP in constant 1993 prices are unavailing

The Republic has contrived a number of tortured interpretations of the Adjustment Fraction that would obviate the use (and, thus, publication) of Actual Real GDP measured in constant 1993 prices for Reference Year 2013 (and beyond). The district court rejected some of these interpretation as "atextual," JA171_n.6, and none of them is consistent with the parties' contract.

Most recently, the Republic argued at summary judgment that it can update the entire chart of Base Case GDP figures through 2035 *all at once* after a rebasing, using just *one* constant adjustment fraction. To apply that theory, the Republic explained, it determines a constant factor by using a numerator and denominator based on a year of its choosing. So, in the Republic's telling, the constant factor becomes *2012* Actual Real GDP measured in constant 2004 prices over *2012* Actual Real GDP

measured in constant 1993 prices. The Republic says that it chose to use 2012 data for its constant factor because that was the last year in which it elected to publish full-year Actual Real GDP measured in constant 1993 prices—not based on any language in the contract.

The English trial and appellate courts soundly rejected this outlandish theory as "simply irreconcilable" with the Global Security's actual terms. U.K.App.Op._¶81. As the appellate court explained, a constant adjustment fraction, applied once to update the entire table, does not accord with the Adjustment Fraction's "introductory words 'at any time'[,]" which describe "a state of affairs, not an event." U.K.App.Op._¶82. The Republic's construction, moreover, requires fabricating a concept called "an Overlap Year" which is "not . . . mentioned in the provision." U.K.App.Op._¶83. The Adjustment Provision requires that "Base Case GDP for each Reference Year shall be adjusted" by an Adjustment Fraction that incorporates Actual Real GDP statistics "for such Reference Year." Glob. Sec. at R-3. In other words, the Adjustment Fraction updates a Base Year GDP figure with Actual Real GDP statistics from that same Reference year.

Moreover, the English Court of Appeal observed that the Republic's theory would allow it to rebase opportunistically, contrary to the parties' clear intent, to avoid payment by adjusting Base Case GDP in one direction, forevermore, merely by the "happenstance" of when the Republic chose to rebase, U.K.App.Op._¶91.

This Court should likewise reject Argentina's strained attempts to read the need to publish GDP in constant 1993 prices out of the Global Security, and should instead apply the Adjustment Fraction's plain text.

### 4. The Republic's unilateral attempt to modify the Adjustment Provision was itself a breach of contract

The Republic's unilateral decision to completely rewrite the Adjustment Fraction isn't just wrong—it is a breach of the Global Security in its own right. The district court correctly held that any change by Argentina to the adjustment methodology specified by the Global Security is a modification of the contract that required holder consent. For good reason: The Global Security's modifications provision (Section 22(f)) explicitly prohibits any unilateral "change to the method of calculation of the Payment Amounts." JA304 (quoting Glob. Sec. § 22(f)). The district court rejected the Republic's argument that its new adjustment methodology is "binding" against holders "absent bad faith,

89

willful misconduct or manifest error on the part of the Ministry of Economy." *See* JA294 (quoting Glob. Sec. at R-4). That so-called Binding Effect Clause, the district court held, does not give Argentina *carte blanche* in how it calculates a Payment Amount. Rather, the formula for that calculation is prescribed by the definition of the term Payment Amount. JA304. No one would ever agree to own a debt security under which the issuer could unilaterally make binding decisions to depart from contractually prescribed calculations needed to determine the payments the issuer owes.

In short, the modifications provision requires super-majority consent of the holders to modify the Global Security's calculation methodology. The Republic indisputably did not seek or obtain such consent—thus breaching the agreement—when it purported to modify the calculation methodology by using something other than the required inputs.

\* \* \*

In sum, the Republic's distortions of the contract don't withstand scrutiny. When those distortions are cleared away, and the proper construction of the contract is adopted, the Republic's liability to Plaintiffs

90

for breach of the Global Security is established as a matter of law. Judgment can and should be entered for Plaintiffs.

If this Court is not prepared to enter judgment for Plaintiffs, it is nevertheless important as a matter of judicial economy to go beyond reversal of the no-action-clause holding and correct certain specific errors in the rulings on motions to dismiss, lest the wrong law be applied on remand necessitating a do-over after another appeal. We respectfully request that this Court hold at least that (1) the operative complaints state a claim valid for breach of contract separate and apart from Plaintiffs' claims that Argentina also breached its duty of good faith and fair dealing; (2) Argentina had an implied duty to publish and use the statistics called for by the contract and necessary to apply the Adjustment Provision; and (3) the prevention doctrine precludes Argentina's attempt to frustrate satisfaction of the conditions on its payment.

## CONCLUSION

For the reasons stated above, this Court should (i) reverse the judgment below and (ii) order the entry of judgment for Plaintiffs or, at a minimum, hold that the operative complaints state a valid claim for breach of contract.

Dated: February 14, 2025

Respectfully submitted,

Michael R. Huston
Matthew M. Riccardi
H. Rowan Gaither, IV
Jacob J. Taber
PERKINS COIE LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036
(212) 261-6863

*Counsel for Plaintiff-Appellant*
*683 Capital Partners, LP*

Matthew S. Salerno
Michael E. Bern
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Plaintiff-Appellant*
*Adona LLC, Egoz I LLC, Egoz II*
*LLC, Mastergen, LLC,*
*Erythrina, LLC, AP 2016 1, LLC,*
*AP 2014 3A, LLC, AP 2014 2,*
*LLC, WASO Holding Corp.*

Javier Bleichmar
Evan A. Kubota
BLEICHMAR FONTI & AULD LLP
300 Park Avenue, Suite 1301
New York, NY 10022
(212) 789-1340

*Counsel for Plaintiff-Appellant*
*Novoriver SA*

*/s/ Roy T. Englert, Jr.*
Roy T. Englert, Jr.
Matthew M. Madden
Zachary N. Ferguson
Paul Brzyski
KRAMER LEVIN NAFTALIS
    & FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500

Edward A. Friedman
Daniel B. Rapport
Lawrence S. Robbins
Michael S. Palmieri
FRIEDMAN KAPLAN SEILER
    ADELMAN & ROBBINS LLP
7 Times Square, 28th Floor
New York, NY 10036
Tel: (212) 833-1100

*Counsel for Plaintiff-Appellants*
*Aurelius Capital Master, Ltd. and*
*ACP Master Ltd.*

Eric Joseph Grannis
LAW OFFICES OF ERIC J.
    GRANNIS
11 Broadway, Suite 615
New York, NY 10004

*Counsel for Plaintiff-Appellants-*
*Cross-Appellees Ape Group SPA,*
*Romano Consulting SPA, Icaro*
*SRL, Elazar Romano*

92

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS

This brief complies with the type-volume limitation set forth in this

Court's June 25, 2024 Case Management Order (Dkt. 27.1) because the

brief contains 18,934 words, excluding the parts of the brief exempted by

Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because it has been prepared in a proportionally spaced typeface using

Microsoft Word in 14-point Century Schoolbook font.

Dated: February 14, 2025          */s/ Roy T. Englert, Jr.*
                                  Roy T. Englert, Jr.