# 24-1209(L),

## 24-1200, 24-1210, 24-1213, 24-1218, 24-1223, 24-1360

### United States Court of Appeals
#### *for the*
### Second Circuit

———————●———————

AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD.,
NOVORIVER S.A., 683 CAPITAL PARTNERS, LP, ADONA LLC,
EGOZ I LLC, EGOZ II LLC, MASTERGEN, LLC, ERYTHRINA, LLC,
AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, WASO HOLDING
CORPORATION,

*Plaintiff-Appellants,*

and

APE GROUP SPA, ROMANO CONSULTING SPA, ICARO SRL,
ELAZAR ROMANO,

*Plaintiff-Appellants-Cross-Appellees,*

v.

REPUBLIC OF ARGENTINA

*Defendant-Appellee.*

————————

**On Appeal from the United States District Court
for the Southern District of New York**

---

## FINAL FORM REPLY BRIEF OF PLAINTIFF-APPELLANTS AND RESPONSE BRIEF OF PLAINTIFF-APPELLANTS-CROSS-APPELLEES

---

**[Counsel listed on following page]**

Michael R. Huston
Matthew M. Riccardi
H. Rowan Gaither, IV
Jacob J. Taber
PERKINS COIE LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036
(212) 261-6863

*Counsel for Plaintiff-Appellant
683 Capital Partners, LP*

Matthew S. Salerno
Michael E. Bern
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Plaintiff-Appellants
Adona LLC, Egoz I LLC, Egoz
II LLC, Mastergen, LLC,
Erythrina, LLC, AP 2016 1,
LLC, AP 2014 3A, LLC, AP
2014 2, LLC, WASO Holding
Corporation*

Javier Bleichmar
Evan A. Kubota
BLEICHMAR FONTI & AULD LLP
300 Park Avenue, Suite 1301
New York, NY 10022
212-789-1340

*Counsel for Plaintiff-Appellant
Novoriver S.A.*

Roy T. Englert, Jr.
Matthew M. Madden
Zachary N. Ferguson
Paul Brzyski
KRAMER LEVIN NAFTALIS
    & FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500

Edward A. Friedman
Daniel B. Rapport
Michael S. Palmieri
FRIEDMAN KAPLAN SEILER
    ADELMAN & ROBBINS LLP
7 Times Square, 28th Floor
New York, NY 10036
Tel: (212) 833-1100

*Counsel for Plaintiff-Appellants
Aurelius Capital Master, Ltd.
and ACP Master Ltd.*

Eric Joseph Grannis
LAW OFFICES OF ERIC J.
    GRANNIS
11 Broadway, Suite 615
New York, NY 10004

*Counsel for Plaintiff-Appel-
lants-Cross-Appellees Ape
Group SPA, Romano Consult-
ing SPA, Icaro SRL, Elazar Ro-
mano*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................iv

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................1

ARGUMENT ..................................................................4

I. The Global Security authorizes Plaintiffs' suits for the 2013 Payment Amounts ........................................................4

    A. Section 11's right to sue is not limited to payments of principal and interest .............................................4

        1. Section 11 permits Plaintiffs' actions to "enforce the payment" of "amounts due" on the GDP Securities ........................................................6

        2. Argentina's interpretation nullifies Section 11's payment-enforcement exception ...................................12

        3. Argentina cannot explain the differences between the Global Security's and Global Note's enforcement exceptions ...............................................15

        4. Argentina fundamentally misapprehends the purpose of no-action clauses and enforcement exceptions ....................................................16

    B. In the alternative, Payment Amounts are payments of principal or interest under Indenture Section 4.9 ...............20

        1. The Indenture and Global Security treat Payment Amounts as principal or interest ..................20

            (a) The Legend ........................................21

            (b) The Indenture's recitals and "Debt Securities" ........................................22

            (c) Indenture Exhibit E ...............................23

i

# TABLE OF CONTENTS—Continued

Page

2. Payment Amounts are "principal" or "interest" as those terms are defined ................................. 24

3. Argentina itself has repeatedly characterized Payment Amounts as "interest" in regulatory filings ........................................................ 26

4. Industry custom confirms that conditional payments are principal or interest ........................... 28

C. Argentina forfeited and waived its no-action defense .......... 29

1. Plaintiffs did not forfeit this argument ....................... 30

2. Argentina both forfeited and waived its no-action defense ............................................................ 31

D. Argentina's alternative grounds for affirmance, and its cross-appeal attacks on rulings of the district court, are baseless ................................................................. 35

1. Plaintiffs have established their right to bring their claims ........................................................ 35

2. The Romano Plaintiffs satisfied the Prescription Clause ............................................................... 40

3. WASO's claim is timely and proper ........................... 50

(a) WASO's notice of claim satisfies the Prescription Clause ................................. 50

(b) WASO's claim arises from Argentina's breaches of contract, which are not subject to the prescription period ................... 53

(c) The relation-back doctrine applies ................. 55

# TABLE OF CONTENTS—Continued

Page

II. The Court should reverse and remand with instructions to enter judgment in Plaintiffs' favor ...................................................57

    A. Argentina relies on extrinsic evidence, not text, and its reading of the Adjustment Provision is logically impossible ...................................................................................59

    B. Plaintiffs' interpretation gives effect to the Adjustment Provision and makes commercial sense ................................63

    C. The contract requires Argentina to publish Actual Real GDP in 1993 prices ................................................................65

CONCLUSION ........................................................................................71

iii

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Adamowicz v. IRS,*
552 F. Supp. 2d 355 (S.D.N.Y. 2008) ............................................. 10, 11

*Ajdler v. Province of Mendoza,*
890 F.3d 95 (2d Cir. 2018) ...................................................... 45

*Aktiebolag v. Andrx Pharms., Inc.,*
695 F. Supp. 2d 21 (S.D.N.Y. 2010) ........................................... 56

*Allan Applestein TTEE FBO D.C.A. Grantor Tr. v. Province
of Buenos Aires,*
415 F.3d 242 (2d Cir. 2005) ..................................... 32, 33, 40

*In re AXA Equitable Life Ins. Co. COI Litig.,*
595 F. Supp. 3d 196 (S.D.N.Y. 2022) ......................................... 40

*Baker v. Dorfman,*
239 F.3d 415 (2d Cir. 2000) ...................................................... 31

*Bank of N.Y. v. Battery Park City Auth.,*
251 A.D.2d 211 (1st Dep't 1998) .............................................. 18

*Batales v. Friedman,*
41 N.Y.S.3d 275 (2d Dep't 2016) ............................................... 42

*Bifolck v. Philip Morris USA Inc.,*
936 F.3d 74 (2d Cir. 2019) ...................................................... 58

*Chatham Capital Holdings, Inc. v. Conru,*
92 F.4th 107 (2d Cir. 2024) ..................................................... 13

*Classic Laundry & Linen Corp. v. Travelers Cas. Ins. Co. of
Am.,*
2017 WL 4350610 (S.D.N.Y. June 30, 2017) ........................... 43

*Commerzbank AG v. U.S. Bank, N.A.,*
100 F.4th 362 (2d Cir. 2024) ............................................. 38, 39

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Contant v. AMA Cap., LLC,*
    66 F.4th 59 (2d Cir. 2023) ................................................... 15

*Davis v. NMU Pension & Welfare Plan,*
    810 F. Supp. 532 (S.D.N.Y. 1992) ...................................... 50

*Diesel Pros S.r.l. v. Greystone Bus. Credit II LLC,*
    631 F.3d 42 (2d Cir. 2011) ................................................. 53

*Diorinou v. Mezitis,*
    237 F.3d 133 (2d Cir. 2001) ............................................... 58

*DRAW Capital Partners, LLC v. Republic of Argentina,*
    2018 WL 5777024 (S.D.N.Y. Nov. 2, 2018) ................... 33, 34

*Durabond Prods. Co. v. Local No. 743,*
    503 F. Supp. 136 (N.D. Ill. 1980) ....................................... 10

*Emmet & Co. v. Catholic Health E.,*
    37 Misc. 3d 854 (N.Y. Sup. Ct. 2012) ............................ 18, 32

*Fortune Limousine Serv., Inc. v. Nextel Commc'ns,*
    35 A.D.3d 350 (2d Dep't 2006) .......................................... 48

*Hauer Const. Co. v. City of New York,*
    85 N.Y.S.2d 42 (N.Y. App. Term 1948) ......................... 42, 46

*Hauser v. Western Grp. Nurseries, Inc.,*
    767 F. Supp. 475 (S.D.N.Y. 1991) ...................................... 12

*Hurlbut v. Christiano,*
    405 N.Y.S.2d 871 (4th Dep't 1978) .................................... 43

*Jackson v. Abernathy,*
    960 F.3d 94 (2d Cir. 2020) ................................................. 31

*Kashef v. BNP Paribas S.A.,*
    925 F.3d 53 (2d Cir. 2019) ................................................. 31

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Kemper Ins. Cos. v. United States*,
  2004 WL 1811390 (W.D.N.Y. Aug. 13, 2004) .................................... 55

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) ............................................................ 11

*Lavin v. Briefly Stated, Inc.*,
  2011 WL 1334845 (S.D.N.Y. Mar. 31, 2011) ............................... 42

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
  2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ................................ 32

*Long Island R.R. Co. v. Northville Indus. Corp.*,
  41 N.Y.2d 455 (1977)....................................................... 69, 70

*Lummus Co. v. Commonwealth Oil Refining Co.*,
  297 F.2d 80 (2d Cir. 1961) ................................................. 19

*Mastrovincenzo v. City of New York*,
  435 F.3d 78 (2d Cir. 2006) ................................................. 19

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  65 F.3d 1044 (2d Cir. 1995) ............................................... 13

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
  859 F. Supp. 743 (S.D.N.Y. 1994)....................................... 31, 32

*MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Ent. Corp.*,
  80 F. Supp. 3d 507 (S.D.N.Y. 2015)..................................... 16

*Merican Curtis, Inc. v. Meg-Na Transp., Inc.*,
  1986 WL 10291 (S.D.N.Y. Sept. 10, 1986) ........................... 56

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007) ............................................... 55

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Nassau Chapter Civil Serv. Emps. Ass'n v. County of Nassau*,
585 N.Y.S.2d 966 (Sup. Ct. 1992) ........................................ 42

*New Medico Assocs. v. Empire Blue Cross & Blue Shield*,
671 N.Y.S.2d 788 (3d Dep't 1998) ........................................ 49

*Newmont Mining Corp. v. AngloGold Ashanti Ltd.*,
344 F. Supp. 3d 724 (S.D.N.Y. 2018) ..................................... 42

*Northgate Elec. Corp. v. Barr & Barr, Inc.*,
877 N.Y.S.2d 36 (1st Dep't 2009) ........................................ 48

*Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*,
743 F.2d 85 (2d Cir. 1984) ............................................... 27

*Oil & Gas Ventures-First 1958 Fund, Ltd. v. Kung*,
250 F. Supp. 744 (S.D.N.Y. 1966) ........................................ 43

*Palladian Partners L.P. v. Republic of Argentina*,
[2024] EWCA Civ. 641 ...................................... 60, 62, 64, 68

*Perez v. MVNBC Corp.*,
2016 WL 6996179 (S.D.N.Y. Nov. 29, 2016) .............................. 56

*Perini Corp. v. City of N.Y.*,
18 F. Supp.2d 287 (S.D.N.Y. 1998) ....................................... 48

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
585 F. Supp. 3d 540 (S.D.N.Y. 2022) ..................................... 39

*Powell v. Ocwen Fin. Corp.*,
2023 WL 3756847 (S.D.N.Y. June 1, 2023) ................................ 27

*Powermat Techs., Ltd. v. Belkin Int'l Inc.*,
2020 WL 2892385 (S.D.N.Y. Apr. 2, 2020) ................................ 51

*Pressman v. Estate of Steinvorth*,
860 F. Supp. 171 (S.D.N.Y. 1994) ........................................ 40

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Quadrant Structured Prods. Co. v. Vertin*,
23 N.Y.3d 549 (2014) ...................................................................... 16, 19

*R.A. Mackie & Co. v. Petrocorp Inc.*,
329 F. Supp. 2d 477 (S.D.N.Y. 2004) .................................................. 37

*Racepoint Partners, LLC v. JPMorgan Chase Bank*,
2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) ........................................ 38

*RBC Capital Markets, LLC v. Educ. Loan Tr. IV*,
2011 WL 6152282 (Del. Ch. Dec. 6, 2011) ........................................... 18

*Reiss v. Financial Performance Corp.*,
97 N.Y.2d 195 (2001) .................................................................... 66, 67

*Rodriguez Narvaez v. Nazario*,
895 F.2d 38 (1st Cir. 1990) ................................................................ 46

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
2016 WL 439020 (S.D.N.Y. Feb. 3, 2016) ........................................... 32

*Sherrill v. Grayco Builders, Inc.*,
64 N.Y.2d 261 (1985) ........................................................................ 33

*St. Pierre v. Dyer*,
208 F.3d 394 (2d Cir. 2000) ............................................................... 46

*Staten Island Rapid Transit Operating Auth. v. ICC*,
718 F.2d 533 (2d Cir. 1983) ............................................................... 10

*Sutton v. East River Sav. Bank*,
55 N.Y.2d 550 (1982) ........................................................................ 69

*This is Me, Inc. v. Taylor*,
1996 WL 20745 (S.D.N.Y. Jan. 17, 1996) ........................................... 42

*United States v. Gomez*,
877 F.3d 76 (2d Cir. 2017) ................................................................ 31

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*United States v. Harrell,*
268 F.3d 141 (2d Cir. 2001) ............................................................ 31

*United States v. Resler,*
313 U.S. 57 (1941) ........................................................................... 9

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.,*
1 N.Y.3d 470 (2004) ...................................................................... 66

*Vista Outdoor, Inc. v. Reeves Family Tr.,*
725 F. App'x 17 (2d Cir. 2018) ...................................................... 48

*W.W.W. Assocs., Inc. v. Giancontieri,*
77 N.Y.2d 157 (1990) ...................................................................... 59

*Wagner Furniture Interiors, Inc. v. Kemner's Georgetown
Manor, Inc.,*
929 F.2d 343 (7th Cir. 1991) .......................................................... 40

*Wieder v. Skala,*
80 N.Y.2d 628 (1992) ...................................................................... 69

*Wood v. Duff-Gordon,*
222 N.Y. 88 (1917) .......................................................................... 67

**Statutes & Rules**

15 U.S.C. § 77ppp ................................................................................ 17

26 U.S.C. § 6103 .................................................................................. 11

Fed. R. Civ. P. 9 ............................................................... 29, 32, 34, 40

Fed. R. Civ. P. 12 ................................................................................ 32

Fed. R. Civ. P. 15 ................................................................................ 56

N.Y. Gen. Oblig. Law § 13-107 .......................................................... 38

# TABLE OF AUTHORITIES—Continued

**Page(s)**

N.Y. U.C.C. § 8-302................................................................37

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)....................................51

5 Corbin on Contracts § 24.16 (rev. ed. 2023) ........................27

Guillermo Francos (@GAFrancosOk), X (Oct. 15, 2024)........58

Hewlett Packard Co., CVR Agr. (Form 8-K, Ex. 99.1), § 9.7
    (Apr. 1, 2002)......................................................................29

Merriam-Webster (online ed. 2024).........................................51

19 *Moore's Federal Practice* § 205.05 (3d ed. 2024 update) ...................31

28 N.Y. Contract Law § 11:31 (2d ed. 2024 update) ...............69

*Oxford English Dictionary* (3d ed. 2010) ...............................25

Restoration Hardware, Inc., Subordinated Unsecured PIK
    Promissory Note (Jan. 24, 2008) ........................................25

Viacom Inc., CVR Agr. (Form S-4, Ex. 4.6), § 807 (June 6,
    1994) ....................................................................................29

11 *Williston on Contracts* § 32:11 (4th ed. 2024 update) .......65

5A Wright & Miller, *Federal Practice & Procedure* § 1295
    (4th ed. 2024 update) ....................................................33, 40

## INTRODUCTION AND SUMMARY OF ARGUMENT

According to Argentina, the core right to sue provided by the Global Security—which expressly protects "the right of any Holder of a Security to enforce the payment of any amounts due" under the Global Security— actually protects *nothing at all*. The English court correctly rejected that argument, recognizing that the restrictions imposed by the Global Security's no-action clause do not apply to individual holders' actions, like this one, for payments due under the Global Security. The English court also correctly determined that Argentina breached its payment obligations under the contract.

I.A.   The opening words of the no-action clause establish an exception that permits holders to sue individually for payment of "any amounts due" under the Global Security. That language was plainly modified from its counterpart in the Global Note, where the exception *is* limited to principal and interest. Thus, the exception in Section 11 of the Global Security reads: "*Except as provided* in Section 4.9 of the Indenture *with respect to the right* of any Holder of a Security *to enforce the payment of <u>any amounts due hereunder</u>* on any Payment Date" (emphasis added). That text dooms Argentina's attempted defense of the judgment below.

1

Argentina struggles to evade that plain language, for example pretending that the clause stops with the words "as provided in Section 4.9 of the Indenture." But the drafters' textual choice to guarantee holders' right without limitation to bring suit for "any amounts due hereunder" means that holders are entitled to sue for *any amounts* due under the Global Security. Argentina's accusation that Plaintiffs ignore the phrase "as provided in Section 4.9" is wrong. That phrase in Section 11 clarifies that holders' right to enforce the payment of any amounts due under the Global Security is absolute and unconditional—as described in Section 4.9.

B.    Even if the exception covers only principal and interest, Plaintiffs have the right to sue because Argentina's payments on the GDP Securities qualify. The Indenture itself treats Argentina's payments as principal and interest, and dictionary definitions, Argentina's own words, and industry custom support the same conclusion.

C.    Argentina raised its no-action defense too late, so the district court should not have reached it. That Argentina waited until summary judgment to raise this argument reflects its extreme weakness.

D.    Plaintiffs have capacity to sue. Whether raised as cross-appeal issues or alternative grounds for affirmance, Argentina's Prescription Clause and assignment arguments lack merit.

II.    Six years of litigation over a contract is enough. This Court can decide the merits now—a job made easier because the English judgment has achieved finality. The English court's decision is correct contract analysis, consistent with New York law, and worthy of preclusive effect. Argentina points to no difference between New York and English law that would justify a different result here.

If this Court is unprepared to remand for entry of judgment in Plaintiffs' favor, it should at least review the issues on which the district court has already ruled (some correctly, some incorrectly). The case should return to the district court with a correct interpretation of the Adjustment Provision, and a correct understanding of Argentina's duty to publish and Plaintiffs' ability to demonstrate damages by using the EMAE Index.

## ARGUMENT

### I. The Global Security authorizes Plaintiffs' suits for the 2013 Payment Amounts

#### A. Section 11's right to sue is not limited to payments of principal and interest

Section 11 of the Global Security is a no-action clause of the sort often found in bond indentures. It states a general prohibition and, in its opening words, an exception to that prohibition. That's typical. Generally, no-action clauses prohibit *some* kinds of suits unless they meet specified preconditions, but preserve *without* conditions each bondholder's right to sue to enforce its core entitlement to payment. That is how Section 11 operates, as the English courts held.

According to Argentina, the exception clause covers … *zilch*. A null set. Argentina insists that the exception applies to payments only of principal and interest but denies that *any* payment under the Global Security qualifies as principal or interest. Argentina's reading produces the extraordinary result that the words of Section 11's guaranteed "right" "to enforce" payment of "any amounts due" under the Global Security were empty when drafted and remain empty. That is a nonsensical reading.

Argentina would have this Court believe that the GDP Securities, unlike all of Argentina's other debt instruments, deny holders the

individual right to enforce payments due—a commercially necessary guarantee by a well-known serial defaulter. Plaintiffs, by contrast, read the exception to be exactly what its words convey: a recognition that the general prohibition against individual holders' suits does not apply "*as provided* in Section 4.9 of the Indenture *with respect to the right* of any Holder of a Security *to enforce the payment of any amounts due hereunder* on any Payment Date (as this Security may be amended or modified pursuant to Paragraph 22)." Glob. Sec. § 11 (emphasis added). That means that holders of Argentina's GDP Securities have the same "absolute and unconditional" individual right to enforce payments due under the Global Security that holders of Argentina's conventional bonds have to enforce the other payments due under the same Indenture (per Section 4.9).

Plaintiffs' straightforward construction of Section 11 fulfills the purpose of a no-action clause to give each holder a guaranteed right to enforce payment—similar to the rights of holders of euro-denominated GDP securities and holders of Argentina's other debt issued under the same Indenture.

### 1. Section 11 permits Plaintiffs' actions to "enforce the payment" of "amounts due" on the GDP Securities

Argentina does not even try to defend the district court's holding that Section 11's reference to "any amounts due hereunder on any Payment Date" refers to something other than Payment Amounts. *See* JA2532; Br. 34–38. Argentina's interpretation of Section 11 instead focuses almost exclusively on the phrase "[e]xcept as provided in Section 4.9 of the Indenture"—divorced from the "with respect to the right … to enforce … payment" language that follows. *See* Opp. 37–39. The "except" clause, Argentina claims, operates independently to *restrict* holders' "right … to enforce the payment of any amounts due" under the Global Security (Section 11) only to payments *of principal and interest*—payments that, Argentina asserts, are *never* due under the Global Security. Opp. 36–40.

That interpretation makes no sense. The no-action clause in Section 11 of the Global Security is materially identical to the Indenture's no-action clause, Section 4.8. Both clauses state a *general* prohibition on holder suits that don't satisfy a series of conditions designed to channel

6

such actions through the Trustee to prevent one-off actions that could prejudice other holders.

But both no-action clauses also provide an express exception preserving each holder's right to sue *individually* for payment *without* meeting the specified conditions. In the Indenture, that exception appears in Section 4.9, which provides:

> Notwithstanding Section 4.8, each Holder of Debt Securities shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on its Debt Security on the stated maturity date for such payment expressed in such Debt Security (as such Debt Security may be amended or modified pursuant to Article Seven) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

Indenture § 4.9. The Global Security's exception, at the beginning of Section 11, incorporates the "absolute and unconditional" right to "institute suit" in Section 4.9 and applies it "with respect to" each holder's entitlement to any payment under the Global Security:

> Except as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder on any Payment Date …

Glob. Sec. § 11.

The reference in the Global Security to Section 4.9 clarifies that the exception here works just like the exception in the Indenture, except that it applies to "any amounts due hereunder," not just "principal and interest" due under the Indenture. That reading does not, as Argentina argues (Opp. 39), render the phrase "as provided in Section 4.9 of the Indenture" a nullity. Rather, that phrase makes clear that each holder's individual right to enforce "any amounts due" under the Global Security is—as provided in Section 4.9—"absolute and unconditional"; encompasses a "suit for … enforcement"; and "shall not be impaired without the consent of [the] Holder." Section 11's enforcement exception thus authorizes suits to enforce the payment of "any amounts due" under the Global Security, JA1487(¶302)—including the 2013 Payment Amounts that Plaintiffs seek through this action.

Argentina's interpretation relies on an unnatural reading of Section 11, inserting an imaginary comma after the phrase "[e]xcept as provided in Section 4.9 of the Indenture." By so doing, Argentina contends that the phrase "[e]xcept as provided" nullifies Section 11's explicit exception for suits "to enforce the payment of *any amounts due hereunder*" by narrowing it to cover *only* suits for principal and interest—sums that

Argentina claims the GDP Securities don't even pay. But Argentina offers no remotely plausible explanation for drafting such a meaningless provision. If the Global Security does not allow the payment of principal and interest, then why would Section 11 guarantee a right to sue for "any amounts due hereunder" applicable *only* to (as Argentina asserts) non-existent amounts of principal and interest? Argentina fails to answer that glaring question.

Argentina's only case citation involves statutory language not at all similar to Section 11. In *United States v. Resler*, the Supreme Court interpreted Section 212(b) of the Motor Carrier Act of 1935, which read:

> Except as provided in section 213 … , any certificate or permit may be transferred, pursuant to such rules and regulations as the Commission may prescribe.

313 U.S. 57, 59 (1941) (alterations omitted). The Court held that the transferability of certificates and permits within Section 213's "sweep" was not governed by Section 212(b), and vice versa. *Id.* It did not hold that Section 212(b)'s reference to Section 213 meant that Section 212(b) covered *nothing*. Notably absent, moreover, was any language explaining that the exception "as provided" in Section 213 was to be applied *with respect to* something separately stated in Section 212(b).

9

What's more, Argentina's argument depends on breaking apart the phrase "[e]xcept as provided in Section 4.9 of the Indenture *with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder*." Glob. Sec. § 11 (emphasis added). Courts analyzing language similar to Section 11's "[e]xcept as provided … with respect to" construction—including this Court—have uniformly determined that the thing the exception applies "with respect to" must come within the scope of the exception.[1]  As the English trial court observed, "[i]t is obvious, in the circumstances, that section 4.9 ought to be regarded as referring to a claim for the Payment Amount." JA1487(¶300).

Argentina responds that "with respect to" can *never* be "language of extension," only "language of limitation." Opp. 44. It relies on *Adamowicz v. IRS*, in which the district court addressed the scope of confidential information submitted "with respect to a [tax] return." 552 F. Supp. 2d 355,

---

[1] *See, e.g.*, *Staten Island Rapid Transit Operating Auth. v. ICC*, 718 F.2d 533, 536 & n.1 (2d Cir. 1983) (interpreting phrase "[e]xcept as provided in Section 6(d) above with respect to the Transferred Employees" in purchase and sale agreement); *Durabond Prods. Co. v. Local No. 743*, 503 F. Supp. 136, 139 (N.D. Ill. 1980) (interpreting phrase "except as provided in Section 3 with respect to the wage re-opener on December 18, 1979" in labor agreement).

366–67 (S.D.N.Y. 2008) (interpreting 26 U.S.C. § 6103(b)(2)(A)).[2] In that particular statute, "with respect to a [tax] return" functioned as "language of limitation": without that "with respect to" phrase, *any* information received by the Treasury Department would become confidential and beyond the reach of public-access laws. *See id.* But just because those words were intended to narrow a vast universe of information in that provision, it hardly follows that "with respect to" in a different document should or could be read to nullify an express exception. Nothing in *Adamowicz* holds that the phrase "with respect to" is *categorically* (or usually) language of limitation. *Cf. Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) ("Use of the word 'respecting' in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject.").

Argentina's myopic focus on the phrase "with respect to," without addressing the text that follows, is sleight-of-hand to divert attention from the relevant context. The *full* text of Section 11—combined with the

---

[2] 26 U.S.C. § 6103(b)(2)(A) states in relevant part: "The term 'return information' means … any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary **with respect to a return** …" (emphasis added).

drafters' purposeful modification of that text from its counterpart in the Global Note—clearly demonstrates the unambiguous right to sue set forth in Section 4.9 with respect to holders' enforcement of "any amounts due" under the Global Security.

### 2. Argentina's interpretation nullifies Section 11's payment-enforcement exception

By treating the phrase "[e]xcept as provided in Section 4.9 of the Indenture" as limiting what follows to principal and interest payments only, and then arguing that amounts due under the Global Security are not payments of principal or interest, Argentina turns Section 11's exception into a clause preserving nothing at all. But New York contract law rejects interpretations that empty a key provision of any plausible meaning. *See, e.g., Hauser v. Western Grp. Nurseries, Inc.*, 767 F. Supp. 475, 488 (S.D.N.Y. 1991).

Argentina implausibly asserts that Section 11's exception still "plays a role" by "tell[ing] the reader that there is no exception besides" the one for enforcing payments of principal and interest under Section 4.9 of the Indenture. Opp. 40. But, in Argentina's telling, Section 4.9 by definition *cannot* apply to the Global Security because it is cabined to suits for payment of principal and interest.

12

If the drafters' intent were for the Global Security's no-action clause to apply without exception, then why not simply draft Section 11 with no exception clause? Other debt instruments intending that result are drafted that way. *See, e.g.*, *Chatham Capital Holdings, Inc. v. Conru*, 92 F.4th 107, 111 n.3 (2d Cir. 2024); *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1050 (2d Cir. 1995). Nor can Argentina explain why the "with respect to" language was needed to "tell[] the reader that there is no exception besides the one in Section 4.9." Opp. 40. If the drafters so intended, they could have begun Section 11 simply by saying "No Holder of a Security shall have any right …"

Argentina also half-heartedly argues that the exception was a placeholder in case the Global Security were someday amended to require Argentina to pay holders conventional principal and interest. Opp. 40–41. Argentina relies on a parenthetical clause contemplating amendment to the Global Security. *Id.* But this argument requires believing that the drafters (i) anticipated the Global Security might be drastically amended to replace contingent GDP-linked payments with conventional bonds; *and* (ii) believed for some reason that Section 11 of the Global Security—

13

but only that Section—needed to include a proviso to anticipate that (unlikely) radical transformation.

The actual purpose of this parenthetical phrase is different and straightforward. A materially identical phrase appears in both Section 11 of the Global Security and Section 4.9 of the Indenture to preclude a security's holder from arguing that it has an "absolute and unconditional" right to enforce the original payment terms even after they had been amended by a supermajority of holders. Otherwise, there could be tension between an individual holder's right to enforce its own payment entitlement (under Sections 4.9 and 11) and other holders' right to amend those payment terms for the entire series (under Article 7 of the Indenture and Section 22 of the Global Security). The drafters sensibly used a few words to resolve any such ambiguity.

Section 9 of the Global Note confirms as much: it too contains the same parenthetical phrase "(as … may be amended or modified …)" even though it, like the Indenture, *already* refers to a holder's right to sue for payments of "principal" and "interest." Argentina does not even try to explain how the same language in the Global Security and Global Note could have meant two different things.

14

### 3. Argentina cannot explain the differences between the Global Security's and Global Note's enforcement exceptions

Argentina offers no explanation for the differing language of the Global Security's and Global Note's payment-enforcement exceptions. As explained in Plaintiffs' opening brief (Br. 40–42), the Form of Global Security and Form of Global Note, each attached to the Indenture, contain nearly identical exceptions in their respective no-action clauses. The sole difference is that the Global Note (Section 9) preserves any holder's right "to enforce the payment of the *principal* of and *interest* on its Security," whereas the Global Security (Section 11) preserves any holder's right to "enforce the payment of *any amounts due hereunder*" (all emphasis added).

That difference must mean something. *See Contant v. AMA Cap., LLC*, 66 F.4th 59, 67 (2d Cir. 2023) ("the use of different terms in the same agreement implies that they are to be afforded different meanings" (cleaned up)). Argentina, however, cannot explain why Section 11's exception describes the payments to which it applies differently from how the Global Note's exception describes the payments to which it applies. Argentina says that "this observation merely shows that the language of

15

Section 11 was deliberately chosen for the GDP-linked Securities." Opp. 41 n.7. *That's precisely our point*. The phrase "any amounts due hereunder" in Section 11 *was* deliberately chosen for the GDP Securities, to make clear that holders have an unconditional right to enforce payments under the Global Security regardless of whether they are "principal and interest."

### 4. Argentina fundamentally misapprehends the purpose of no-action clauses and enforcement exceptions

The purpose of no-action clauses like Section 11 is to prevent litigation that "foster[s] the interests of minority securityholders at the potential expense of the majority's interest." *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 565–66 (2014). No-action clauses channel some such litigation through either the holders' trustee or the holders of a substantial percentage of bonds.

But no-action clauses (as here) typically preserve an individual holder's right to bring suit to enforce the issuer's core payment obligations to that holder. *MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Ent. Corp.*, 80 F. Supp. 3d 507, 517–18 (S.D.N.Y. 2015). Each holder's unconditional right to sue to enforce the core payment obligation

is critical to protecting investors' reasonable expectations against any inaction by a majority of investors. And a holder's lawsuit to enforce the amount that it is contractually due doesn't impair other holders' interests or remedies. For both reasons, a core-payment-obligation exception is a common and expected—sometimes mandated—proviso to no-action clauses' restrictions on holders' ability to sue individually.[3]

Section 11 accordingly excepts from the no-action clause all suits to enforce payments due under the Global Security. Argentina's argument (Opp. 42) that so interpreting that exception would "destroy[] the carefully crafted" no-action regime is just hot air. Argentina does not contend that affording holders of its conventional bonds or the Global Notes the right to sue for payment destroys the no-action clause applicable to those instruments. The same is true here. The obvious logic of the no-action regime is to distinguish between actions to enforce the issuer's core payment obligation to each security-holder and its more generalized obligations to them—not to treat payments due on bonds and payments due on contingent debt securities differently.

---

[3] *See* 15 U.S.C. § 77ppp(b) (prohibiting the impairment of a holder's right to receive bond payments under Trust Indenture Act-qualified indentures).

The no-action clause applies to "any suit, action or proceeding" instituted under any provision of the Indenture or Global Security *other than* a holder's action "to enforce the payment of any amounts hereunder." Glob. Sec. § 11. Holders might bring many kinds of suits seeking something other than enforcement of payment rights, and courts routinely apply no-action clauses with similar payment-enforcement exceptions to preclude such actions. *See, e.g.*, *RBC Capital Markets, LLC v. Educ. Loan Tr. IV*, 2011 WL 6152282, at *5 (Del. Ch. Dec. 6, 2011) (dismissing excessive-fees suit against issuer under New York law); *Emmet & Co. v. Catholic Health E.*, 37 Misc. 3d 854, 860 (N.Y. Sup. Ct. 2012) (dismissing bond-redemption suit against issuer), *aff'd*, 114 A.D.3d 605 (1st Dep't 2014); *Bank of N.Y. v. Battery Park City Auth.*, 251 A.D.2d 211, 211 (1st Dep't 1998) (mem.) (same).

Argentina cites two cases for the proposition that Plaintiffs' construction of the enforcement exception would be "contrary to courts' preference to interpret exceptions narrowly." Opp. 43. But the cases concern licensing regulations and arbitration agreements, not no-action clauses,

18

and Argentina has the law backwards.[4] It is *no-action clauses* that are "construed strictly and thus read narrowly" under New York law. *Quadrant*, 23 N.Y.3d at 560.

Argentina also argues that Plaintiffs' actions should be barred by the no-action clause because, if successful, they would "alter how the Payment Conditions are satisfied going forward," which could affect the rights of all holders. Opp. 62–63. But individual payment-enforcement actions typically excepted from no-action clauses invariably involve competing claims over whether an issuer has breached its contractual payment obligations, such that courts must interpret contractual terms to resolve those claims. This is equally true of the individual payment-enforcement actions under the Indenture and Global Note, with which Argentina takes no issue. No case supports Argentina's contention that any possible collateral effect on other holders' future entitlement to payments is a reason to ignore explicit payment-enforcement exceptions typical of no-action clauses.

---

[4] *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) (interpreting exception to street-vendor licensing regulations); *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 93 (2d Cir. 1961) (interpreting exception in arbitration agreement).

## B. In the alternative, Payment Amounts are payments of principal or interest under Indenture Section 4.9

As noted, Section 11 allows Plaintiffs' actions to enforce Argentina's payment of "amounts due" under the Global Security regardless of whether those amounts are "principal" or "interest." Section 11 applies the unconditional, guaranteed right to sue as provided in Section 4.9 with respect to *any* payments due under the Global Security, no matter what label Argentina would apply to those payments.

But if this Court were instead to read Section 11 to incorporate a "principal and interest" requirement, then to give that provision *any* meaning, Payment Amounts due under the Global Security must qualify as principal or interest. And Argentina itself has so described them.

### 1. The Indenture and Global Security treat Payment Amounts as principal or interest

Indenture Section 1.1 defines "Global Security" as "a Debt Security," a type of security that generally pays principal and interest. Section 4.9 then provides that "*each* Holder of *Debt Securities* shall have the right, *which is absolute and unconditional*, to receive payment of *the principal of* and *interest on* its Debt Security on the stated maturity date … and to institute suit for the enforcement of any such payment" (emphasis added). Unlike certain Indenture provisions that distinguish the

20

GDP Securities from other Debt Securities, *e.g.*, Sections 2.1(b)-(c) and 2.5(a), Section 4.9 applies to *all* Debt Securities, including the GDP Securities.

Moreover, although the GDP Securities' authorization provides that *certain* Indenture provisions do not apply to the Global Securities, Section 4.9 is conspicuously missing. *See* Br. 51 n.10. All of those provisions confirm that, if it matters, Payment Amounts due under the Global Security are payments of principal or interest.

Argentina's contrary arguments fail:

### (a)   The Legend

Like the district court (JA2533), Argentina relies on the Global Security's legend. Opp. 51–52. But the legend provides only that holders are not entitled to Argentina's payment of "principal in the amount of" or "interest based on" the GDP Securities' *notional amount*. It doesn't say that the payments to which holders *are* entitled—based on Argentina's GDP growth and in an amount capped well *below* the GDP Securities' notional amount—aren't "principal" or "interest." *See* Br. 52–53.

In other words, if a holder owns $1 billion notional in GDP Securities, the holder is not entitled to $1 billion in principal or to interest

calculated based on the $1 billion of notional. Rather, the holder is entitled to a *Payment Amount* if the specified conditions are met. Although the Payment Amount is allocated based on individual holders' notional amounts, the legend makes clear that there is no entitlement to any payment based on the notional amount itself.

Argentina claims (Opp. 52) that this reading of the legend contradicts Section 2(a) of the Global Security, which requires the Holder (Cede & Co.) to make a "*pro rata* distribution" of a Payment Amount to beneficial owners "based on the notional amount of this Security" that each owner holds. But Section 2(a) is consistent with Plaintiffs' interpretation of the legend: Both Section 2(a) and the legend confirm that notional amounts are used solely to allocate Payment Amounts among holders.

### (b)   The Indenture's recitals and "Debt Securities"

Argentina also argues that the Indenture's first recital "distinguishes between 'debentures, notes, bonds, other evidence[s] of indebtedness,' on the one hand, and 'GDP-Linked Securities,' on the other." Opp. 50, 56. That misstates the text, which lists those five things and then defines *all* of them as "Debt Securities." Indenture at 1.

22

Having defined "Debt Securities" to *include* the GDP Securities, the Indenture repeatedly affirms Argentina's obligation to pay principal and interest on each of the "Debt Securities." *See* Br. 49–51. Argentina notes that two sections were "adapt[ed]" to the Global Security by replacing the terms "principal" and "interest" with "amounts due hereunder." Opp. 52–53. That's correct, and it *strengthens* Plaintiffs' primary argument above that Indenture Section 4.9's enforcement exception is "adapted" to the Global Security through Section 11's intentional reference to "amounts due hereunder."

### (c) Indenture Exhibit E

The authorization for the GDP Securities, attached to the Indenture (at E-1), withholds the application of *certain* Indenture provisions from the Global Securities, but *not* Section 4.9. *See* Br. 51 n.10. That omission further confirms that Section 4.9 applies to the GDP Securities. *Id.* Argentina responds that Plaintiffs "misconstrue the purpose of Exhibit E," which supposedly serves only to identify "provisions of the Trust Indenture that are superseded by the specific terms of the GDP-linked Securities." Opp. 56–57. That can't be right—Argentina itself identifies two Indenture provisions (Sections 3.5(a) and 4.13) as superseded by

23

terms in the Global Security (Opp. 54–55), but they aren't listed in Exhibit E.

Even Argentina acknowledges that Exhibit E is designed to "avoid potential confusion" (Opp. 57) by identifying important Indenture terms inapplicable to the Global Security. If the drafters had intended Section 4.9's payment-enforcement exception *not* to guarantee GDP-Securities-holders' core right to payment, then they would have included Section 4.9 among the excluded provisions in Exhibit E.

### 2. Payment Amounts are "principal" or "interest" as those terms are defined

The district court's erroneous decision relied on dictionary definitions of "principal" and "interest." JA2532–33. But as explained in Plaintiffs' opening brief (Br. 53–55), those definitions *support* treating Payment Amounts as principal, interest, or both.

Argentina responds that Payment Amounts are not principal because they are "unknowable in advance" and "contingent on factors other than the amount of any investment." Opp. 48–49. It cites nothing for that proposition. No source defines principal in that way because it's demonstrably incorrect: payment-in-kind notes, for example, permit unpaid interest to be rolled into the note's principal such that the note's principal

24

amount is "unknowable in advance." *See, e.g.*, Restoration Hardware, Inc., Subordinated Unsecured PIK Promissory Note, at 1 (Jan. 24, 2008), https://tinyurl.com/yc6snurw ("[A]ny accrued but unpaid interest shall be capitalized and added … to the principal amount of this Note."). And the GDP Securities were exchanged *for the principal*, and in an amount *proportional to the principal*, of Argentina's defaulted legacy bonds. *See, e.g.*, JA93.

Argentina also asserts that Payment Amounts cannot be "interest" paid at "regular intervals" or at a "particular rate" because they are contingent on Argentina's GDP performance. Opp. 48–49. But the payment "intervals" *are* "regular" because they "conform[] to or [are] governed by an accepted standard of procedure or convention," *Regular*, *Oxford English Dictionary* (3d ed. 2010)—namely, the "procedure[s]" set forth in the Global Security—and are paid on a specified annual date. Payment Amounts are likewise paid at a "particular *rate*"—*i.e.*, "the amount of a charge or payment expressed as a percentage of another amount, or as a basis of calculation," *Rate*, *Oxford English Dictionary* (3d. ed. 2010)—because they are a "payment" that is "expressed … as a basis of calculation" in the Global Security. *See* Glob. Sec. § 2(b).

Dictionary definitions aside, it is simply untrue that interest must always be calculated at a fixed rate. As noted in Plaintiffs' opening brief, GDP-linked securities issued by other countries pay interest at variable rates based, in part, on the contingent performance of the country's economy. *See* Br. 55 n.11. Argentina nowhere grapples with those examples.

Finally, Argentina argues that it is "undisputed" that the GDP Securities were intended "to mirror many of the features of equity instruments." Opp. 50–51. But not in any way relevant here. Equity is junior to all debt obligations. By contrast, the GDP Securities are "Debt Securities" and explicitly on footing equal to Argentina's conventional bonds; the amount and due date of each payment are prescribed by the terms of the Global Security; the payment obligation is enforceable, not discretionary; and the GDP Securities do not give holders any control over the management of the issuer, Argentina.

### 3. Argentina itself has repeatedly characterized Payment Amounts as "interest" in regulatory filings

Until this litigation, Argentina has characterized Payment Amounts as "interest" in public regulatory filings. For a decade, Argentina described Payment Amounts under the GDP Securities as "interest,"

26

"interest expense," and "interest due on GDP-linked Securities." Br. 55 n.12, 56–57. Argentina now seeks to ignore those repeated, consistent, official statements. Opp. 58–59. But it is hornbook contract law that parties' post-ratification statements are relevant to a contract's interpretation.[5]

Argentina also argues that statements elsewhere in its SEC filings described the GDP Securities differently. Regardless, Argentina's own repeated description of the Payment Amounts as interest is strong evidence that the contractual phrase "principal and interest" can be understood to encompass those Payment Amounts. The Court should not permit Argentina now to renounce a decade's worth of regulatory filings characterizing Payment Amounts as "interest." *Cf. Powell v. Ocwen Fin. Corp.*, 2023 WL 3756847, at *12 (S.D.N.Y. June 1, 2023) ("a party's classification of assets in one manner in 'tax and regulatory filings' may disable that party from being able to 'seriously claim that' the asset should be classified

---

[5] *See* 5 Corbin on Contracts § 24.16 (rev. ed. 2023) ("In the process of interpreting a contract, the court can receive great assistance from the interpreting *statements made by the parties themselves* … The practical interpretation of a contract may thus be evidenced by the parties' acts *or by their words*." (emphasis added)); *Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 90-91 (2d Cir. 1984).

differently" in litigation (quoting *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 735–36 (2d Cir. 2010)).

### 4. Industry custom confirms that conditional payments are principal or interest

Argentina faults Plaintiffs' observation that contingent payments under contingent-value rights ("CVRs") have been treated as principal or interest for decades under the Trust Indenture Act of 1939 ("TIA"). *See* Br. 58–60. Its arguments are quickly dispatched.

First, Plaintiffs did not forfeit this observation by not offering it below. Opp. 59–60. This example, based on a similar debt security, is just that: *an example*. It is not a separate argument subject to forfeiture. Under Argentina's application of forfeiture doctrine, any analogy, example, illustration, or citation not deployed below is unavailable on appeal. That is not the law and would be especially nonsensical here, where Argentina's 107-page appellate brief expands on an argument it raised in just 1.5 pages below.

Second, Argentina complains that Plaintiffs fall short of establishing a custom or usage of trade on CVRs. Opp. 60. But Plaintiffs' point is subtler: Contrary to Argentina's insistence that contingent payments *cannot* be principal or interest, CVR issuers—since at least 1994—have

treated their contingent payments as principal or interest for purposes of TIA Section 316(b). *See* Br. 58 & n.14 (citing examples).[6] That consistent practice suggests that the Global Security's contingent payments can likewise be principal or interest.

### C. Argentina forfeited and waived its no-action defense

Argentina forfeited its no-action defense by failing to assert it early in the litigation, and it knowingly waived the defense by proceeding through costly litigation for years. *See* Br. 60–68.

First, Argentina's no-action defense is a challenge to Plaintiffs' contractual standing to bring their claims, and contractual standing is a "threshold defense[] … that must be raised and disposed of at the outset of the suit" under Federal Rule of Civil Procedure 9(a)(2). Br. 61–62 (alterations in original). Argentina forfeited this threshold defense (as even Argentina calls it, at Opp. 1, 2, 32, 73) by never raising it in *three* motions to dismiss. Br. 62–65.

---

[6] Contrary to Argentina's suggestion (Opp. 60), this was so before the first Global Security issued in 2005. *See, e.g.*, Viacom Inc., CVR Agr. (Form S-4, Ex. 4.6), § 807 (June 6, 1994), https://tinyurl.com/8hnzua2k; Hewlett Packard Co., CVR Agr. (Form 8-K, Ex. 99.1), § 9.7 (Apr. 1, 2002), https://tinyurl.com/2s45h4f4.

Second, Argentina's decision to litigate this case so far—without mentioning the no-action clause—also resulted in waiver under New York contract law. Just as a party cannot compel arbitration when it invokes the judicial process in a manner inconsistent with arbitration, so too a party cannot litigate a case extensively and then suddenly assert a contractual right not to be sued. Br. 66–68. Argentina's delay prejudiced Plaintiffs by waiting until after the statute of limitations had run, a tactic that Argentina does not deny was intentional. *See* Br. 65.

### 1. Plaintiffs did not forfeit this argument

Argentina first argues that Plaintiffs forfeited their own forfeiture argument. Opp. 64. From day one, however, Plaintiffs have claimed entitlement to Payment Amounts from the 2013 Payment Year. Plaintiffs' challenge to the timeliness of Argentina's no-action defense relates directly to the sole claim for relief asserted below.

The district court expressly considered timeliness and mistakenly concluded that Argentina's no-action defense was timely. *See* JA2523_n.11. Because the district court "raised [this] issue of law" and resolved it, it is "fully reviewable on appeal even though no party raised

it below." 19 *Moore's Federal Practice* § 205.05 (3d ed. 2024 update); *see also United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001).

If not, then this Court "should exercise [its] discretion" to consider that issue because it "presents a question of law" that the parties have extensively briefed and "there is no need for additional fact-finding." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 62 (2d Cir. 2019); *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000); *see also Jackson v. Abernathy*, 960 F.3d 94, 98 n.1 (2d Cir. 2020).

This Court also exercises its discretion when "there is a reason why" a party did not raise an argument below. *United States v. Gomez*, 877 F.3d 76, 95 (2d Cir. 2017). Here, Argentina's 1.5-page argument in its summary judgment brief ignored Section 11's exception altogether and instead asserted that the no-action clause's preconditions to suit *always* "must be satisfied" without exception. JA1241–42/SJA459–60. Plaintiffs showed why *that* argument was wrong instead of devoting briefing space to Argentina's waiver.

### 2. Argentina both forfeited and waived its no-action defense

Argentina cites a single relevant case, *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F. Supp. 743 (S.D.N.Y. 1994), for the

proposition that a no-action defense needn't be raised in a defendant's first responsive pleading. Opp. 64–66. But *McMahan* addressed only Federal Rule of Civil Procedure 12, which has no bearing on Plaintiffs' waiver argument. 859 F. Supp. at 749. *McMahan* was decided before this Court's *Applestein* decision, which applied Rule 9 (not Rule 12(h)) in holding that "an assertion of a party's capacity to sue"—including challenges to contractual "standing"—must be "raised and disposed of at the outset of the suit" as a "threshold defense[]." *Allan Applestein TTEE FBO D.C.A. Grantor Tr. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005).

Argentina argues that no-action defenses can never be forfeited. Opp. 66–69. But Argentina cites no case so holding—other than the outdated *McMahan* opinion. Argentina's assertion that a no-action defense is *not* a challenge to contractual standing contradicts the way numerous courts have analyzed the issue.[7] Indeed, it contradicts *Argentina's own*

---

[7] *See, e.g., LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *14 (S.D.N.Y. Mar. 29, 2022) ("Defendant argues that Plaintiffs lack *contractual standing* because of the Agreement's no-action clause. The Court finds it clear that the no-action clause *does not strip Plaintiffs of standing* to bring the claims asserted in this action." (emphasis added) (internal citation omitted)); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 439020, at *3 (S.D.N.Y. Feb. 3, 2016) ("[C]ompliance with the no-action clause is excused and Plaintiff does not lack *standing* on this ground." (emphasis added)); *Emmet & Co.,*

*position* in prior litigation arguing—successfully—that a plaintiff's "lack of standing" for failure to comply with Indenture Section 4.8 meant that the Complaint "must be dismissed."[8] Argentina's challenge to contractual standing had to be "raised and disposed of at the outset of the suit" under controlling authority. *Applestein*, 415 F.3d at 245.

Argentina's defense of its waiver of the purported contractual right not to be sued is likewise unpersuasive. Argentina contends that its conduct did not demonstrate "intent" to waive its rights under the no-action clause. Opp. 70. But Argentina failed to assert this defense at the outset of the litigation, and then "dr[e]w on the judicial process for a particular advantage," *Sherrill v. Grayco Builders, Inc.*, 64 N.Y.2d 261, 273 (1985)—obtaining discovery from Plaintiffs, *id.* at 274, and running out the clock on the statute of limitations, *see* Br. 65; 5A Wright & Miller, *Federal Practice & Procedure* § 1295 (4th ed. 2024 update) ("[a]llowing preservation of [capacity defenses] could operate to the plaintiff's prejudice if the

---

37 Misc.3d at 861 ("Plaintiffs' failure to comply with [the no-action] clauses' terms deprives them of standing."); Br. 63 n.17.

8 ECF No. 17 at 6-7, *DRAW Capital Partners, LLC v. Republic of Argentina*, No. 1:18-cv-00548-LAP (S.D.N.Y. May 18, 2018); *see also DRAW Capital Partners, LLC v. Republic of Argentina*, 2018 WL 5777024, at *2-4 (S.D.N.Y. Nov. 2, 2018).

defendant first asserted his objection under Rule 9(a) *after the statute of limitations had run*" (emphasis added)).

Argentina attempts to distinguish arbitration-waiver cases (Br. 66–67) by arguing that Argentina "was entitled to obtain evidence that Plaintiffs had failed to comply with the No-Action Clause before seeking judgment for failure to do so." Opp. 71. This is frivolous: Plaintiffs' complaints invoked Section 11's payment-enforcement exception, not satisfaction of the five conditions necessary to sue under the no-action clause. *See, e.g.*, JA182–83(¶¶15–17); JA2622–23(¶¶15–17); JA2566–67(¶¶16–18). Furthermore, Argentina could have simply inquired of the Trustee whether Plaintiffs had satisfied the no-action clause conditions. And, as Argentina knows from experience litigating Indenture Section 4.8, courts grant motions to dismiss for lack of contractual standing when the complaint fails to plead compliance with an applicable no-action clause. *See DRAW Capital Partners*, 2018 WL 5777024 at *2–4.

### D. Argentina's alternative grounds for affirmance, and its cross-appeal attacks on rulings of the district court, are baseless

Argentina fires a scattershot of grounds on which it claims this Court may affirm the district court's bottom-line judgment against Plaintiffs. Opp. 72–82. Each of Argentina's alternative arguments is meritless.

#### 1. Plaintiffs have established their right to bring their claims

Argentina first contends (Opp. 74) that, because four Plaintiffs purchased "all or the vast majority of their Securities" *after* Argentina announced that no payment was due, these Plaintiffs are claiming damages that accrued to someone else. *Id.* at 76. This is factually and legally wrong.

(a.) First, the Global Security itself grants the right to sue for failure to pay to *any new beneficial owner* upon its receipt of the GDP Securities.[9] Each successive beneficial owner is deemed to be an original owner, with the same rights as if it received the GDP Securities contemporaneously with the bonds.

---

[9] As noted in footnote 3 of Plaintiffs' opening brief, Plaintiffs have generally used the term "holder" colloquially to refer to security holders sometimes described by the Global Security as "beneficial owners."

The GDP Securities were originally issued as a "Unit" with new Debt Securities. *See* Glob. Sec. § 1(b); JA1355(§1) (2010 GDP Securities enjoy same privileges under 2005 Indenture). Argentina granted holders of GDP Securities the same rights to enforce payment as holders of the other Debt Securities. The Global Security treats each successive beneficial owner as if it were an original holder:

> The Republic expressly acknowledges, with respect to the right of any Holder to pursue a remedy under the Indenture, the GDP-Linked Securities Authorization or the Securities, the right of any beneficial owner of Securities to pursue such remedy with respect to the portion of this Global Security that represents such beneficial owner's interest in this Security as if Certificated Securities had been issued to such beneficial owner.

Glob. Sec. § 11.

The alternative would be chaos. Like almost all debt securities, the GDP Securities trade on open markets among anonymous buyers and sellers, settling electronically without any written contract. It is wholly impractical, if not impossible, for a buyer to ascertain the chain of beneficial ownership of a given security and then confirm that each predecessor in interest documented an assignment of rights. By treating successive beneficial owners as if the GDP Securities were issued to them, the governing documents intentionally provide certainty as to whom

36

payments are due, as well as who may have claims for failure to pay. The governing documents likewise prevent duplicative recovery on the same security. Argentina's position, by contrast, would separate the right to sue for prior non-payments from current beneficial owners' right to sue for future payments, creating uncertainty and risking competing claims.

(b.) Even if the Global Security did not provide that holders have the right to sue for nonpayment, New York law does. "[A] purchaser of a certified or uncertified security acquires all rights in the security that the transferor had or had power to transfer," N.Y. U.C.C. § 8-302, including all such "rights against the issuer under the contract," *R.A. Mackie & Co. v. Petrocorp Inc.*, 329 F. Supp. 2d 477, 507 (S.D.N.Y. 2004). "[A]ll rights" includes claims against Argentina arising from its breach of the Global Security *before* the GDP Securities were transferred. *R.A. Mackie*, 329 F. Supp. 2d at 507 (plaintiffs could bring claims against issuer based on warrants purchased post-breach under Texas statute identical to N.Y. U.C.C. § 8-302).

Argentina's only response below to N.Y. U.C.C. § 8-302 was to assert that Plaintiffs hadn't established that New York law governs the transfer of the GDP Securities' litigation rights. JA2234/SJA1063. Yet

Argentina now relies on New York law to argue that Plaintiffs have failed to show that an assignment occurred. *See* Opp. 75 (citing N.Y. Gen. Oblig. Law § 13-107).[10]

New York law governs this issue even without Argentina's helpful concession. The Indenture (Section 12.7) and Global Security (Section 16) expressly state that New York law governs, which this Court has held relevant to whether transfer of litigation rights is governed by New York law. *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 385 (2d Cir. 2024). Moreover, as in *Commerzbank*, Cede & Co. is the Holder of the 2005 GDP Securities, meaning that the transfers of beneficial interests in those securities "occur[red] in and [were] governed by the laws of New York." *Id.* at 385.

---

[10] Argentina's reliance on N.Y. Gen. Oblig. Law § 13-107 is curious: the statute applies only to "bonds," "interests in an issue of bonds," "notes," "debentures," or "other evidences of indebtedness"—the types of debt securities that Argentina spends *15 pages* trying to distinguish from the GDP Securities. *See* Opp. 46-61. In any event, Section 13-107 is no barrier here. It provides that "a transfer of any bond shall vest in the transferee *all claims or demands of the transferrer* … for damages or rescission against the obligor on such bond" "[u]nless expressly reserved in writing" (emphasis added). This results in "automatic assignment of bondholders' claims" upon transfer. *Racepoint Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416, at *4 (S.D.N.Y. Oct. 26, 2006).

Plaintiffs introduced still more evidence at summary judgment showing that New York law applies under New York choice-of-law principles. *See* JA1818_n.23/SJA659_n.23; JA2495–96; JA1726–27(¶¶216–23)/SJA567–68(¶¶216–23). Even if the evidence Plaintiffs introduced does not address each purchase by each Plaintiff, it should still suffice to deny Argentina summary judgment on this issue, which the district court did not reach.[11]

The cases Argentina cites show only that *transferors* of securities failed to demonstrate that they had *retained* the right to sue post-transfer. *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 563 (S.D.N.Y. 2022); *Commerzbank*, 100 F. 4th at 384. But Plaintiffs are transferees. Moreover, none of the securities at issue in those cases provided, as the Global Security does, that beneficial owners have the same enforcement rights as the Holder.

(c.) Argentina's argument also was waived. A challenge to the validity of the assignment of a claim is a challenge to a party's capacity to

---

[11] Beneficial owners of Argentina's *bonds* have brought numerous payment-enforcement cases over the past three decades, likewise governed by New York law, without any court ever holding that current bondholders had to establish a historical chain of assignments of litigation rights.

sue. *See In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 231 (S.D.N.Y. 2022); *Applestein*, 415 F.3d at 245. If a capacity-to-sue "defense is not raised in a timely manner, i.e. at the outset of a lawsuit, it is waived." *Pressman v. Estate of Steinvorth*, 860 F. Supp. 171, 176 (S.D.N.Y. 1994); *see also* Br. 62–63; *Applestein*, 415 F.3d at 245; *Wagner Furniture Interiors, Inc. v. Kemner's Georgetown Manor, Inc.*, 929 F.2d 343, 345 (7th Cir. 1991).

Argentina did not raise this defense in its motions to dismiss or answers. As with Argentina's no-action defense, Argentina dawdled through fact and expert discovery and belatedly advanced this argument at summary judgment. That delay effected a waiver under Rule 9. *See* 5A Wright & Miller, *Federal Practice & Procedure* § 1295 (4th ed. 2024 update).

### 2. The Romano Plaintiffs satisfied the Prescription Clause

Elazar Romano is an 82-year-old resident of Bologna, Italy, who designed packaging machines before taking up investing in his retirement. JA3318(¶¶1–3). He invests his money directly and through his companies. (We will refer to Mr. Romano and his companies as the "Romano

Plaintiffs," rather than the "Ape Group Plaintiffs," as Mr. Romano is the common link between them.)

The Romano Plaintiffs purchased GDP Securities long before Argentina defaulted on them. In fact, Mr. Romano first learned about these securities because he received some automatically in exchange for bonds on which Argentina had defaulted. JA3318(¶¶5–6).

In the fall of 2019, Mr. Romano heard that other holders of GDP Securities had sued Argentina, and decided to sue if the court denied Argentina's then-pending motion to dismiss. JA3319(¶¶9–10). Accordingly, the Romano Plaintiffs' counsel sent three emails to Argentina's counsel asserting their claim against Argentina and seeking a tolling agreement. Argentina's counsel never responded, so the Romano Plaintiffs thereafter sued within New York's six-year statute of limitations.

(a) Argentina contends that the Romano Plaintiffs failed to comply with the Global Security's Prescription Clause (Section 14). However, as the district court properly held, this clause requires only that a "claim" be "made" within five years—not that a lawsuit be filed. JA3329–30.

"Contractual stipulations which limit the right to sue to a period shorter than that granted by statute, are not looked upon with favor

41

because they are in derogation of the statutory limitation." *Hauer Const. Co. v. City of New York*, 85 N.Y.S.2d 42, 44 (N.Y. App. Term 1948), *aff'd*, 93 N.Y.S.2d 915 (1st Dep't 1949). "Hence, they should be construed with strictness against the party invoking them." *Id.*; *accord Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 344 F. Supp. 3d 724, 748 (S.D.N.Y. 2018); *Lavin v. Briefly Stated, Inc.*, 2011 WL 1334845, at *6 (S.D.N.Y. Mar. 31, 2011) (such provisions are "[v]iewed with caution and construed strictly against the party invoking them" (cleaned up)). An intention to shorten the statute of limitations must be "clearly and unequivocally set forth." *Nassau Chapter Civil Serv. Emps. Ass'n v. County of Nassau*, 585 N.Y.S.2d 966, 970 (Sup. Ct. 1992), *aff'd,* 612 N.Y.S.2d 880 (2d Dep't 1994); *Batales v. Friedman*, 41 N.Y.S.3d 275, 276 (2d Dep't 2016) (provision must be "clear and unambiguous").

Applying these principles, courts have repeatedly held that: (i) a contractual time limitation does not require the filing of a lawsuit within the specified period unless the clause makes this clear; and (ii) the word "claim" does not make this clear. *See This is Me, Inc. v. Taylor*, 1996 WL 20745, at *1–2 (S.D.N.Y. Jan. 17, 1996) (contract requiring that a "claim" be made within a specified time did not "clearly or unequivocally"

42

shorten the statute of limitations since it did "not mention the filing of an action in a court of law"); *Oil & Gas Ventures-First 1958 Fund, Ltd. v. Kung*, 250 F. Supp. 744, 753 (S.D.N.Y. 1966) (requirement that "claims … be presented within two years does not indicate any clear intention to shorten the statutory limitation period"); *see also Hurlbut v. Christiano*, 405 N.Y.S.2d 871, 873 (4th Dep't 1978) (provision that "representations and warranties … survive the closing for a period of three (3) years" required only that defendant be "noticed" during this period). Argentina could have included a suit-limitation provision, but did not. *See, e.g.*, *Classic Laundry & Linen Corp. v. Travelers Cas. Ins. Co. of Am.*, 2017 WL 4350610, at *4 (S.D.N.Y. June 30, 2017) (finding suit limitation unambiguous where contract had provision noting that "[n]o one may bring a legal action ... unless ... [t]he action is brought within 2 years after the date on which the direct physical loss or damage occurs"), *aff'd*, 739 F. App'x 41 (2d Cir. 2018).

The GDP Securities' Prescription Clause requires that a "claim" be "made" within five years. JA3304(§14). As the above-cited authority establishes, such language does not clearly or unequivocally require that *a lawsuit* be brought within that period. Moreover, the Global Security

consistently uses *other* terms to refer to lawsuits, including "suit, action or proceeding," "action, suit or proceeding," "action or proceeding," "actions," "actions or proceedings," "legal action or proceedings," "suit," "proceedings," and "legal or judicial process." Glob. Sec. §§ 11, 11(b), 11(d), 17, 18, 19(a), 20, 22(f).

Argentina cites two out-of-Circuit, unpublished district-court decisions in which the word "claim" was interpreted to mean "lawsuit." Opp. 82 (citing *Greenwood Nursery, Inc. v. Home Depot, U.S.A., Inc.*, 2008 WL 4181186, at *1 (N.D. Ga. Sept. 4, 2008), and *Pulmonary Assocs. of Charleston PLLC v. Greenway Health, LLC*, 2020 WL 9073551 (N.D. Ga. June 29, 2020)). But those decisions turned not on the word "claim" but on the word "bring" (in the phrases "bring any claim or dispute" and "no claim … may be brought") given that one "brings" a lawsuit. Here, the Prescription Clause uses the word "made," not "bring." Accordingly, the foregoing cases support the Romano Plaintiffs' position that they had to "make" a claim, not "bring" a lawsuit. And that's what they did.

Moreover, as the district court observed (JA3329–30), the Prescription Clause must be interpreted in light of Section 2(e) of the Global

44

Security—the only other section that mentions "prescription"—which concerns the Trustee's retention of unclaimed funds:

> Any monies … remaining unclaimed for five years or any shorter prescription period provided by law … shall be repaid to the Republic …, and the Holder of any such Security may thereafter look only to the Republic for … payment …

JA3299. Since the Prescription Clause's purpose is to provide notice that enables the Trustee to determine whether to release funds to Argentina, the assertion of a claim is sufficient. Moreover, by allowing holders to seek payment from Argentina after the five-year prescription period, Section 2(e) demonstrates that the Prescription Clause is not, as Argentina asserts, a contractually shortened statute of limitations.

Argentina cites *Ajdler v. Province of Mendoza,* 890 F.3d 95, 98–100 (2d Cir. 2018), but as the plaintiff in that case didn't claim to have provided notice within the prescription period, the issue of whether notice would have sufficed wasn't raised. Moreover, as the district court noted (JA3327), *Ajdler*'s discussion of prescription was dicta since the ten-year-old claims at issue there were already barred by the statute of limitations. The "dispositive question" in *Ajdler* was "whether claims for interest payments continue to accrue even after claims to the principal have unquestionably been time-barred." JA3328.

45

Finally, Argentina cites cases stating that the civil-law concept of prescription is "analogous" to or "roughly synonymous" with a statute of limitations. Opp. 80–81. Therefore, Argentina maintains, prescription must also require the filing of lawsuits. However, as one of Argentina's own cited cases acknowledges, common-law prescription requirements can be tolled by other events such as "interruption" and "renunciation." *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir. 2000). In Italy, where Mr. Romano lives, prescription periods are tolled by notice, and the notice in this case would have had this effect there. JA3320–22(¶¶2–13). Similarly in Puerto Rico, another jurisdiction with a civil-law heritage, prescription periods can be tolled by "an extrajudicial claim" which "include[s] virtually any demand formulated by the creditor." *Rodriguez Narvaez v. Nazario*, 895 F.2d 38, 44 (1st Cir. 1990). Thus, to the extent Argentina's use of the term "prescription" is intended to incorporate this civil-law concept, it would support the Romano Plaintiffs' position.

Argentina has thus failed to establish that its interpretation of the Prescription Clause survives the requirement that this provision be "construed with strictness against the party" claiming that it shortens the statute of limitations. *Hauer*, 85 N.Y.S.2d at 44.

(b) The Romano Plaintiffs made a claim within the prescription period. On November 4, 2019, Mr. Romano's attorney informed Argentina's counsel via email that Mr. Romano "owns $126,000,000 in U.S. Dollar-Denominated GDP-Linked Securities (ISIN: US040114GM64)," had become "aware of the cases brought by Aurelius Capital and Novoriver with respect to GDP-Linked Securities," and "wishe[d] to preserve his rights while these litigations proceed without having to bring a suit against Argentina." JA2896. The attorney followed up twice. JA2897–99. The recipients of these emails included four attorneys who have filed appearances in this action. JA2898–99. Argentina did not agree to a tolling agreement, and the Romano Plaintiffs brought suit within the limitations period.

These emails went beyond what was required to give Argentina adequate notice since they identified (i) the types of securities held by the Romano Plaintiffs; (ii) the number of securities they held; and (iii) the nature of their claim (*i.e.*, the same as that being asserted by Aurelius Capital and other Plaintiffs).

Argentina objects that this notice was unclear and improperly served. Under New York law, however, "strict compliance with contractual notice provisions need not be enforced where the adversary party

47

does not claim the absence of actual notice or prejudice by the deviation." *Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 35 A.D.3d 350, 353 (2d Dep't 2006) (collecting cases); *accord Vista Outdoor, Inc. v. Reeves Family Tr.*, 725 F. App'x 17, 23 (2d Cir. 2018) (quoting *Fortune Limousine*).

Argentina incorrectly cites two cases for the proposition that New York law requires "strict compliance" with notice provisions. Both cases involved contracts that themselves explicitly required strict compliance. *See Perini Corp. v. City of N.Y.*, 18 F. Supp.2d 287, 290 (S.D.N.Y. 1998) (contract requiring that claimant have "strictly complied with all requirements relating to the giving of notice"); *Northgate Elec. Corp. v. Barr & Barr, Inc.*, 877 N.Y.S.2d 36, 37 (1st Dep't 2009) ("provision setting forth the consequences of a failure to strictly comply"). The provision at issue here includes no such language.

Thus, Argentina must establish that it failed to receive actual notice or was prejudiced. Unsurprisingly, Argentina does not deny that it received actual notice as a result of the emails sent to the attorneys already representing it in this litigation. Neither does Argentina establish prejudice. Although it complains that Mr. Romano didn't "make any demands or assert any rights," (Opp. 79), Argentina fails to explain how it

48

was unclear that Mr. Romano was asserting the same claims for payment that were being made in the referenced lawsuit or what actions it might have taken had this notice been worded differently.

(c) Before investing in the GDP Securities, Mr. Romano reviewed the prospectus that Argentina had made available online through the Luxembourg Stock Exchange. JA3319(¶7). However, neither that prospectus nor any other document provided to investors through the Luxembourg Stock Exchange disclosed the GDP Securities' Prescription Clause. *See generally* JA2900–3294,_3307–17. This was particularly misleading since this prospectus *did* disclose a prescription clause for the new bonds. *Compare* JA3283 (disclosing the bonds' prescription clause) *with* JA3283–85 (failing to disclose the GDP Securities' Prescription Clause).

Argentina relies principally on cases in which parties executed bilateral commercial agreements containing time limitations. A case like this in which Mr. Romano was never even given a document disclosing the time limitation, much less executed one, is different. *See New Medico Assocs. v. Empire Blue Cross & Blue Shield*, 671 N.Y.S.2d 788, 789 (3d Dep't 1998) (declining to grant summary judgment where plaintiffs "were

49

not provided with a copy of the underlying [insurance] policy" but rather a booklet that did not reference the provisions shortening the claim period); *Davis v. NMU Pension & Welfare Plan*, 810 F. Supp. 532, 534 (S.D.N.Y. 1992) (pension plan's claim period not adequately disclosed under New York law). Such an inadequately disclosed time limitation should be applied narrowly if at all.

### 3.   WASO's claim is timely and proper

Addressing an argument never reached below, Argentina briefly argues that some of WASO's claims are barred by the Prescription Clause. Opp. 77–79.  Argentina is wrong for multiple reasons.

#### (a)   WASO's notice of claim satisfies the Prescription Clause

After incorrectly arguing (with respect to the Romano Plaintiffs) that the Prescription Clause requires the filing of a lawsuit, Argentina now argues that even the filing of a lawsuit within the prescription period doesn't satisfy the condition. When WASO commenced litigation against Argentina on December 11, 2019, *within* the prescription period, it gave notice to Argentina that "the GDP Warrants require Argentina to pay, at

minimum, USD $1,320,255,073.65 to holders of the GDP Warrants" for Reference Year 2013.[12] JA2748(¶15).

WASO's first claim for relief alleges that "Argentina was contractually obligated to make a Payment Amount of at least USD $0.07680 *per notional dollar* on December 15, 2014" and that "Argentina breached its contractual obligations by failing to … pay such amount when due." JA2779(¶110) (emphasis added). Therefore, WASO provided proper and timely notice to Argentina sufficient to satisfy the Prescription Clause, and Argentina received notice of the *total* Payment Amount due, including a detailed calculation, within the five-year prescription period. This is more than sufficient to "make" a "claim" under the prescription clause for all amounts sought in this litigation.[13]

---

[12] Indeed, Argentina received actual notice of the total Payment Amount due for 2013 as early as 2017: On September 25, 2017, an Aurelius official sent Argentina's secretary of finance a letter stating that the Republic "owed the holders of the GDP Warrants a Payment Amount for Reference Year 2013 of approximately $1.3 billion," but "[n]one of these amounts have been paid." JA1712(¶173)/SJA553(¶173).

[13] *See Powermat Techs., Ltd. v. Belkin Int'l Inc.*, 2020 WL 2892385, at *13 (S.D.N.Y. Apr. 2, 2020) ("The pertinent Black's Law Dictionary definitions of 'claim' are '[t]he assertion of an existing right; any right to payment or to an equitable remedy, *even if contingent or provisional*,' and '[a] demand for money, property, or a legal remedy to which one asserts a right … [a]lso termed claim for relief.'" (emphasis added) (citing *Claim*, Black's Law Dictionary (11th ed. 2019)); *Claim*, Merriam-Webster

51

Argentina emphasizes that WASO acquired additional securities after December 15, 2019, and argues that claims based on "these additional Securities … were already time-barred" when WASO acquired them. Opp. 78. But WASO had already by that date timely given notice that Argentina was obligated to pay $1.32 billion to the "holders of the GDP Warrants" JA2748(¶15), a payment amount that encompassed the amount it seeks with respect to the additional securities, thereby satisfying the Prescription Clause.

Furthermore, the Payment Amount due is a single claim of the sole "Holder," Cede & Co., which has continuously held the right to enforce payment under the 2005 Global Security. WASO's entire beneficial ownership of the GDP Securities relates to the single issuance of the 2005 Global Security. Section 11 of the 2005 Global Security vests "any beneficial holder" with the remedial right to bring suit to enforce payment. Because WASO gave timely notice of the Holder's claim and instituted suit with respect to *all* its beneficial holdings before expiration of New

---

Dictionary (online ed. 2024) ("a demand for something due or believed to be due").

York's six-year statute of limitations, the prescription clause is no barrier to WASO's claim.[14]

### (b) WASO's claim arises from Argentina's breaches of contract, which are not subject to the prescription period

Furthermore, Argentina breached its notice obligations under the Global Security. *See* Glob. Sec. § 2(a) ("The Republic shall announce any payments hereunder prior to the relevant Payment Date by notice to the Trustee or through publication as provided [herein]."). Instead of the required contractual notice of payment due, Argentina published an announcement denying any payment due. Argentina did not notify holders about its unilateral modification of the calculation method, leaving Plaintiffs guessing about the reasons for the surprise non-payment and their remedies. JA1710–11(¶168)/SJA551–52(¶168).

---

[14] Argentina cites *Diesel Pros S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 55 (2d Cir. 2011), for the proposition that assignees take property subject to their assignor's liabilities. That is doubly irrelevant here. Because there is only one continuous Holder of the 2005 Global Security (Cede & Co.), there was no transfer of ownership, merely a change in *beneficial ownership* that does not affect the Prescription Clause analysis. Moreover, the additional GDP Securities carried no "liabilities"; WASO satisfied the Prescription Clause by claiming Argentina was obligated to pay the Holder (for the benefit of all beneficial owners).

Further, as the district court recognized, to determine whether a payment was due in any given year, the Global Security required Argentina to continue to measure Actual Real GDP in constant 1993 prices. JA301,_306–07. Argentina did not do so, however, and first revealed that it had impermissibly used a constant-factor approach in the English proceedings, several years later. Argentina thereby frustrated the ability of holders to sue.

This is not a case involving unclaimed funds deposited with the Trustee, or even a case where the Republic acknowledged that payment was due but failed to deposit funds with the Trustee. Rather, here the Republic ignored the contract, unilaterally changed the calculation methodology without consent, and failed to publish contractually necessary data in order to avoid payment for Reference Year 2013 and frustrate holders' ability to show their entitlement to payment.

In such circumstances, Argentina's prescription period was unenforceable or tolled until holders received notice of the methodology used to conclude that no payment was owed. "[A] party's performance under a contract is excused where the other party has substantially failed to

54

perform its side of the bargain." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).

### (c) The relation-back doctrine applies

Finally, WASO's updated beneficial holdings relate back to the claim in its initial complaint, filed during the prescription period. The initial complaint, subject to amendment at any time before expiration of New York's six-year statute of limitations, asserted a provisional right to payment on the total Payment Amount due for Reference Year 2013. The complaint did not specify a particular amount due, merely indicating that Plaintiffs together sought to recover "amounts in excess of $75 million." JA2748(¶16).

WASO's amended complaint clarified the particular beneficial holdings for which WASO sought relief, but did not change its claim. *See generally* JA2783–2826. The amended complaint updated Argentina with respect to WASO's holdings and brought the claim "up to date." *Kemper Ins. Cos. v. United States*, 2004 WL 1811390, at *4 (W.D.N.Y. Aug. 13, 2004). No additional claims have been made, and the theory of recovery has not changed.

Courts routinely allow parties to amend a claim if the amendment "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," Fed. R. Civ. P. 15(c)(1)(B), particularly where the "defendant had notice of the subject matter of the dispute and was not prejudiced in preparing his defense," *Aktiebolag v. Andrx Pharms., Inc.*, 695 F. Supp. 2d 21, 27, 28 n.2 (S.D.N.Y. 2010). Argentina had "notice of the subject matter of the dispute" and was not "prejudiced in preparing [its] defense" by virtue of WASO's amended complaint. *Id*. And "[t]he fact that an amendment increases the amount of recovery sought has no bearing on the question of relation back." *Merican Curtis, Inc. v. Meg-Na Transp., Inc.*, 1986 WL 10291, at *2 (S.D.N.Y. Sept. 10, 1986); *see also Perez v. MVNBC Corp.*, 2016 WL 6996179, at *5 (S.D.N.Y. Nov. 29, 2016) ("[B]eing exposed to greater potential damages is not prejudicial if the conduct relied upon for the theory of damages does not change substantially.").[15]

---

[15] For that reason, the English courts held that relation back is applicable. JA1482(¶276) ("All that the Second Claimant has done since the proceedings were begun is amend its holdings. That does not amount to a new claim …. In any event, … the doctrine of relation back applies.").

In arguing that a hypothetical "plaintiff who acquired a single dollar's worth of Securities to timely sue could then later acquire and recover for all of the remaining outstanding Securities," JA1247/SJA465, Argentina misapprehends the relief sought. The "finality and repose" (*id.*) that Argentina seeks derives from New York's six-year statute of limitations, which has already passed.

Here, WASO commenced litigation with respect to all of its current beneficial holdings within the limitations period. Having complied with both the Prescription Clause and New York's statute of limitations, WASO needs to show no more to justify relief on all WASO's holdings as provided in the amended complaint.

## II. The Court should reverse and remand with instructions to enter judgment in Plaintiffs' favor

The judgment against Argentina in England became final on October 15, 2024, when the Supreme Court of the United Kingdom denied review. Acknowledging the denial, Argentina's chief of cabinet publicly expressed Argentina's "greatest commitment to work every day to become a serious country for the world again" and attributed Argentina's liability to earlier government administrations' "manipulation of INDEC data" intended "to avoid making additional payments to bondholders."

*See* Guillermo Francos (@GAFrancosOk), X (Oct. 15, 2024), https://perma.cc/UPX7-EBHS?type=standard (quoting X-provided English translation).

Given the finality in England after a full and fair opportunity to litigate, Argentina is precluded from relitigating any issue of law or fact actually decided by the English judgment. *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79–80 (2d Cir. 2019) (detailing elements of nonmutual collateral estoppel, all of which apply here); *Diorinou v. Mezitis*, 237 F.3d 133, 139, 142–43 (2d Cir. 2001) (applying collateral estoppel to a foreign-court judgment in a fair forum as a matter of comity, which also applies here).

In any event, the English judgment is correct and is equally correct under New York law. Argentina breached because the plain text of the Adjustment Provision required Argentina to publish Actual Real GDP for the relevant Reference Year *measured in constant 1993 prices* in the event of a rebasing—a result entirely consistent with the rest of the contract and the parties' reasonable commercial expectations. Argentina didn't publish the required information, accordingly didn't apply the Adjustment Provision, and therefore incorrectly withheld a contractually

58

required payment. Argentina never supports its baseless declaration that the judgment in England turns on meaningfully different English law instead of the plain meaning of the same contractual text.

## A. Argentina relies on extrinsic evidence, not text, and its reading of the Adjustment Provision is logically impossible

In a dead giveaway of the weakness of Argentina's position, the Republic begins not with the text of the Adjustment Provision but with an assertion about the Global Security's supposed "key macroeconomic assumption." Specifically, Argentina declares that "[t]he drafters of the Securities … started with a baseline 3% Base Case GDP Growth." Opp. 86. Argentina relies on the words of "Sebastian Katz," "roadshow presentations," "numerous analyst reports," and deposition testimony. Opp. 86–89. This is no way to interpret a contract. *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) (evidence outside the four corners of the document cannot vary the writing).

Even if 3% growth were *originally* used as a baseline, Argentina's lead argument is sleight-of-hand. The debt-sustainability analysis that projected 3% long-term potential GDP growth was done using real GDP measured only in constant 1993 prices. JA1846–48(¶¶17–18)/SJA687–

59

89(¶¶17–18). It did not analyze—and could not have—a baseline rate of GDP growth based on real GDP measured in some other unknown, future base year. Even if the 3% growth benchmark were referenced in the contract, that number is inapposite after rebasing.

When Argentina bothers to address the actual language of the contract, it makes no persuasive arguments to support its interpretation. As the English Court of Appeal recognized, "the language is simply irreconcilable with the Republic's construction." U.K.App.Op._¶81. Likewise, the district court rejected Argentina's interpretation of the Adjustment Provision as "atextual." JA171_n.6.

Argentina argues that "the parties intended for only a single base year to be in use at any given time" and that "the contract contemplates that the old base year will have no further function after a rebasing." Opp. 89. That claim flouts the plain language of the Adjustment Provision, which requires using real GDP from two different base years to calculate Base Case GDP following rebasing: its numerator is "Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices," and its denominator is "the Actual Real GDP for such Reference Year *measured in constant 1993 prices.*" Glob. Sec. at R-3

(emphasis added). The 1993 base year always performs a function under the Global Security—before and after a rebasing.

Argentina also argues that its "Constant Factor Approach" is correct because the words "such change" and "a fraction" in the Adjustment Provision suggest a single change and a single fraction for all Reference Years. Opp. 89–90. And Argentina accuses Plaintiffs of relying "entirely on the word 'each' in the 115-word Adjustment Provision." *Id.* at 92. Nonsense.

First, the Adjustment Provision does not, and could not, support Argentina's "Constant Factor Approach" because that approach is impossible; it cannot be performed. That's because "Actual Real GDP for such Reference Year"—a figure that is required for both the fraction's numerator and denominator—*is not knowable in advance for future Reference Years*. The Adjustment Provision does speak of "a fraction," but it's referring to the unique fraction (derived from the Actual Real GDP figures) that must be calculated for each Reference Year.

Second, Plaintiffs' interpretation does not hang on the word "each" but conforms overall to the temporal language at the start of the Adjustment Provision. That language prescribes when to apply the Adjustment

Provision: "if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993." That is not the language of one-time change; it is language describing a state or condition, which can occur at any point in the future, and which is assessed anew each year. The adjustment fraction is applied "at any time" the base year isn't 1993, not just once when the year isn't 1993. "[T]he Adjustment Provision addresses itself to an adjustment in each year because each year fulfils the introductory condition for its application." U.K.App.Op._¶82.

Finally, Argentina instead claims a contractual prerogative to misread the contract. Even if holders, the district court, and the English courts are right that Argentina's Constant Factor Approach lacks any basis in the contract's text, Argentina claims that approach still governs *because Argentina says so*. For that, Argentina relies on the Global Security's provision that "[a]ll calculations made by the Ministry of Economy hereunder shall be binding." Glob. Sec. at R-4.

The district court correctly rejected that argument. JA306–07. The "binding effect" clause appears within the definition of "Payment Amount" and is limited to the Ministry's calculation of the Payment

62

Amount. The parties' dispute is not about any of Argentina's "calculations." Rather, it is about Argentina's misinterpretation of the contract by changing "the *method* of calculation" without the contractually required vote of 75% of the holders. JA304 (emphasis added). The English trial court likewise rejected Argentina's erroneous interpretation of the "binding effect" clause, easily distinguishing between calculation of the Payment Amount and the method of calculation used to determine satisfaction of the payment conditions. JA264–67(¶¶53–54,_58–63,_65–66).

## B. Plaintiffs' interpretation gives effect to the Adjustment Provision and makes commercial sense

Argentina next claims that, because Plaintiffs' interpretation anchors the Securities to Actual Real GDP measured in constant 1993 prices, it "write[s] out" the Adjustment Provision and is "commercially unreasonable." Opp. 93, 100. Not so. Under Plaintiffs' plain-text reading, the provision does exactly what it is supposed to do—control for the effects of any rebasing without prejudicing the holders.

The Adjustment Provision, when applied annually as its terms provide, preserves the parties' bargain by ensuring that a rebasing will not affect the right to payment. JA1664–66(¶¶35,_37,_39–40)/SJA505–07(¶¶35,_37,_39–40). Both the English trial and appellate courts

63

appreciated the provision's economic import and logic. "[A] creditor or investor who makes the decision at any point to accept or purchase the Securities, based on the known position in terms of base case in 1993 [Year of Base Prices] and published Actual Real GDP in 1993 YOBP, knows that a rebasing will not affect their assessment of whether payments are likely in the future." JA1469(¶¶203–04). Or as the English Court of Appeal pithily affirmed: "there is nothing uncommercial in parties tying themselves to 'the devil they know' in 1993 YOBP pricing." U.K.App.Op._¶98.

Plaintiffs' interpretation also makes commercial sense in other ways. *See* JA1469–72(¶¶203–20). For instance, there is no dispute that a rebasing has different effects on Actual Real GDP in different years. *See* JA1470(¶207). And so an Adjustment Fraction that likewise changes with each Reference Year ensures that the rebasing is also reflected annually in the Base Case GDP—to which Actual Real GDP can then be compared apples-to-apples. JA1471(¶¶211–15).

By contrast, Argentina's Constant Factor Approach "moves the goalposts" based on what Argentina selects as the year of base prices. U.K.App.Op._¶90. Argentina gets to select the "overlap year" (a term

appearing nowhere in the Global Security) to use for determining the constant fraction—a highly significant choice because the numerical value of a constant fraction affects the thresholds for the Level Condition for every year. JA1472(¶217).[16]

## C. The contract requires Argentina to publish Actual Real GDP in 1993 prices

The district court correctly held that Argentina is required to perform "a calculation … using the inputs that the Adjustment Fraction requires," JA301. But it held incorrectly that Argentina is under no obligation to produce those inputs. JA309. Those holdings cannot be reconciled. The latter breaks the Adjustment Fraction's required mechanics, rendering the Securities ineffective. *See* 11 *Williston on Contracts* § 32:11 (4th ed. 2024 update) (interpretation should not render a contract "invalid or its performance impossible"). Indeed, Argentina itself *concedes* that the

---

[16] Argentina tries to create the misimpression that Aurelius lacks conviction in its own interpretation of the contract. Opp. 22–23, 100, 103. That is silly. From 600,000+ pages of documents and 36 depositions, Argentina plucks one email by one junior analyst. And the Aurelius analyst testified that his reference to "absurd results" was not his own view, but one he understood other market participants may have believed. JA1284-86_at_168:6-170:25. Aurelius sued *because* its reading of the contract is the correct one. Indeed, in September 2017, well before bringing this action, Aurelius sent Argentina a demand letter, explaining its position and why Argentina owed money for the 2013 Reference Year. *See* JA1510–16.

Adjustment Fraction, applied in accordance with its terms, "would also require the continued publication of the … 1993 base year." Opp. 6.

Argentina protests that such a GDP publication obligation is "unprecedented." Opp. 95. But GDP-linked securities are relatively novel instruments, and the GDP Securities at issue here are the only ones to have explicitly addressed the rebasing of GDP statistics. JA2066–67(¶¶44–45)/SJA907–08(¶¶44–45).

Argentina cites *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470 (2004), and *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195 (2001), for the unremarkable proposition that courts should be reluctant to infer unwritten terms in contracts. Opp. 96. Those cases contrast sharply with this one: the purported unwritten obligations at issue were not necessary for the contracts' basic functioning or to preserve the parties' bargain. In *Vermont Teddy Bear*, the term at issue was an implied written-notice obligation as part of the lessor's restoration obligation. Such a notice requirement was not necessary to the lease's basic operation.

*Reiss* involved stock-purchase warrants allowing their holder to purchase a specified number of shares at a specified price. Following a

5-to-1 reverse stock split that quintupled the warrants' value, the issuer argued for an implied term whereby the number of warrants would also drop by a factor of five. The court disagreed. Critically, however, *Reiss* signaled that a different result would obtain if the stock split had been a 1-to-5 (which would dilute the warrants' value five times over). Citing then-Judge Cardozo in *Wood v. Duff-Gordon*, 222 N.Y. 88 (1917), the court wrote that "[i]t may be that [plaintiff] would be entitled to a remedy if [defendant] performed a forward stock split, on the theory that he did not intend to acquire nothing … We should not assume that one party intended to be placed at the mercy of the other." *Reiss*, 97 N.Y.2d at 201 (internal citations and quotations marks omitted). Argentina's position here, if accepted, means that holders are at its mercy because Argentina can render the Securities worthless by refusing to publish necessary figures. That must be wrong.

The English courts understood this fundamental point, finding it "obvious" that "there must be an implied term in the Securities that the Republic is required to publish such data as is necessary for the Securities to be operable in accordance with their express terms." U.K.App.Op._¶77. Argentina responds (Opp. 99) that that case was

67

decided under English law, and suggests—with no analysis or citation to controlling authority—that New York law is materially different. It isn't.

The English courts interpreted the Global Security using the objective approach to contract interpretation that has long prevailed in the Anglo-American tradition. When those courts held that Argentina had a duty to publish, they were not applying some principle unique to English law—nor does Argentina identify any. A recent decision of the U.K. Supreme Court describes England's approach: "A term will be implied if a reasonable reader of the contract, knowing all its provisions and the surrounding circumstances, would understand it to be implied … provided that (i) the reasonable reader is treated as reading the contract at the time it was made and (ii) he would consider the term to be so obvious as to go without saying or to be necessary for business efficacy." *Marks & Spencer plc v. BNP Paribas Secs. Servs. Tr. Co. (Jersey) Ltd.* [2015] UKSC 72, ¶ 23. That basic framework under English law is substantively the same as the one articulated by New York courts.[17]

---

[17] If anything, English law is *more* exacting when identifying implied terms, requiring that the following five conditions be satisfied: (1) the term must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract; (3) it must be so obvious that it goes

Contrary to Argentina's assertion, New York law does not impose any "categorical prohibition" on identifying unwritten terms in contracts. Opp. 99. Rather, New York law recognizes that contracts necessarily include "understandings or expectations that were so fundamental that [parties] did not need to negotiate about those expectations." *Wieder v. Skala*, 80 N.Y.2d 628, 637 (1992). "In interpreting contract language [under New York law], a court will look at not only the literal language but also will consider whatever may reasonably be implied therefrom. A promise, though not expressed within the contract, may be implied from a fair interpretation of the agreement." 28 N.Y. Contract Law § 11:31 (2d ed. 2024 update) (citing *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 555 (1982), and *Long Island R.R. Co. v. Northville Indus. Corp.*, 41 N.Y.2d 455, 461 (1977)). Contracts include "any promises that a reasonable person in the position of the promisee would be justified in understanding were included in the promise." *Id.*

---

without saying; (4) it must be capable of clear expression; and (5) it must not contradict any express term of the contract. *Marks & Spencer*, ¶ 18.

Here, whether understood formally as an implied term, or within the scope of Argentina's express obligation to make the contract's required calculations, the answer is the same—Argentina must publish.

\* \* \*

In the six years since this litigation commenced, the district court has addressed every issue that Plaintiffs ask this Court to address. The district court held (correctly) that the Adjustment Provision requires certain inputs for its calculation and that Argentina failed to apply the Provision, JA301–02; it held (incorrectly) that Argentina had no duty to publish Actual Real GDP in 1993 prices, JA308; it held (incorrectly) that Plaintiffs cannot allege facts using the EMAE Index to establish what the missing GDP data would have been if published, JA172–74; and it addressed the prevention doctrine at length, JA309–13. These issues are ripe for this Court's review.

Six years should be enough to resolve a basic contract action on payment that was due more than a decade ago. Indeed, English courts have fully resolved the "twin" of Plaintiffs' claims, in the holders' favor, through a trial and appeals. Plaintiffs respectfully request that this

70

Court bring this case to its proper conclusion by ruling in their favor on the merits through this appeal.

If the Court is not prepared to do so, however, then at the very least this case should return to the district court with Plaintiffs' correct interpretation of the Adjustment Provision and a correct understanding of Argentina's duty to publish and Plaintiffs' ability to demonstrate damages by using the EMAE Index, consistent with the decisions of the English courts.

## CONCLUSION

For the reasons described above, and in Plaintiffs' opening brief, this Court should (i) reverse the judgment below and (ii) order the entry of judgment for Plaintiffs or, at a minimum, hold that Plaintiffs correctly interpret the Adjustment Provision and that their operative complaints state valid claims for breach of contract.

Dated: February 14, 2025

Michael R. Huston
Matthew M. Riccardi
H. Rowan Gaither, IV
Jacob J. Taber
PERKINS COIE LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036
(212) 261-6863

*Counsel for Plaintiff-Appellant
683 Capital Partners, LP*

Matthew S. Salerno
Michael E. Bern
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Plaintiff-Appellants
Adona LLC, Egoz I LLC, Egoz II
LLC, Mastergen, LLC,
Erythrina, LLC, AP 2016 1,
LLC, AP 2014 3A, LLC, AP 2014
2, LLC, WASO Holding Corp.*

Javier Bleichmar
Evan A. Kubota
BLEICHMAR FONTI & AULD LLP
300 Park Avenue, Suite 1301
New York, NY 10022
(212) 789-1340

*Counsel for Plaintiff-Appellant
Novoriver S.A.*

Respectfully submitted,

*/s/ Roy T. Englert, Jr.*
Roy T. Englert, Jr.
Matthew M. Madden
Zachary N. Ferguson
Paul Brzyski
KRAMER LEVIN NAFTALIS
    & FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500

Edward A. Friedman
Daniel B. Rapport
Michael S. Palmieri
FRIEDMAN KAPLAN SEILER
    ADELMAN & ROBBINS LLP
7 Times Square, 28th Floor
New York, NY 10036
Tel: (212) 833-1100

*Counsel for Plaintiff-Appellants
Aurelius Capital Master, Ltd. and
ACP Master Ltd.*

Eric Joseph Grannis
LAW OFFICES OF ERIC J.
    GRANNIS
11 Broadway, Suite 615
New York, NY 10004

*Counsel for Plaintiff-Appellants-
Cross-Appellees Ape Group SPA,
Romano Consulting SPA, Icaro
SRL, Elazar Romano*

72

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation set forth in this Court's June 25, 2024, Case Management Order (Dkt. 27.1) because the brief contains 13,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: February 14, 2025           */s/ Roy T. Englert, Jr.*
                                     Roy T. Englert, Jr.