# 24-1209(L)

## 24-1200, 24-1210, 24-1213, 24-1218, 24-1223, 24-1360

## In the United States Court of Appeals for the Second Circuit

———————————

AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., NOVORIVER S.A., 683 CAPITAL PARTNERS, LP, ADONA LLC, EGOZ I LLC, EGOZ II LLC, MASTERGEN, LLC, ERYTHRINA, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, WASO HOLDING CORPORATION,

*Plaintiffs-Appellants*,

and

APE GROUP SPA, ROMANO CONSULTING SPA, ICARO SRL, ELAZAR ROMANO,

*Plaintiff-Appellants-Cross-Appellees*,

v.

REPUBLIC OF ARGENTINA,

*Defendant-Appellee-Conditional-Cross-Appellant*.

———————————

On Appeal from the United States District Court
for the Southern District of New York

———————————

**FINAL FORM RESPONSE AND OPENING BRIEF
FOR DEFENDANT-APPELLEE-CONDITIONAL-
CROSS-APPELLANT THE REPUBLIC OF ARGENTINA**

———————————

[Counsel listed on following page]

Amanda F. Davidoff
Thomas C. White
Elizabeth A. Rose
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
davidoffa@sullcrom.com

Robert J. Giuffra, Jr.
Sergio Galvis
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

*Attorneys for the Argentine Republic*

## CORPORATE DISCLOSURE STATEMENT

The Argentine Republic is a governmental party not required to file a corporate disclosure statement under Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

*Page*

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .....................................................7

STATEMENT OF THE ISSUES .........................................................7

STATEMENT OF THE CASE .............................................................8

    A.   Factual Background .................................................................8

        1.   Argentina's Default and Restructuring ................................8

        2.   The Terms of the GDP-Linked Securities...........................10

        3.   INDEC's Rebasing of Argentina's GDP Under IMF Pressure ....................................................................15

        4.   The "Mainstream" and "Alternative" Interpretations of the "Adjustment Provision" ...........17

    B.   Procedural History ................................................................24

        1.   Plaintiffs Commence Litigation in New York .....................25

        2.   Early Proceedings in the District Court..............................27

        3.   The District Court's Summary Judgment Order ................29

SUMMARY OF ARGUMENT ............................................................31

STANDARD OF REVIEW ..................................................................35

ARGUMENT .......................................................................................36

I.     THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT BECAUSE PLAINTIFFS FAILED TO COMPLY WITH THE NO-ACTION CLAUSE...................................................36

    A.   The District Court Correctly Held That Section 4.9 of the Trust Indenture Identifies the Only Exception to the Pre-Suit Requirements in Section 11 of the Global Security. .....................37

    B.   The District Court Correctly Held That Plaintiffs' Claims Are for Neither "Principal" Nor "Interest." ....................46

C.    The Purposes of the No-Action Clause Reinforce the District Court's Interpretation.........................................61

D.    The Republic Preserved Its Arguments That Plaintiffs Failed to Comply with the No-Action Clause. ...............................63

II.    **THIS COURT CAN AFFIRM THE JUDGMENT ON SEVERAL ALTERNATIVE GROUNDS.**.......................................................**72**

A.    Plaintiffs Have Not Established Their Right To Bring Their Claims. ...............................................................................74

    1.    Most Plaintiffs Did Not Carry Their Burden of Proving That They Had the Litigation Rights to These Claims. ........................................................75

    2.    WASO and Ape Group's Claims Are Barred by the Prescription Clause. ...........................................77

B.    The Republic's Interpretation of the Adjustment Provision Is Correct as a Matter of Law. ........................................83

    1.    The Republic's Interpretation Follows the Context and Text of the Securities. .......................................84

    2.    Plaintiffs' Interpretation Writes the Adjustment Provision Out of the Contract. ...............................92

    3.    Plaintiffs' Interpretation Requires Reading an Unprecedented, Unwritten Obligation into the Securities, Which the District Court Correctly Rejected. .................................................................95

    4.    Plaintiffs' Interpretation Is Commercially Unreasonable. ........................................................100

**CONCLUSION**.............................................................................**105**

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*2138747 Ontario, Inc.* v. *Samsung C & T Corp.*,
    31 N.Y.3d 372 (2018) ..................................................96

*Abdu-Brisson* v. *Delta Air Lines, Inc.*,
    239 F.3d 456 (2d Cir. 2001) ........................................74

*ACE Capital Re Overseas Ltd.* v. *Cent. United Life Ins. Co.*,
    307 F.3d 24 (2d Cir. 2002) .....................................45, 46

*Adamowicz* v. *IRS*,
    552 F. Supp. 2d 355 (S.D.N.Y. 2008)........................44, 45

*Aivaliotis* v. *Cont'l Broker-Dealer Corp.*,
    817 N.Y.S.2d 365 (N.Y. App. Div. 2006) ...................39, 40

*Ajdler* v. *Province of Mendoza*,
    890 F.3d 95 (2d Cir. 2018) .....................................81, 82

*Allan Applestein TTEE FBO D.C.A. Grantor Tr.* v. *Province of Buenos Aires*,
    415 F.3d 242 (2d Cir. 2005) ...................................68, 69

*Allstate Life Ins. Co.* v. *Robert W. Baird & Co.*,
    2011 WL 5024269 (D. Ariz. Oct. 21, 2011) ....................70

*Ambac Assurance Corp.* v. *U.S. Bank Nat'l Ass'n*,
    2021 WL 6060710 (2d Cir. Dec. 20, 2021)......................55

*Animazing Ent., Inc.* v. *Louis Lofredo Assocs., Inc.*,
    88 F. Supp. 2d 265 (S.D.N.Y. 2000)............................66

*Arrowgrass Master Fund Ltd.* v. *Bank of N.Y. Mellon*,
    965 N.Y.S.2d 473 (N.Y. App. Div. 2013) .......................42

iv

*Barner* v. *Jeffersonville-Youngsville Cent. Sch. Dist.*,
117 A.D.2d 162 (N.Y. App. Div. 1986)......................................................81

*Beal Sav. Bank* v. *Sommer*,
8 N.Y.3d 318 (2007)..................................................................................92

*Beth Isr. Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J., Inc.*,
448 F.3d 573 (2d Cir. 2006) ....................................................................70

*Boulware* v. *United States*,
552 U.S. 421 (2008)..................................................................................45

*CILP Assocs., L.P.* v. *PriceWaterhouse Coopers LLP*,
735 F.3d 114 (2d Cir. 2013) ....................................................................73

*Collins* v. *Harrison-Bode*,
303 F.3d 429 (2d Cir. 2002) ..................................................................104

*Commerzbank AG* v. *U.S. Bank, N.A.*,
100 F.4th 362 (2d Cir. 2024).............................................68, 75, 76, 77

*Corhill Corp.* v. *S. D. Plants, Inc.*,
9 N.Y.2d 595 (1961)..................................................................................92

*Demolition Contractors, Inc.* v. *Westchester Surplus Lines Ins. Co.*,
2009 WL 929014 (W.D. Mich. Apr. 3, 2009) .................................71, 72

*Diesel Props S.r.l.* v. *Greystone Bus. Credit II LLC*,
631 F.3d 42 (2d Cir. 2011) ...............................................................65, 78

*Donohue* v. *Hochul*,
32 F.4th 200 (2d Cir. 2022)....................................................................35

*Dreni* v. *PrinterOn Am. Corp.*,
2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021) .......................................26

*Emery Mukendi Wafwana & Assocs., P.C.* v. *Mengara*,
2022 WL 2392510 (S.D.N.Y. May 19, 2022) ......................................66

*Farricielli* v. *Holbrook*,
215 F.3d 241 (2d Cir. 2000) ...............................................................72

*FDIC* v. *Horn*,
2015 WL 1611995 (E.D.N.Y. Apr. 8, 2015)...................................69

*FDIC* v. *Murex LLC*,
500 F. Supp. 3d 76 (S.D.N.Y. 2020)................................................69

*Feldbaum* v. *McCrory Corp.*,
1992 WL 119095 (Del. Ch. June 2, 1992).....................................62

*Focus Products Group Int'l, LLC* v. *Kartri Sales Co., Inc.*,
2021 WL 1946756 (S.D.N.Y. May 14, 2021) ...............................69

*Galli* v. *Metz*,
973 F.2d 145 (2d Cir. 1992) ....................................................92, 93

*Greenwood Nursery, Inc.* v. *Home Depot, U.S.A., Inc.*,
2008 WL 4181186 (N.D. Ga. Sept. 4, 2008) ................................82

*H.P.S. Capitol, Inc.* v. *Mobil Oil Corp.*,
588 N.Y.S.2d 29 (1992) ......................................................................81

*Horowitz* v. *148 S. Emerson Assocs. LLC*,
888 F.3d 13 (2d Cir. 2018) .................................................................67

*HTI Fin. Solutions Ltd.* v. *Manhattan SMI KG
Props. Fin. Ltd.*,
2024 WL 4452295 (S.D.N.Y. Oct. 9, 2024).................................66

*Hughes Commc'ns India Private Ltd.* v. *DirecTV Group, Inc.*,
71 F.4th 141 (2d Cir. 2023).............................................................100

*Int'l Fid. Ins. Co.* v. *Cty. of Rockland*,
98 F. Supp. 2d 400 (S.D.N.Y. 2000)................................................41

*Jennings* v. *Rodriguez*,
583 U.S. 281 (2018)...............................................................................45

*Jones* v. *Goodrich Pump & Engine Control Sys., Inc.*,
86 F.4th 1010 (2d Cir. 2023)..........................................................105

*Krauth* v. *Exec. Telecard, Ltd.*,
890 F. Supp. 269 (S.D.N.Y. 1995)..................................................................59

*L. Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010) .......................................................................91

*LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Cap. Corp.*,
424 F.3d 195 (2d Cir. 2005) .......................................................................39

*LCM XXII Ltd.* v. *Serta Simmons Bedding, LLC*,
2022 WL 953109 (S.D.N.Y. Mar. 29, 2022)..............................................69, 70

*Lightwater Corp. Ltd.* v. *Republic of Argentina*,
2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) ................................................8

*Loc. 377, RWDSU, UFCW* v. *1864 Tenants Ass'n*,
533 F.3d 98 (2d Cir. 2008) .........................................................................59

*Lovatio* v. *Petróleos de Venezuela, S.A.*,
2020 WL 5849304 (S.D.N.Y. Sept. 30, 2020) ..........................................42, 61

*Lummus Co.* v. *Commonwealth Oil Ref. Co.*,
297 F.2d 80 (2d Cir. 1961) .........................................................................43

*Mastrovincenzo* v. *City of New York*,
435 F.3d 78 (2d Cir. 2006) .........................................................................43

*McMahan & Co.* v. *Wherehouse Ent., Inc.*,
859 F. Supp. 743 (S.D.N.Y. 1994)..............................................................65

*McMahan & Co.* v. *Wherehouse Ent., Inc.*,
65 F.3d 1044 (2d Cir. 1995) .......................................................................66

*MeehanCombs Glob. Credit Opportunities Funds, LP* v. *Caesars Ent. Corp.*,
80 F. Supp. 3d 507 (S.D.N.Y. 2015)............................................................63

*Nassau Tr. Co.* v. *Montrose Concrete Prods. Corp.*,
56 N.Y.2d 175 (1982)..................................................................................72

*Nat'l Org. for Marriage, Inc.* v. *Walsh*,
714 F.3d 682 (2d Cir. 2013) .......................................................................73

vii

*Natixis Real Est. Cap. Tr. 2007-HE2* v. *Natixis Real Est. Holdings, LLC*,
149 A.D.3d 127 (N.Y. App. Div. 2017)........................................................100

*Newmont Mines Ltd.* v. *Hanover Ins. Co.*,
784 F.2d 127 (2d Cir. 1986) ........................................................61

*In re Nortel Networks Corp. Secs. Litig.*,
539 F.3d 129 (2d Cir. 2008) ........................................................64

*Northgate Elec. Corp.* v. *Barr & Barr, Inc.*,
877 N.Y.S.2d 36 (N.Y. App. Div. 2009) ........................................................80

*Oregon RSA No. 6, Inc.* v. *Castle Rock Cellular of Oregon L.P.*,
840 F. Supp. 770 (D. Or. 1993)........................................................59

*Patel* v. *Contemporary Classics of Beverly Hills*,
259 F.3d 123 (2d Cir. 2001) ........................................................65, 66, 68

*Penades* v. *Republic of Ecuador*,
2016 WL 5793412 (S.D.N.Y. Sept. 30, 2016) ........................................................65

*Perini Corp.* v. *City of New York*,
18 F. Supp. 2d 287 (S.D.N.Y. 1998)........................................................80

*Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*,
585 F. Supp. 3d 540 (S.D.N.Y. 2022)........................................................75

*Pulmonary Assocs. of Charleston PLLC* v. *Greenway Health, LLC*,
2020 WL 9073551 (N.D. Ga. June 29, 2020)........................................................82

*Pyett* v. *Pa. Bldg. Co.*,
498 F.3d 88 (2d Cir. 2007) ........................................................82

*Quadrant Structured Prods. Co.* v. *Vertin*,
23 N.Y.3d 549 (2014)........................................................62

*Racepoint Partners LLC* v. *JPMorgan Chase Bank*,
2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006)........................................................76

*Randolph Equities, LLC* v. *Carbon Cap., Inc.*,
648 F. Supp. 2d 507 (S.D.N.Y. 2009)...............................................70

*RBC Cap. Mkts., LLC* v. *Educ. Loan Tr. IV*,
2011 WL 6152282 (Del. Ch. Dec. 6, 2011)......................................62

*Reiss* v. *Fin. Performance Corp.*,
97 N.Y.2d 195 (2001) ...............................................................96, 99

*Royal Park Investments SA/NV* v. *Wells Fargo Bank, N.A.*,
2018 WL 739580 (S.D.N.Y. Jan. 10, 2018)................................75, 77

*Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*,
2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) .....................................75

*Royal Park Invs. SA/NV* v. *HSBC Bank USA, N.A.*,
2018 WL 679495 (S.D.N.Y. Feb. 1, 2018) .......................................76

*S. Rd. Assocs., LLC* v. *Int'l Bus. Machines Corp.*,
4 N.Y.3d 272 (2005) ..............................................................90, 91

*SC Note Acquisitions, LLC* v. *Wells Fargo Bank, N.A.*,
934 F. Supp. 2d 516 (E.D.N.Y. 2013) .......................................61, 62

*Schonfeld* v. *Hilliard*,
218 F.3d 164 (2d Cir. 2000) ....................................................3, 72

*SEC* v. *Rashid*,
96 F.4th 233 (2d Cir. 2024) ........................................................35

*Sherrill* v. *Grayco Builders, Inc.*,
64 N.Y.2d 261 (1985) .................................................................71

*SM Kids, LLC* v. *Google LLC*,
963 F.3d 206 (2d Cir. 2020) .................................................67, 68

*Solis* v. *Loretto-Oswego Residential Health Care Facility*,
692 F.3d 65 (2d Cir. 2012) ..........................................................64

*Songbyrd, Inc.* v. *Est. of Grossman*,
23 F. Supp. 2d 219 (N.D.N.Y. 1998)........................................80, 81

*SR Int'l Bus. Ins. Co.* v. *World Trade Center Props., LLC*,
    467 F.3d 107 (2d Cir. 2006) ................................................. 60

*St. Pierre* v. *Dyer*,
    208 F.3d 394 (2d Cir. 2000) ................................................. 80

*Subaru Distributors Corp.* v. *Subaru of Am., Inc.*,
    425 F.3d 119 (2d Cir. 2005) ................................................. 85

*Sunrise Mall Assocs.* v. *Imp. Alley of Sunrise Mall, Inc.*,
    621 N.Y.S.2d 662 (App. Div. 1995) ............................... 94, 95

*Tannenbaum* v. *Zeller*,
    552 F.2d 402 (2d Cir. 1977) ................................................. 55

*In re Teekay Offshore Partners L.P. Common Unitholders Litig.*,
    2021 WL 1227415 (S.D.N.Y. Mar. 31, 2021) ..................... 58

*Thompson* v. *Gjivoje*,
    896 F.2d 716 (2d Cir. 1990) ................................................. 61

*U.S. Fire Ins. Co.* v. *Gen. Reinsurance Corp.*,
    949 F.2d 569 (2d Cir. 1991) ............................................... 104

*United States* v. *Resler*,
    313 U.S. 57 (1941) ................................................................ 38

*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) ................................. 69

*White* v. *Cont'l Cas. Co.*,
    9 N.Y.3d 264 (2007) ............................................................. 47

*ZBD Constructors, Inc.* v. *Billings Generation, Inc.*,
    2011 WL 1327144 (S.D.N.Y. Mar. 25, 2011) ................. 70, 71

*ZBD Constructors, Inc.* v. *Billings Generation, Inc.*,
    472 F. App'x 83 (2d Cir. 2012) ........................................... 66

**Statutes & Rules**

8 U.S.C. § 1252 ........................................................................45

15 U.S.C. § 77ddd....................................................................60

15 U.S.C. § 77ppp....................................................................60

28 U.S.C. § 1291 ........................................................................7

28 U.S.C. § 1330 ........................................................................7

Fed. R. Civ. P. 9 ......................................................................66

N.Y. C.P.L.R. § 205 ................................................................31

N.Y. Gen. Oblig. Law § 13-107 ............................................75

**Other Authorities**

Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1292 (4th ed.) ..........................66

Black's Law Dictionary (6th ed. 1990)..................................38

Black's Law Dictionary (11th ed. 2019)................................48

Black's Law Dictionary (12th ed. 2024)................................49

IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr. 18, 1994)......55, 56

Oxford English Dictionary (3d ed. 2010)........................48, 49

*Palladian Partners* v. *Republic of Arg.*
    EWCA [2024] (Civ) 641 ....................................................99

Restatement (Second) of Contracts § 202........................26, 85

## INTRODUCTION

This appeal arises out of a dispute over the proper interpretation of the governing documents for GDP-linked securities (or "Securities") that the Republic of Argentina issued as part of its sovereign debt restructuring in 2005 and 2010. As the district court correctly found, Plaintiffs' claims failed at the threshold: Plaintiffs, who are highly sophisticated investors, elected not to follow the contractual requirements for asserting their claims set forth in the Securities' "No-Action Clause." The district court's decision, which rested on its straightforward application of that clause, should be affirmed.

Specifically, the No-Action Clause, found in Section 11 of the Global Security, prohibits holders of the Securities ("Holders") from initiating "any suit, action, or proceeding" without first complying with five preconditions. Plaintiffs admit that they did not satisfy these preconditions before filing their lawsuits. By cross-reference to Section 4.9 of the Trust Indenture, the No-Action Clause incorporates a narrow exception that allows individual claims for "principal" and "interest." J.A. 662 § 4.9.[1] The district court correctly held

---

[1] District court materials cited in the joint appendix ("J.A."), sealed joint appendix ("S.J.A."), and special appendix ("S.A.") are from the dockets in *Aurelius Capital Master, Ltd.* v. *The Republic of Argentina*, No. 1:19-cv-00351-LAP (S.D.N.Y.), *ACP Master, Ltd.* v. *The Republic of Argentina*, No.

that Plaintiffs' claims do not fall within this exception because Plaintiffs are seeking contingent payments tied to the Republic's real GDP that the Global Securities expressly say are *not* "principal" or "interest."  Because Section 4.9 only "creates an individual right of action as applied to payments for *principal* of and *interest* on a stated maturity date," S.A. 90 (emphasis added), the lone exception to the No-Action Clause simply does not apply.

Plaintiffs argue on appeal that it "doesn't matter" whether their lawsuits fit under the principal-or-interest exception in Section 4.9 of the Trust Indenture because the No-Action Clause creates an independent right to bring suits for "any amounts due hereunder."  Br. 38–39.  But, as the district court correctly ruled, that is not what the No-Action Clause says.  It does not expand the scope of Section 4.9; it incorporates that provision and "cabins" the scope of the exception "to the parameters set forth in Section 4.9 of the Indenture," *i.e.*, for claims to payment of "principal" and "interest."  S.A. 86.

Beyond seeking reversal of the district court's correct threshold determination, Plaintiffs make the extraordinary request that this Court

---

1:19-cv-10109-LAP (S.D.N.Y.), *683 Capital Partners, LP* v. *The Republic of Argentina*, No. 1:19-cv-10131-LAP (S.D.N.Y.), *Adona LLC et al.* v. *The Republic of Argentina*, No. 1:19-cv-11338-LAP (S.D.N.Y.), and *Ape Group SpA* v. *The Republic of Argentina*, No. 1:20-cv-10409-LAP (S.D.N.Y.).

direct the district court to enter judgment in their favor on the substance of their claims. As a general rule, this Court does not review matters not addressed by the court below. *See Schonfeld* v. *Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000). In any event, the Republic's interpretation of the governing documents is the only one that honors the text and the parties' mutual expectations at the time the Securities were issued.

The GDP-linked Securities were created as part of Argentina's January 2005 debt exchanges (launched again in April 2010), in which creditors traded 152 different series of non-performing bonds for three new series of performing bonds with lower interest rates, reduced principal, and/or longer maturities. The GDP-linked Securities were not the centerpiece. They were offered as a "sweetener," Br. 7, so that if the country's real economic performance exceeded expectations—measured by real GDP surpassing a pre-set level ("Base Case GDP") and growing above a healthy rate (*i.e.*, above the predetermined "Base Case GDP Growth")—Holders would receive a "Payment Amount" tied to the amount of Argentina's economic overperformance above the contractual benchmarks ("Excess GDP"). In this way, creditors were given an equity-like stake in the Republic's future economic performance.

The Republic paid out approximately $10 billion under the Securities for "Reference Years" 2005, 2006, 2007, 2008, 2010, and 2011.  Meanwhile, in 2009, the International Monetary Fund ("IMF") began to raise concerns about the reporting of the Republic's official statistics dating back to 2007, and exerted increasing pressure on the Republic and its national statistical agency ("INDEC") to change its methodology for calculating real GDP.  The IMF believed that the Republic was overstating its real economic performance, in part because the outdated 1993 "base year" that INDEC used at the time was painting a distorted picture of the country's economy.  INDEC accelerated its "rebasing" process (transitioning to the new base year) in response to the IMF's concerns and completed its transition to the 2004 base year in March 2014, publishing GDP figures for 2012 and 2013 in the updated 2004 base year.  Consistent with uniform international practice, INDEC stopped calculating and publishing Argentina's real GDP using the 1993 base year once it knew that it would complete the rebasing by March 2014.

The rebasing exercise is the genesis of this dispute.  The target Base Case GDP levels in the Global Security were expressed in constant 1993 prices. For example, the Base Case GDP level for 2011 was 349,720.93 million pesos in constant 1993 prices.  After a rebasing, a different peso-denominated Base

4

Case GDP level would have to be established for each remaining year of the life of the Securities (*i.e.*, through 2034). The Securities contain a formula for adjusting the Base Case GDP benchmarks following a rebasing (the "Adjustment Provision"). This way, after a rebasing, the official GDP statistics published by INDEC in the new base year can be compared apples-to-apples with an adjusted version of the Base Case GDP figures in the Securities.

The correct interpretation of the Adjustment Provision, adopted by the Republic and most market analysts, is that the Base Case GDP figures in the Global Security should all be rescaled to the new base year after a rebasing using a single adjustment fraction, which preserves the approximately 3% difference between each year's Base Case GDP benchmark (the "Constant Factor Approach"). Under the Constant Factor Approach, investors know in advance for each year what the benchmarks will be in the new base year, and it is not necessary to continue to publish real GDP in an increasingly obsolete base year.

In late 2013 and early 2014, a few market commentators offered an alternative reading of the Adjustment Provision under which, after a rebasing, the Base Case GDP figures must be adjusted every year by a new fraction (the

"Variable Factor Approach").  Most analysts considered this "alternative" interpretation to be wrong because it had the effect of cancelling out the adjustment and making the payment triggers dependent on the 1993 base year, as though no rebasing had ever occurred.  The Variable Factor Approach would also require the continued publication of the increasingly obsolete 1993 base year, which no country has ever done after a rebasing and which was not contemplated in the terms of the Securities or any of the contemporaneous documents describing their terms.

The Republic's Ministry of Economy—which is charged by the Securities' governing documents with making "all calculations" thereunder—carefully considered this issue and concluded that the "alternative" Variable Factor Approach was incorrect because it was inconsistent with the economic logic of the Securities, among other reasons.  The 1993 base year was, in any event, not available for 2013 and forward.  Accordingly, using the Constant Factor Approach and the new 2004 base year, the Ministry announced in December 2014 that no payment was due under the Securities for 2013 because the 3.22% Base Case GDP Growth threshold was not met.

The record before the district court showed that the Ministry of Economy's conclusion was correct in light of the contractual language and

undisputed evidence showing that these Securities were designed around an assumption that payments would be made if and only if the Republic's economy was growing in real terms at 3% or more (among other conditions). Regardless, this Court does not even need to reach the merits of the underlying contractual dispute because, in their haste to sue the Republic, Plaintiffs skipped past the contractual prerequisites to bringing their claims set out in the unambiguous No-Action Clause. This Court can—and should—affirm on that ground alone.

## JURISDICTIONAL STATEMENT

The district court exercised subject-matter jurisdiction over these cases under 28 U.S.C. § 1330. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's March 31, 2024 final judgment. Plaintiffs filed their notices of appeal on April 29, 2024, and the Republic timely filed notice of its conditional cross-appeal on May 13, 2024. J.A. 3335–36.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly granted summary judgment to the Republic because Plaintiffs admittedly failed to comply with the requirements of the No-Action Clause and they do not qualify for its only exception because they are not seeking payments of "principal" or "interest."

7

2. Whether the district court's judgment should be affirmed on the alternative grounds that:

a. Most Plaintiffs failed to demonstrate that they had acquired the right to sue under the Securities;

b. Both Ape Group and WASO's claims are untimely (in whole or in part) under the contractual prescription clause;

c. The Republic correctly interpreted and applied the Securities' governing documents in concluding that no payment was due for Reference Year 2013.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. Argentina's Default and Restructuring

By December 2001, "Argentina [was] experiencing the worst economic crisis in its history." *Lightwater Corp. Ltd.* v. *Republic of Argentina*, 2003 WL 1878420, at *2 (S.D.N.Y. Apr. 14, 2003).[2] The economic depression that followed paralyzed economic activity, pushed inflation above 40%, and tipped more than half of Argentina's population below the poverty line. S.J.A. 683.

---

[2] Unless otherwise specified, internal quotation marks, citations, and alterations have been omitted from quotations throughout.

With an alarming debt-to-GDP ratio of more than 130% and real GDP contraction of -11%, Argentina needed to restructure its sovereign debt to sustainable levels.  S.J.A. 683.

Between 2003 and 2005, the Republic held more than 80 meetings with creditors and institutional stakeholders such as the IMF, the World Bank, and officials from various countries to develop its restructuring proposals.  S.J.A. 694.  Negotiations addressed the amount of debt that would be sustainable for Argentina going forward, and there was some disagreement about the rate at which the Republic's economy could be expected to grow.  S.J.A. 694–95.

The Republic's Ministry of Economy undertook a careful debt sustainability analysis to project the Republic's growth rate "so that the Republic's financial commitments would be manageable" in light of those projections.  S.J.A. 683–84.  Based on a historical analysis of the Republic's real economy over the prior century, the Ministry of Economy projected higher economic growth in the short term during recovery from the recession, which would taper down to a long-term sustainable annual growth rate of approximately 3%.  S.J.A. 686–87.  This 3% estimate of the Republic's long-term future economic growth became the key "macroeconomic assumption" underlying the debt restructuring.  S.J.A. 1849.  The restructuring aimed to

reduce Argentina's debt burden enough that the Republic could meet its debt obligations if the economy grew as anticipated.  S.J.A. 683–85.

This was accomplished through debt "exchanges" that allowed Argentina's creditors to tender 152 different non-performing bonds for new series of bonds with lower interest rates, reduced principal, and/or longer maturities.  Participants in the exchanges also received the GDP-linked Securities.  Under these instruments, the Republic would compensate Holders if the economy performed above the long-term 3% rate that would enable the Republic to sustainably service its obligations under the debt securities (par, quasi par, and discount bonds) issued in the restructuring.  S.J.A. 702–03, 705. Relative to the sums of money implicated by the new bonds, market participants generally viewed the GDP-linked Securities "as having very little value."  J.A. 125.

### 2.    The Terms of the GDP-Linked Securities

The GDP-linked Securities are governed by a Trust Indenture and a Global Security.[3]  S.J.A. 705–06.  Several provisions are relevant to this appeal.

---

[3] The GDP-linked Securities were issued pursuant to the Trust Indenture dated June 2, 2005, as amended in April 2010.  J.A. 631.  "[T]he terms of both the 2005 and 2010 Global Securities are materially identical," S.A. 67, and unless otherwise specified, citations to the "Global Security" reference the

1.   ***The No-Action Clause***.   The Global Security and the Trust Indenture contain a No-Action Clause of the kind that is "frequently included in indentures 'to limit suits arising from those agreements.'"  S.A. 81.  As Plaintiffs acknowledge, no-action clauses "are fairly common" and "make[] it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders" by imposing conditions on holders' ability to bring lawsuits that could impair the other holders' recovery.  Br. 10–11 (quoting *Quadrant Structured Prods. Co.* v. *Vertin*, 23 N.Y.3d 549, 565–66 (2014)).  Section 11 of the Global Security is titled "Enforcement."  It circumscribes Holders' right to bring suit as follows:

> Except as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder on any Payment Date (as this Security may be amended or modified pursuant to Paragraph 22), ***no Holder*** of a Security shall have any right by virtue of or by availing itself of any provision of the Indenture, the GDP-Linked Securities Authorization or the Securities to ***institute any suit, action or proceeding in equity or at law upon or under or with respect to the Indenture, the GDP-Linked Securities Authorization or the Securities, or for any other remedy hereunder or under the GDP-Linked Securities Authorization or the Indenture*** . . .

---

2005 Global Security, J.A. 759, which is Exhibit G to the Trust Indenture, J.A. 732.

11

J.A. 778 § 11 (emphasis added).  Section 4.8 of the Trust Indenture contains its own No-Action Clause "with substantially the same language."  S.A. 83; *see* J.A. 661–62 § 4.8.

The broad bar to individual suits set out in the No-Action Clause can be overcome only if Holders satisfy five preconditions that center on providing the Securities' Trustee the opportunity to bring the suit itself, on behalf of all Holders.  A Holder who wishes to "institute any suit, action or proceeding" against the Republic must first meet the following preconditions:

> (a) such Holder previously shall have given to the Trustee written notice of default and of the continuance thereof with respect to the Securities;

> (b) the Holders of not less than 25% in aggregate notional amount of the Outstanding Securities shall have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Indenture;

> (c) such Holder or Holders shall have provided to the Trustee such reasonable indemnity and/or security as it may require against the costs, expenses and liabilities to be incurred therein or thereby;

> (d) the Trustee for 60 days after its receipt of such notice, request and provision of indemnity and/or security shall have failed to institute any such action, suit or proceeding; and

> (e) no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 4.11 of the Indenture;

J.A. 778 § 11; *see* J.A. 661–62 § 4.8.  Only if these steps are followed may the holder proceed with its lawsuit, and they must bring it "for the equal, ratable and common benefit of all Holders of the Securities."  J.A. 778 § 11; *see* J.A. 661–62 § 4.8.

The only exception to the clear requirement to follow these steps before pursuing an individual action appears in Section 4.9 of the Trust Indenture, which is titled "Unconditional Right of Holders to Receive Principal and Interest."  Section 4.9 states:

> Notwithstanding Section 4.8, each Holder of Debt Securities shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on its Debt Security on the stated maturity date for such payment expressed in such Debt Security (as such Debt Security may be amended or modified pursuant to Article Seven) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

J.A. 662 § 4.9.

2.  ***Provisions Governing Payment***.  The Global Security contains a number of interrelated provisions used to determine whether and how much payment is due in a given year (the "Reference Year"), based on the strength of Argentina's economy.  Holders are entitled to a "Payment Amount" tied to the Republic's real GDP only if, for a given Reference Year, (i) the Republic's real GDP exceeds the "base case" benchmark in the Global Security, (ii) the

13

Republic's real GDP growth rate exceeds the "base case" growth rate benchmark in the Securities, and (iii) the total payments do not exceed a prescribed cap.  J.A. 770–71 § 2(b).

These conditions were designed to ensure that the Republic will make payments only if it is wealthy enough (as measured by its real GDP) and is growing at a healthy enough rate (as measured by its real GDP growth rate). S.J.A. 696–700.  This structure reduces the risk of default by aligning the obligation to pay to the Republic's ability to pay, because payments on the Securities are lower or nonexistent if the Republic's economic performance is poor.  S.J.A. 700.  The Republic has paid approximately $10 billion to Holders of GDP-linked Securities since they were first issued.  J.A. 1019–27; *see also* Br. 13 ("Argentina made payments to holders of its GDP Securities for six of the first eight Reference Years: 2005–2011, excepting 2009 and 2012.").

3. ***Prescription***. Section 14 of the Global Security, titled "Prescription," sets a five-year prescription period after which claims can no longer be brought under the Securities.  The Prescription Clause provides: "All claims against the Republic for any amounts due hereunder (including Additional Amounts) shall be prescribed unless made within five years from

14

the date on which such payment first became due, or a shorter period if provided by law." J.A. 779 § 14.

### 3. INDEC's Rebasing of Argentina's GDP Under IMF Pressure

Generally accepted standards for maintaining national accounts prescribe "rebasing"—changing the base year used to calculate real GDP—every five to ten years in order to mitigate the distortions that result from changes in the economy over time. S.J.A. 723–24.

Before the rebasing that INDEC announced on March 27, 2014, the last rebasing in Argentina was in 1999, when real GDP was rebased to the 1993 base year. S.J.A. 724. In 2009, the IMF began to express concerns regarding INDEC's reporting of official statistics, noting issues dating back to 2007. S.J.A. 727. In particular, the passage of time since INDEC's last rebasing, as well as concerns about the soundness of the 1993 base year itself, led to mounting IMF scrutiny of the Republic's GDP statistics. S.J.A. 727–50. Notably, the IMF can discontinue funding to countries that fail to meet statistical reporting standards it sets for GDP data. S.J.A. 726–27. While Plaintiffs suggest that the Republic suddenly "declared, three months after 2013 had ended, that it would begin reporting real GDP in constant 2004 prices," Br. 15, the undisputed facts before the district court were that the

15

IMF set the timing by placing intense pressure on INDEC and the Republic to "[u]pdate the base year of national accounts estimate to 2004, from the current 1993 base year." S.J.A. 733; 727–50.

In particular, after years of intense pressure, in February 2013, the IMF sanctioned the Republic for missing deadlines to rebase its GDP statistics. Then, in December 2013, the IMF "brought forward to March 31, 2014" the deadline for the Republic to begin publishing real GDP figures in the new 2004 year of base prices. J.A. 1032; S.J.A. 738–49. The IMF Executive Board warned Argentina that failure to meet this date would lead to "immediate consideration of a Declaration of Ineligibility to use Fund resources." S.J.A. 746.

Four days before the IMF's deadline, on March 27, 2014, INDEC published preliminary real GDP for 2012 and 2013 in the updated 2004 base year that reflected a growth rate of 3.0%. S.J.A. 750–52. The Republic ceased publication of real GDP in the 1993 base year, in line with the universal practice of ceasing calculation and publication of an old base year once a new base year is in place. S.J.A. 760–61; 82–84 ¶¶ 118–22; J.A. 349–50 ¶¶ 39–40. As a result, INDEC never measured or published real GDP for 2013 in the old 1993 series. S.J.A. 759–60. Following minor revisions over the next several

months, on September 24, 2014, INDEC published Actual Real GDP in the 2004 base that reflected a growth rate of 2.93% for 2013.  S.J.A. 795.

### 4. The "Mainstream" and "Alternative" Interpretations of the "Adjustment Provision"

The Global Security addresses rebasing, referred to as a change in the "Year of Base Prices,"[4] to solve a problem of comparison:  the Base Case GDP figures in the Global Security were listed in constant 1993 pesos (the Year of Base Prices used when the Securities were issued).  Thus, real GDP in a new Year of Base Prices cannot be directly compared to the original Base Case GDP figures (shown below).

---

[4] *See* J.A. 770 ("if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year").

17

| Reference Year | Base Case GDP (in millions of constant 1993 pesos) | Reference Year | Base Case GDP (in millions of constant 1993 pesos) |
|---|---|---|---|
| 2005 | 287,012.52 | 2020 | 458,555.87 |
| 2006 | 297,211.54 | 2021 | 472,312.54 |
| 2007 | 307,369.47 | 2022 | 486,481.92 |
| 2008 | 317,520.47 | 2023 | 501,076.38 |
| 2009 | 327,968.83 | 2024 | 516,108.67 |
| 2010 | 338,675.94 | 2025 | 531,591.93 |
| 2011 | 349,720.39 | 2026 | 547,539.69 |
| 2012 | 361,124.97 | 2027 | 563,965.88 |
| 2013 | 372,753.73 | 2028 | 580,884.85 |
| 2014 | 384,033.32 | 2029 | 598,311.40 |
| 2015 | 395,554.32 | 2030 | 616,260.74 |
| 2016 | 407,420.95 | 2031 | 634,748.56 |
| 2017 | 419,643.58 | 2032 | 653,791.02 |
| 2018 | 432,232.88 | 2033 | 673,404.75 |
| 2019 | 445,199.87 | 2034 | 693,606.89 |

The Base Case GDP levels increase by slightly above 3% in the ten years immediately following the issuance, evening out to exactly 3% for the last twenty years in the life of the Securities. The April 13, 2010 prospectus that accompanied the issuance of the Securities in the 2010 "reopening" of the 2005 exchange offer identifies the Base Case GDP Growth rate for each year, as shown below.

18

| Reference Year | Base Case GDP (1993 pesos in millions) | Base Case Growth Rate (%) | Reference Year | Base Case GDP (1993 pesos in millions) | Base Case Growth Rate (%) |
|---|---|---|---|---|---|
| 2009 | 327,968.83 | 3.29% | 2022 | 486,481.92 | 3.00% |
| 2010 | 338,675.94 | 3.26% | 2023 | 501,076.38 | 3.00% |
| 2011 | 349,720.39 | 3.26% | 2024 | 516,108.67 | 3.00% |
| 2012 | 361,124.97 | 3.26% | 2025 | 531,591.93 | 3.00% |
| 2013 | 372,753.73 | 3.22% | 2026 | 547,539.69 | 3.00% |
| 2014 | 384,033.32 | 3.03% | 2027 | 563,965.88 | 3.00% |
| 2015 | 395,554.32 | 3.00% | 2028 | 580,884.85 | 3.00% |
| 2016 | 407,420.95 | 3.00% | 2029 | 598,311.40 | 3.00% |
| 2017 | 419,643.58 | 3.00% | 2030 | 616,260.74 | 3.00% |
| 2018 | 432,232.88 | 3.00% | 2031 | 634,748.56 | 3.00% |
| 2019 | 445,199.87 | 3.00% | 2032 | 653,791.02 | 3.00% |
| 2020 | 458,555.87 | 3.00% | 2033 | 673,404.75 | 3.00% |
| 2021 | 472,312.54 | 3.00% | 2034 | 693,606.89 | 3.00% |

J.A. 978. This table highlights that the very specific Base Case GDP figures were calculated by applying a growth rate to the prior year's number. J.A. 978; 567–68; 327–28 ¶ 26; 1004–06 at 149:15–151:22. Of course, anyone with a calculator could reach the same conclusion without the prospectus—and an investor in these Securities all the more so.

The Global Security contains a formula for adjusting the Base Case GDP table after a rebasing. The "Adjustment Provision" provides as follows:

> [I]f the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP for each Reference Year shall be adjusted to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP for such Reference Year (as set forth in chart above) by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator

19

of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices.

J.A. 768.

The Global Security vests the Republic's Ministry of Economy with the responsibility to make "[a]ll calculations" under the Securities and provides that "absent bad faith, willful misconduct or manifest error" the Ministry of Economy's calculations are binding on all Holders. J.A. 769. The Global Security also expressly requires that any calculations under the Securities be made exclusively based on GDP data "as published by INDEC." J.A. 767–69.

The Ministry of Economy understood that the fraction envisioned in the Adjustment Provision—a new base year figure over an old base year figure— would be applied once to the entire table in the Global Security to rescale the Base Case GDP figures to the new Year of Base Prices (the Constant Factor Approach). The mathematical effect of multiplying each Base Case GDP figure by a single ratio is to preserve the 3% growth rate embedded in the Base Case GDP levels. This was the approach followed more than two years before the rebasing, in a January 17, 2012 Ministry of Economy memorandum. S.J.A. 767–68.

When INDEC announced in September 2013 that it would rebase GDP the following year, the Adjustment Provision began to attract the attention of

20

some market analysts covering the Securities. The consensus view among these analysts was that the Adjustment Provision operated precisely as the Ministry of Economy understood it to operate—that is, the Constant Factor Approach. J.A. 1100–01; 1108; 1111. For example, discussing this "mainstream" interpretation, a Bank of America Merrill Lynch analyst explained that "a re-scaling of the base case GDP by a constant factor . . . is consistent with the indentures and the prospectuses and makes complete economic sense [and] is entirely consistent with what we believe was the original spirit of the indenture, as the path of real GDP growth was set in accordance with a debt sustainability analysis and a reasonable estimate of the economy's long-run growth." J.A. 1108. HSBC reported that the Constant Factor Approach was the "only one reading" that "makes economic sense" as "the [Base Case GDP Growth] was designed based explicitly on a debt sustainability exercise . . . [t]he path for growth, and thus the trigger converging to 3% was a proxy for Argentina's potential GDP based on long-term history not a capricious number." J.A. 1100–01.

A few market commentators, however, noted an "alternative interpretation" in which a different fraction is applied to Base Case GDP figures *every year* (the "Variable Factor Approach"). S.J.A. 773–74; 785–89;

J.A. 1100. Under this approach, rather than re-scaling the entire Base Case GDP table in the Securities to establish the new benchmarks that the Argentine economy would need to achieve to make payments, the Variable Factor Approach required the calculation of a new adjustment fraction each and every year thereafter, using GDP in both the then-current Year of Base Prices and the old 1993 Year of Base Prices. This alternative interpretation "makes less economic sense" because it would "require the government to continue to report GDP under the old National Accounts methodology until 2034" and "changes the nature and original spirit of the security," as "the new base case GDP path needed to determine payments would not be known in advance anymore." J.A. 1108. In other words, the Variable Factor Approach "would make the trigger variable, emptying it from economic meaning." J.A. 1101.

Lead Plaintiff Aurelius made the same point in private in March of 2014: that Plaintiffs' alternative reading "leads to some absurd results" including that it would: (i) require INDEC to report GDP data "under 1993 prices for the duration of the instrument"; (ii) make it impossible "to discern the growth threshold prospectively"; and (iii) cause the Securities to be dependent on an increasingly outdated GDP measure instead of the current year of base prices,

raising the obvious question: "would investors really want to be dependent on a figure that serves no other purpose" than to calculate payments under the Securities? S.J.A. 790; 338–39.

Commentary concerning the alternative reading of the Adjustment Provision led the Ministry of Economy to look at the issue. In an April 4, 2014 memorandum, a Ministry official concluded that the Variable Factor Approach was flawed because it cancels out the Adjustment Provision and renders it mathematically irrelevant, as if it were not applied at all. J.A. 1090. The memorandum also noted that the Variable Factor Approach required the continued publication of GDP in the 1993 base year for the life of the Securities, which "is not a common practice of Statistics Offices around the world." J.A. 1090. Indeed, Plaintiffs' national accounts expert conceded at his deposition that he was not aware of any "country anywhere in the world that has ever continued to calculate GDP in an old base year after changing its base year." S.J.A. 374 at 276:12–19.

In a document memorializing its determination that no payment was due for Reference Year 2013, the Ministry of Economy applied the Constant Factor Approach and concluded that "the new GDP Base Case maintains the growth rates of the Base Case" set forth in the Securities, meaning that Base

Case GDP Growth for Reference Year 2013 remained at the 3.22% benchmark in the Global Security. J.A. 1039. Therefore, because the Republic's Actual Real GDP Growth rate for 2013 of 2.93% was below the Base Case GDP Growth threshold, the Ministry of Economy concluded that no payment was due. J.A. 1039. On December 15, 2014, the Ministry of Economy announced that no payment was due under the Securities for Reference Year 2013 (the "No-Payment Announcement"). S.J.A. 798.

### B. Procedural History

Almost all Plaintiffs here purchased the vast majority (and in some cases, the entirety) of their Securities holdings on the secondary market well after the Republic completed its 2010 reopening of the 2005 exchange offer and even after the Republic completed its rebasing and published real GDP in the 2004 base year. S.J.A. 811–13.[5] The testimony and documentary evidence before the district court showed that a key motivation behind Plaintiffs' acquisition of the Securities was to litigate these very claims. S.J.A. 1114–17.

---

[5] The Plaintiffs in these cases, consolidated for the purposes of this appeal, are: Aurelius Capital Master, Ltd.; ACP Master, Ltd.; Novoriver S.A.; 683 Capital Partners, LP; Adona LLC; Egoz I LLC; Egoz II LLC; Mastergen, LLC; Erythrina, LLC; AP 2016 1, LLC; AP 2014 3A, LLC; AP 2014 2, LLC; WASO Holding Corporation; Ape Group SpA; Romano Consulting SpA; Icaro SRL; and Elazar Romano.

### 1. Plaintiffs Commence Litigation in New York

More than four years after the Ministry of Economy's No-Payment Announcement, Aurelius filed suit in January 2019, claiming that the Republic breached the terms of the Global Security by failing to make a payment for Reference Year 2013. To show that the payment conditions were met for 2013, Aurelius relied in its complaint on a Monthly Economic Activity Estimator (*Estimador Mensual de Actividad Económica*), or "EMAE Index," to estimate a hypothetical 2013 real GDP in constant 1993 prices as an alleged substitute for Actual Real GDP in 1993 prices as published by INDEC, which did not exist. S.J.A. 457.

ACP Master, 683 Capital Partners, Novoriver, and Adona followed with their own complaints in the fall and winter of 2019, filing shortly before the Global Security's five-year prescription period expired in December 2019. Ape Group SpA, Romano Consulting SpA, Icaro SRL, and Elazar Romano ("Ape Group") waited another year before filing suit on December 10, 2020.

In August 2019, holders of Argentina's Euro-denominated GDP-linked Securities filed an action in England, raising similar theories to those advanced by Plaintiffs. Before filing their lawsuit, however, the claimants in the English litigation complied with each of the preconditions in the No-Action

25

Clause of the Global Security, including providing the requisite notice to the Trustee, which decided not to file suit against the Republic and took no position on issues of liability.  J.A. 1153 ¶ 10; 1205 ¶ 284.

The English case went to trial in late 2022, and on April 5, 2023, the English trial court entered judgment in favor of the claimants.  That decision—which applied *English* law—rested on the premise that, contrary to New York law and the district court's rulings, there was an implied term requiring publication of Actual Real GDP in the 1993 base year through 2034. J.A. 1195–96 ¶¶ 228–32.  The English court reasoned, also contrary to New York law and the district court's rulings, that "the fact that there is no express term dealing with publication is not a reason to conclude that the [Variable Factor Approach] is wrong."  J.A. 1195 ¶ 229.

In addition, the English court gave no weight, as New York law requires, to the evidence concerning the context in which the Securities were issued. Restatement (Second) of Contracts § 202 cmt. b (1981); *see also Dreni* v. *PrinterOn Am. Corp.*, 2021 WL 4066635, at *3 (S.D.N.Y. Sept. 3, 2021) ("The Court's consideration of the context and circumstances surrounding the execution of the [contract] is consistent with well-established precedent."). For example, the English court placed no weight on the uncontradicted

evidence that the Securities were only meant to pay out if real economic growth—independent of any base year—exceeded Argentina's long-term potential GDP growth rate of about 3%.

### 2.  Early Proceedings in the District Court

On January 7, 2020, the district court granted the Republic's first motion to dismiss Aurelius' complaint for failure to state a claim because it relied on the EMAE Index instead of the figures prescribed by the Global Security (Actual Real GDP "as published by INDEC").  The district court held that Aurelius could not "construct[] its claim using alternate statistics not contemplated by the Global Security's plain terms."  J.A. 174.

In response, Aurelius and the other Plaintiffs filed amended complaints alleging that the Republic: (i) breached an *implicit* provision of the Global Security, or in the alternative, violated the duty of good faith and fair dealing by not "publish[ing] 2013 Actual Real GDP in 1993 prices . . . for Reference Year 2013," and (ii) breached the Global Security by not "apply[ing] the adjustment fraction" at all and in failing to do so violated the "modifications" provision in the Global Security.  J.A. 201–03 ¶¶ 67–68, 71.

On March 29, 2021, the district court denied the Republic's motion to dismiss, holding that Plaintiffs' allegations were sufficient to state a claim that

the Republic either (i) breached the duty of good faith and fair dealing when it allegedly "caused INDEC to stop publishing data to obscure the fact that a payment was due so as to prevent having to make payment to bondholders"; or (ii) "modified" the Securities by allegedly "using unadjusted figures to calculate the Payment Amount for the 2013 Reference Year." S.A. 48–49; 56–57.

Separately, the Republic filed a motion to dismiss the Ape Group complaint because those claims were time-barred under the five-year prescription period in Section 14 of the Global Security. J.A. 2861–70. The Republic's No-Payment Announcement was on December 15, 2014, but Ape Group did not file suit until December 10, 2020. J.A. 2845–58. On February 15, 2022, the district court denied the Republic's motion, holding that the Prescription Clause functions as a mere notice provision requiring "the assertion of a right to payment" but "does not unambiguously require the filing of a lawsuit" within the five-year period. S.A. 100. Ape Group had satisfied this "notice" obligation, according to the district court, with an email from its counsel to the Republic's counsel shortly before the prescription period expired, asking whether the Republic "would be willing to enter into a tolling agreement." J.A. 2896.

### 3. The District Court's Summary Judgment Order

The Republic and Plaintiffs filed cross-motions for summary judgment in April and June 2023. While the Republic advanced eight arguments in its summary judgment motion, the district court reached only the first of those arguments in granting the Republic's motion on March 31, 2024. The district court held that Section 11 of the Global Security required Plaintiffs to comply with the contractually prescribed preconditions to bringing suit, and that it was undisputed that Plaintiffs did not satisfy those conditions. S.A. 91. In particular, after analyzing the plain language of Sections 4.8 and 4.9 of the Trust Indenture and Section 11 of the Global Security, the district court concluded that, "[g]iven the sweeping reach of the No-Action Clause to encompass any suit regarding any claim arising under the Indenture or GDP-Linked Securities, these actions seeking to enforce Contingent Payments under the GDP-Linked Securities clearly fall within the ambit of the No-Action Clause." S.A. 85.

The district court explained that the use of "[e]xcept as provided in Section 4.9" at the beginning of Section 11 of the Global Security "cabins the subsequent text to the parameters set forth in Section 4.9 of the Indenture," which only "allows for individual holders to enforce their right to bring suit to

29

receive payment *for principal of and interest on their bonds*." S.A. 86 (emphasis added).

Plaintiffs' claims for contingent payments were not suits for "principal" or "interest" covered by the Section 4.9 exception. After consulting the dictionary definitions of "principal" and "interest," the district court held that "under their natural and ordinary meanings" the terms "principal" and "interest" simply do not apply to the contingent payments under the Global Security. S.A. 87–88. This interpretation was reinforced by the fact that the very first page of the Global Security "makes clear" by "set[ting] out, in capital letters" that "HOLDERS OF THIS SECURITY ARE NOT ENTITLED TO RECEIVE PRINCIPAL IN THE AMOUNT OF, OR INTEREST BASED ON, SUCH NOTIONAL AMOUNT." S.A. 88 (quoting J.A. 761).

Although Plaintiffs relied heavily on a decision by the English court that the claimants there could have proceeded solely under Section 4.9, the district court was not persuaded.[6] The district court explained that the English court's

---

[6] Even though the English claimants followed the preconditions in the No-Action Clause, the English trial court addressed the issue of whether an individual suit was possible under Section 4.9 of the Trust Indenture to determine whether the claimants were also entitled to bring a claim in their own right in addition to a claim under Section 4.8 on behalf of all Holders. J.A. 1203–08 ¶¶ 277–305. This issue did not affect the outcome of the case for the

conclusion "that '[S]ection 4.9 ought to be regarded as referring to a claim for the Payment Amount'" was inconsistent with the "plain text." S.A. 90 (quoting J.A. 1208 ¶ 300). "Section 4.9 means exactly what it says" and "Plaintiffs' suggested expansion of the provision would allow the exception to swallow the No-Action Clause." S.A. 90–91.

On September 25, 2024, while this appeal was pending, Plaintiffs filed a new lawsuit in the Southern District of New York, invoking C.P.L.R. § 205(a). In their new complaint, Plaintiffs allege the same theories that they advanced in the court below and seek payment for Reference Year 2013, but also allege that, following the dismissal of this case, they subsequently satisfied the requirements of Section 11 and the Trustee declined to prosecute their claims. *Aurelius Cap. Master, Ltd., et al.* v. *The Republic of Argentina*, 24-cv-07247-LAP, Dkt. 1 (S.D.N.Y. Sept. 25, 2024).

## SUMMARY OF ARGUMENT

I.     Both the Trust Indenture and the Global Security contain an unambiguous No-Action Clause that broadly prohibits individual actions for claims under the GDP-linked Securities unless Holders comply with five

---

Republic (as the preconditions of Section 11 of the Global Security had been satisfied by the English claimants), and the Trustee decided not to appeal the issue.

preconditions centered on giving the Trustee the opportunity to pursue the claims on behalf of all Holders. Plaintiffs conceded that they did not follow these contractually mandated steps, and the district court correctly entered judgment against them based on that threshold defect in their claims. The district court also correctly held that Plaintiffs' claims are not covered by the narrow exception for individual Holder actions in Section 4.9 of the Trust Indenture because Plaintiffs are not seeking payments of "principal" or "interest." Plaintiffs' arguments for reversing the district court are all meritless.

A.     Plaintiffs now contend that "it doesn't matter whether Payment Amounts qualify as principal and interest" under Section 4.9 of the Trust Indenture because Section 11 of the Global Security gives them an unconditional right to sue individually without involving the Trustee. Br. 38. This argument cannot be squared with the text of the Global Security and the Trust Indenture. As the district court correctly held, the opening language of Section 11, which identifies the lone exception to the Securities' No-Action provisions, "cabins the subsequent text to the parameters set forth in Section 4.9 of the Indenture." S.A. 86.

B.     The district court also correctly held that it is "clear that the Contingent Payments provided for under the Global Security are distinct from principal and interest." S.A. 88. The plain meaning of the words "principal" and "interest" supports the district court's holding, as does the very first page of the Global Security, which provides, in capital letters, that "Holders of this Security are not entitled to receive principal in the amount of, or interest based on, such notional amount." J.A. 761. In addition, the prospectuses that accompanied the Securities' issuance stated that the Securities "do not represent a right to receive principal or interest payments." J.A. 846.

C.     The district court's ruling is consistent with the purpose of no-action clauses, which ensure that litigation that might affect the rights of all Holders is channeled through the Trustee and to benefit all holders. This objective is particularly important for claims like Plaintiffs', which would change the manner in which contingent payments are determined and calculated.

D.     Finally, Plaintiffs argue, for the first time on appeal, that the Republic forfeited or waived its argument under the No-Action Clause by not raising it until summary judgment. Plaintiffs did not make this argument below and it is therefore not preserved for appeal. Their argument is also

33

wrong. Plaintiffs' failure to comply with the contractual preconditions to suit set forth in the No-Action Clause constitutes a failure to state a claim upon which relief can be granted, and therefore cannot be waived. Indeed, courts routinely adjudicate the failure to comply with a no-action clause on summary judgment, and this Court has affirmed those judgments.

II. If this Court disagrees with the district court's interpretation of the No-Action Clause, it should remand for the district court to address the remaining issues raised in the parties' summary judgment briefing but not reached below. If this Court rules on these other issues, which it should not, it nonetheless should affirm.

A. Apart from the No-Action Clause issue, there are other procedural defects in Plaintiffs' claims. *First*, most Plaintiffs acquired their Securities *after* the No-Payment Announcement, and thus after any claim for breach of contract would have accrued. These Plaintiffs, however, have failed to produce any evidence that they acquired the right to sue on their claims. *Second*, Plaintiff WASO acquired nearly all of its Securities *after* the five-year prescription period expired, and Plaintiff Ape Group did not commence its lawsuit with respect to any of its holdings until after that period expired, meaning that their claims are respectively time-barred in part and in whole.

B.    This Court can also affirm the judgment on the ground that the Republic's interpretation of the Global Security (the Constant Factor Approach) is correct as a matter of law, and therefore no payment was due for Reference Year 2013.  The Republic's interpretation is faithful to the plain language of the governing documents, particularly when those documents are read in their entirety and in the context of the Securities' issuance.  Plaintiffs' interpretation, by contrast, does not read the language of the contract as a whole.   In fact, Plaintiffs' interpretation renders the entire Adjustment Provision meaningless.  Plaintiffs' interpretation also requires reading an unwritten and concededly unprecedented obligation into the Securities, and produces commercially unreasonable results, contrary to settled New York law.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision granting summary judgment de novo."  *Donohue* v. *Hochul*, 32 F.4th 200, 206 (2d Cir. 2022).  This standard applies to conclusions of law, including issues of contractual interpretation.  *SEC* v. *Rashid*, 96 F.4th 233, 240 (2d Cir. 2024); *Donohue*, 32 F.4th at 206.  It also applies to mixed questions of law and fact when the question is predominantly legal, *Rashid*, 96 F.4th at 240, as is the case for the

35

district court's application of its interpretation of the Prescription Clause to Ape Group's pre-suit communications.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT BECAUSE PLAINTIFFS FAILED TO COMPLY WITH THE NO-ACTION CLAUSE.

The district court correctly concluded that the broad No-Action Clause in Section 11 of the Global Security applied to Plaintiffs' individual actions, and that Plaintiffs did not comply with the preconditions to suit contained therein. The court also correctly concluded that—because Plaintiffs sought contingent payments under the Global Security, not payments of "principal" or "interest"—Plaintiffs did not qualify for the narrow exception in Section 4.9 of the Trust Indenture. S.A. 90–91.

Plaintiffs argue on appeal that "[i]t doesn't matter whether Payment Amounts qualify as principal and interest" under Section 4.9 because Section 11 creates a standalone right to pursue their individual claims without complying with the No-Action Clause. Br. 38. This reading is incorrect: it ignores the plain language of Section 11, which "cabins the subsequent text to the parameters set forth in Section 4.9 of the Indenture." S.A. 86. Plaintiffs' interpretation is also at odds with the No-Action Clause's basic purpose of

requiring that the Trustee receive notice and the opportunity to pursue litigation first—and requiring that all suits, whether initiated by the Trustee or by Holders who satisfy the preconditions, be brought "for the equal, ratable and common benefit of all Holders of the Securities." J.A. 778 § 11.

### A. The District Court Correctly Held That Section 4.9 of the Trust Indenture Identifies the Only Exception to the Pre-Suit Requirements in Section 11 of the Global Security.

Section 11 of the Global Security prohibits Holders from initiating any action unless they first comply with five enumerated preconditions. It cross-references Section 4.9 of the Trust Indenture, which establishes only a single, narrow exception for claims that may be brought without prior notice to the Trustee. Plaintiffs' claims do not fit into that exception because Plaintiffs are not suing for payment of "principal" or "interest." That should be the end of the analysis, because Section 11 does not confer or expand enforcement rights beyond what is provided in Section 4.9.

1. For starters, Plaintiffs cannot get around the very first words in Section 11 of the Global Security: "*Except as provided in Section 4.9 of the Indenture* with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder on any Payment Date (as this Security

37

may be amended or modified pursuant to Paragraph 22) . . . ."  J.A. 778 (emphasis added).

The "except as provided in" language tells the reader that the only exception to Section 11's broad prohibition against individual holder actions bypassing the Trustee is found in Section 4.9 of the Trust Indenture.  As the district court put it, Section 11's "use of 'except as provided in Section 4.9' cabins the subsequent text to the parameters set forth in Section 4.9 of the Indenture."  S.A. 86.  The district court's conclusion is consistent with how courts interpret "[t]he phrase 'Except as provided'" as "remov[ing] from the sweep of" one provision "*only*" that which is "within the compass of" the cross-referenced provision.  *United States* v. *Resler*, 313 U.S. 57, 59 (1941) (emphasis added).  There is no other plausible reading of the words "except as provided"—they set the parameters of the sole thing that is left out of a general rule.  *See* Black's Law Dictionary (6th ed. 1990) ("Except" defined as "[b]ut for; only for; not including; other than; otherwise than; to leave out of account or consideration").

2.  Gliding past the "Except as provided in Section 4.9 of the Indenture" language, Plaintiffs now focus on the words that follow:  "with respect to the right of any Holder of a Security to enforce the payment of any

amounts due hereunder." J.A. 778. According to Plaintiffs, this language is broader than the language of Section 4.9 of the Trust Indenture and thus *expands* the right to sue beyond the parameters set out in Section 4.9. Br. 38–40. Plaintiffs are wrong.

a. First, Plaintiffs' interpretation is impossible to square with the plain text. Most importantly, Plaintiffs would make the language "Except as provided in Section 4.9 of the Indenture" a nullity. Plaintiffs concede that an interpretation that renders contractual terms a "meaningless nullity . . . is not a supportable reading of the provision under New York law." Br. 43; *see LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."). Under Plaintiffs' reading, Section 11 would say in relevant part: "~~Except as provided in Section 4.9 of the Indenture with respect to the right of~~ [A]ny Holder of a Security ~~to~~ may enforce the payment of any amounts due hereunder on any Payment Date. . . ." That is a rewriting of the provision, not an interpretation of it. *Aivaliotis* v. *Cont'l Broker-Dealer Corp.*, 817 N.Y.S.2d 365, 366 (N.Y. App. Div. 2006) ("[A] court should not, under the

guise of contract interpretation, imply a term which the parties themselves failed to insert or otherwise rewrite the contract.").

If the Global Security gave Holders the unconditional right to bring individual actions for *any* amounts due—not just "principal" and "interest" payments—then there would be no reason to reference Section 4.9 of the Trust Indenture. Plaintiffs respond by accusing the district court of rendering Section 11's entire exception "wholly ineffective surplusage." Br. 43. But that is not right. The exception in Section 11 plays a role in the Global Security: as the district court put it, Section 11 tells the reader that there is no exception besides the one in Section 4.9 "for individual holders to enforce their right to bring suit to receive payment for principal of and interest on their bonds." S.A. 86.

This exception would come into play if the Global Security were amended to allow for principal and interest payments, as the Security expressly allows. Again, the text of the exception reads: "Except as provided in Section 4.9 of the Trust Indenture with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder on any Payment Date *(as this Security may be amended or modified pursuant to Paragraph 22)* . . ." J.A. 778 § 11 (emphasis added). The parenthetical

language recognizes the possibility of an amendment that could allow Holders to claim "principal" or "interest" in addition to the contingent payments related to real GDP. In that scenario, Section 4.9 would permit them to sue individually for principal and interest.[7]

Plaintiffs question why language would be added "anticipating that modification, rather than being amended later to reflect the modification," Br. 46, but Plaintiffs offer no other explanation for this parenthetical language. Nor can the parenthetical language be ignored as simple boilerplate, as no other provision in the Global Security contains a similar reference to the possibility of amendment. *See Int'l Fid. Ins. Co.* v. *Cty. of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) (applying to contract interpretation "the corresponding statutory presumption that Congress acts intentionally when particular language is included in one section of a statute but omitted in another").

---

[7] Plaintiffs point to Section 9 of the Global Note, which governs the Republic's traditional debt securities that pay principal and interest, noting that it "has an enforcement provision corresponding to Section 11 of the Global Security" that references "principal" and "interest" instead of "amounts due hereunder." Br. 40–41. But this observation merely shows that the language of Section 11 was deliberately chosen for the GDP-linked Securities, including the decision to limit the rights conferred by using a cross-reference to Section 4.9 of the Trust Indenture.

b.      Second, Plaintiffs' interpretation cannot be squared with the broader contractual context.  *See Arrowgrass Master Fund Ltd.* v. *Bank of N.Y. Mellon*, 965 N.Y.S.2d 473, 474–75 (N.Y. App. Div. 2013) ("Single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part.").  Plaintiffs ignore that their most-emphasized language—"with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder"— appears within *an exception* to a No-Action Clause.  Br. 39.  If the parties intended to *expand* Holders' rights to bring individual claims, an exception inside a *prohibition* on claims would be a strange place to do it.  The purpose of Section 11, after all, is to "make it more difficult" to bring individual lawsuits.  *Lovatio* v. *Petróleos de Venezuela, S.A.*, 2020 WL 5849304, at *3 (S.D.N.Y. Sept. 30, 2020).  No reasonable drafter would sneak into that provision a vastly expanded right to bring suit that destroys the carefully crafted—and expressly incorporated—language in Section 4.9 of the Trust Indenture.[8]

---

[8] Plaintiffs fault the district court for observing that if the parties had intended for Section 11 to be a rights expanding provision, they "presumably would have used the defined term of 'Payment Amount' instead of the language they did use – 'amounts due hereunder on any Payment Date (as this Security may be

Interpreting the exception within a No-Action Clause as *expanding* the general rule that individual actions can only be brought after complying with the required preconditions is also contrary to courts' preference to interpret exceptions narrowly. *See Mastrovincenzo* v. *City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) (courts should reject a contractual interpretation that would "transform an otherwise narrow exception . . . into an 'exception that swallows the rule'"); *Lummus Co.* v. *Commonwealth Oil Ref. Co.*, 297 F.2d 80, 93 (2d Cir. 1961) (Friendly, J.) ("It may be that the office our construction leaves the [exception] is a small one; we prefer that to a reading that would allow an exception, ineptly worded to meet a particular problem, to swallow the rule.").

Here, Section 11 of the Global Security sets out a detailed, sequential enforcement scheme under which Holders must present the Trustee with a claimed default and the Trustee has an opportunity to pursue that claim on behalf of all Holders. If the Trustee decides not to do so, the Holders may then sue for the "equal, ratable and common benefit of all Holders." J.A. 778 § 11.

---

amended or modified pursuant to Paragraph 22)." S.A. 87. Plaintiffs argue that the district court got it wrong because the term "any amounts due hereunder" is broader than "Payment Amounts." Br. 35–36. This misses the point. The failure to use the defined term "Payment Amounts" simply bolsters the conclusion—already compelled by the plain language—that there was no intent for the No-Action Clause to expand the exception in Section 4.9 beyond its plain language to include claims for any Payment Amount.

Under Plaintiffs' reading, this entire scheme has no purpose. *Any* lawsuit concerning whether a contingent payment is due under the Securities or about the measurement, calculation, or distribution of such payments is not governed by the No-Action Clause—and as a practical matter there is no other relief left to be sought for the "equal, ratable and common benefit of all Holders," J.A. 778 § 11, and no point in including the enforcement procedures in Section 11 at all. Thus, as the district court recognized, "Plaintiffs' suggested expansion of the provision would allow the exception to swallow the No-Action Clause." S.A. 90–91.

3. Plaintiffs invoke Section 11's "with respect to" language ("Except as provided in Section 4.9 of the Indenture *with respect to* the right of any Holder . . .") to try to salvage the position that Section 11 was intended to expand Holders' right to bring individual actions. Plaintiffs argue that this is "not language of *limitation*" but rather "language of *application*" that "extend[s]" the right to sue for payment of principal and interest under Section 4.9 to a "right" to sue for "any payments due" under the Global Security. Br. 39. But "with respect to" is not language of extension. Rather, it is most commonly language of limitation used to refer to some portion of a larger whole. *See Adamowicz* v. *IRS*, 552 F. Supp. 2d 355, 367 (S.D.N.Y. 2008)

44

("That second clause, broad as it may be, is followed by *language of limitation – 'with respect to* a return.'") (emphasis added); *Boulware* v. *United States*, 552 U.S. 421, 437 (2008) ("'with respect to . . . stock' is a limiting condition").

The two cases Plaintiffs cite to support their contrary reading do not help them. Br. 39–40. Plaintiffs cite Justice Thomas's concurrence in *Jennings* v. *Rodriguez*, 583 U.S. 281 (2018), but that opinion addressed a provision that began: "With respect to review of an order of removal under subsection (a)(1), the following requirements apply . . ." 8 U.S.C. § 1252. As Justice Thomas explained, "with respect to" *is* the "prefatory clause" in that case; it defines the full application of what follows. *Jennings*, 583 U.S. at 320. Here, by contrast, the prefatory clause is "[e]xcept as provided in Section 4.9 of the Indenture." J.A. 778 § 11. Thus, even supposing that "'with respect to' means 'referring to,' 'concerning,' or 'relat[ing] to,'" *Jennings*, 583 U.S. at 320, its scope has already been limited by Section 11's prefatory clause, so that the language following "with respect to" must be "referring to, concerning, or relating to" Section 4.9 of the Indenture.

Plaintiffs also cite *ACE Capital Re Overseas Ltd.* v. *Cent. United Life Ins. Co.*, 307 F.3d 24 (2d Cir. 2002), but that case, too, is beside the point. The

court there focused on the fact that the prefatory clause, which required arbitration "[a]s a condition precedent to any right of action hereunder," "does not limit the scope of the arbitration clause but rather establishes a limitation on when a judicial action may be brought under the Agreement." *Id.* at 31. Section 11's "[e]xcept as provided" language, by contrast, plainly limits the provision's scope. *Id.* at 33–34.

*     *     *

For all of these reasons, the district court correctly concluded that the cross-reference to Section 4.9 in the Trust Indenture's No-Action Clause was not intended to *expand* Plaintiffs' ability to bring individual claims. Rather, it was meant to incorporate Section 4.9's exception and summarize the rights contained therein. As a result, the cross-reference to Section 4.9 "cabins the subsequent text to the parameters set forth in Section 4.9 of the Trust Indenture." S.A. 86.

### B. The District Court Correctly Held That Plaintiffs' Claims Are for Neither "Principal" Nor "Interest."

Turning to the issue that Plaintiffs now say "doesn't matter," Br. 38, the district court correctly held that Plaintiffs' claims do not fall within Section 4.9's exception allowing individual actions because "[i]t is clear that the Contingent Payments provided for under the Global Security are distinct from

46

principal and interest." S.A. 88. Plaintiffs drew the same distinction as the district court in their pleadings. 683 Capital expressly alleged in its amended complaint that, "in the case of Argentina's GDP Warrants, *no principal is ever paid*." J.A. 2678–79 ¶ 29 (emphasis added). Aurelius and ACP Master similarly alleged that: "[i]n the exchange offers, holders of defaulted bonds received new bonds representing a steep 'haircut' from the face amount (or *interest coupon*) of the bonds they were tendering, *plus GDP Warrants providing for contingent additional payments* based on the performance of the Argentine economy through 2035." J.A. 176–77 ¶ 2; 2616–17 ¶ 2 (emphasis added). The district court correctly rejected Plaintiffs' subsequent effort to recharacterize their claims seeking a contingent payment linked to Argentina's GDP as claims for payment of "principal" or "interest." S.A. 87–88.

1.    Contractual provisions "must be given their plain and ordinary meaning." *White* v. *Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007). The plain meaning of the words "principal" and "interest" cannot be stretched to encompass the contingent payments that Plaintiffs seek.

a.    Contingent payments based on real GDP are not payments of "principal." As the district court recognized, "'principal' is commonly

47

understood to mean 'the amount of a debt, investment[,] or other fund, not including interest, earnings, or profits.'" S.A. 87–88 (quoting Black's Law Dictionary (11th ed. 2019)); *see* Oxford English Dictionary (3d ed. 2010) (a "sum of money lent or invested, on which interest is paid"). The notional amount of the Securities held does not represent an entitlement to recover any amounts lent or invested. Contingent payments become due only if Argentina's real GDP exceeds a certain level and growth rate, their amounts are determined based on "Excess GDP," which reflects the extent of the economy's over-performance, and they are distributed based on notional amount held. J.A. 768–69.

Plaintiffs try to stretch the definition of "principal" on the theory that the original creditors who exchanged their defaulted bonds were entitled to "some return of amounts on defaulted bonds" up to the "Payment Cap." Br. 53–54. This is also wrong. The idea that there might be "some return" on an instrument does not mean that the return is a payment of *principal*. Instead, the "return" on the GDP-linked Securities is a sum that is unknowable in advance, and that is contingent on factors other than the amount of any investment. In fact, by their terms, the Securities do not guarantee any payment at all, and thus payment on the Securities may never

48

occur.  Nor does the Payment Cap establish an amount due.  It simply sets an upper limit on the payments that might (or might not) come due during the life of the Securities.  The maximum amount of potential payouts is not a "sum of money lent or invested, on which interest is paid."  Oxford English Dictionary (3d ed. 2010).

b.  Contingent GDP payments are not "interest" either.  Interest is "money paid regularly at a particular rate for the use of money lent, or for delaying the repayment of a debt."  S.A. 87–88 (quoting Oxford English Dictionary (3d ed. 2010)); *see also* Black's Law Dictionary (12th ed. 2024) ("The compensation fixed by agreement or allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use; esp., the amount owed to a lender in return for the use of borrowed money.").  Plaintiffs argue that GDP-linked Payment Amounts can be shoehorned into the definition of interest because any payments are made "on a regular date" and "at a particular rate."  Br. 54.  In fact, the Payment Amounts under these Securities are not driven by, or based on, the passage of time, which is a key factor in calculating interest in any debt instrument.  They are not paid at regular intervals—they are conditional and only become due if certain conditions are met.  Because the Payment Amounts are contingent, there are

49

also no payments at a "particular rate" of return, as with an interest payment. S.A. 88.

Nor are the Payment Amounts "for delaying the repayment of debt." Br. 54. Plaintiffs argue that the Securities "were originally issued in exchange for defaulted notes on which money was lent and not repaid." Br. 55. But Plaintiffs point to no language in the Global Security or Trust Indenture that links the Securities to any specific amount of debt. Moreover, as Plaintiffs themselves concede, the Securities were merely a "sweetener" to the debt exchange. Br. 7.

The recitals at the beginning of the Trust Indenture further underscore the lack of any relation to "money lent" or a "debt," S.A. 88, because they distinguish between "debentures, notes, bonds, other evidence of indebtedness" on the one hand, and "GDP-Linked Securities" on the other, J.A. 645. If the Securities are not "evidence of indebtedness," then it follows that payments under the Securities are not interest, which requires a direct relationship with "money lent" or a "debt." J.A. 88.

c. The district court's conclusion that GDP-linked contingent payments are a distinct category from "principal" and "interest" payments is also reinforced by the undisputed fact that the Securities were intended to

mirror many of the features of equity instruments. Much like equity securities, any payments under the GDP-linked Securities are dependent on the performance of the issuer, and there is no commitment to repay an amount (principal) or to pay interest. S.J.A. 206–209 ¶¶ 9–19. Plaintiffs themselves acknowledge that there is no "fixed return" on these Securities, and instead "purchasers have an interest in the overall economic performance of the issuing country." J.A. 2679 ¶ 29; *see* J.A. 2794 ¶ 38 ("GDP-linked bonds are a hybrid security—they do not include any fixed return, but instead provide purchasers with an interest in the overall economic performance of the issuing country.").

2. Lest there be any doubt, the rest of the contract confirms the plain meaning of "principal" and "interest." As the district court rightly noted, the very first page of the Global Security "makes clear that the GDP-Linked Securities do not contemplate paying principal or bearing interest." S.A. 88.

That first page contains emphatic language, in all capital letters, making clear that "HOLDERS OF THIS SECURITY ARE NOT ENTITLED TO RECEIVE PRINCIPAL IN THE AMOUNT OF, OR INTEREST BASED ON, SUCH NOTIONAL AMOUNT." J.A. 761. It further clarifies the nature of these payments: "THE ONLY AMOUNTS PAYABLE IN RESPECT OF

THIS SECURITY ARE THE PAYMENTS CONTINGENT UPON AND
DETERMINED ON THE BASIS OF THE PERFORMANCE OF THE
GROSS DOMESTIC PRODUCT OF THE REPUBLIC OF ARGENTINA."
J.A. 761.  As the district court observed, S.A. 88, the Global Security thus
draws a clear distinction between "contingent" payments tied to the Republic's
GDP, and "principal" or "interest" payments.

Plaintiffs claim that "the legend *does not* say that the payments that *are*
due under the Global Security are not payments of principal or interest."
Br. 53.  Yet that is precisely what the plain language says.  Plaintiffs' theory is
that the capitalized text merely indicates that Holders are not entitled to
principal or interest "based on" the notional amount, implying that they might
receive principal or interest on some other basis.  Br. 52–53.  But that theory
would never authorize suit to recover the contingent payments under the
Securities at issue here, which under Section 2(a) of the Global Security are
expressly "*based on the notional amount* of this Security that each such
beneficial owner holds."  J.A. 770 § 2(a) (emphasis added).

3.     Other indicators in the governing documents confirm that GDP-
linked payments are not covered by Section 4.9's carveout for "principal" and
"interest."   Although Plaintiffs cited various examples of provisions in the

52

Trust Indenture that use "principal" or "interest," each actually illustrates how the Global Security scrupulously *deletes* references to "principal" and "interest" when adapting provisions for the GDP-linked Securities. Br. 50.[9] For example, Section 4.13 of the Trust Indenture, which contains the Trust Indenture's prescription clause, is rewritten as Section 14 of the Global Security, where references to "principal" and "interest" are struck and replaced by the language "any amounts due hereunder." J.A. 779 § 14. Similarly, Section 3.5(a) of the Trust Indenture, governing payments, was adapted in Section 2(a) of the Global Security, where it does not mention principal and interest at all and instead discusses the "Payment Amount." Plaintiffs also point to Section 11.4 of the Trust Indenture, governing the repayment of unclaimed funds paid as principal and interest, but this is

---

[9] Plaintiffs argue that it is "inconceivable" that the Trust Indenture would use "principal" and "interest" to describe the Republic's "obligation to make payments" under the traditional debt securities "while remaining utterly silent about the Republic's corresponding obligations" for the Securities. Br. 50. But this drafting decision was entirely rational, as the entitlements arising under the other three series of bonds issued under the Trust Indenture dwarfed that of the GDP-linked Securities, J.A. 125, which were viewed as a mere "sweetener" in the overall restructuring. Br. at 7. The specific terms addressing the Republic's obligations under the Securities were supplied by the Global Security, which makes no reference to "principal" or "interest" other than to say that Holders are not entitled to either. J.A. 761.

adapted in Section 2(e) of the Global Security to deal with "payments," *not* principal or interest.

The prospectuses that accompanied the 2005 and 2010 issuances also informed investors that "these GDP-linked Securities *do not represent a right to receive principal or interest payments*. Rather, they represent the right to receive certain payments that are contingent upon and determined on the basis of the performance of Argentina's gross domestic product." J.A. 846 (emphasis added). The prospectuses elsewhere highlight the distinction between the contingent payments as opposed to principal or interest payments:

- "The New Securities will . . . pay interest and principal (or, in the case of GDP-linked Securities, make payments in accordance with their terms) . . ." J.A. 869; 982.

- "There are no principal payments on the GDP-linked Securities, and all payments on the GDP-linked Securities are linked to the performance of Argentina's gross domestic product." J.A. 841.

- "The GDP-linked Securities will . . . not evidence any principal." J.A. 872; 985.[10]

4.      Plaintiffs advance a mish-mash of other arguments on appeal, none of which overcomes the plain language of the Global Security and the Trust Indenture.

a.      Plaintiffs point out that the Securities are included in the defined term "Debt Security" in the Trust Indenture, which they contend refers to "a type of security that typically pays principal and interest"—an assertion that Plaintiffs support by citing to an IRS bulletin from the 1990s that does not even use the term "debt security."  Br. 49 (citing IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr. 18, 1994)).[11]  It is hardly surprising that the parties settled on

---

[10] Although prospectuses do not strictly form a part of the investment contract between the Republic and Holders, they are "contemporaneous disclosures" that help shed light on the Global Security.  *Tannenbaum* v. *Zeller*, 552 F.2d 402, 415 n.15 (2d Cir. 1977) (explaining, in a derivative shareholder action, that the 1965 and 1973 prospectuses are "contemporaneous disclosures [which] obviously support the conclusion that" the allocation of brokerage commissions had not breached the fund's management and distribution agreements); *see Ambac Assurance Corp.* v. *U.S. Bank Nat'l Ass'n*, 2021 WL 6060710, at *4 n.4 (2d Cir. Dec. 20, 2021) ("We also agree with the district court that this interpretation is reinforced by the Policy and the Prospectus Statement, both of which the district court properly considered in its analysis.").

[11] The IRS bulletin, Br. 49, does not help Plaintiffs.  One of the key factors provided for distinguishing between "debt" and "equity" is "whether there is

"Debt Security" as an umbrella term for the various securities being issued in the context of a global restructuring encompassing all of Argentina's outstanding private debt.  As noted above, however, the Trust Indenture distinguishes between "debentures, notes, bonds, other evidence of indebtedness," on the one hand, and "GDP-Linked Securities," on the other. J.A. 638.  Plaintiffs' point therefore cuts in favor of the district court's interpretation of the terms "principal" and "interest."

b.    Plaintiffs point out that Exhibit E to the Trust Indenture, the GDP-Linked Securities Authorization, "expressly provides that *certain* Trust Indenture provisions 'shall not apply to GDP-Linked Securities'" but does not list Section 4.9.  Br. 51 n.10.  This argument does not make sense.  Section 11 of the Global Security explicitly cross-references Section 4.9, so it obviously would not be listed as a provision that is not part of the GDP-linked Securities. Plaintiffs also misconstrue the purpose of Exhibit E.  The Authorization is not intended to address every provision that differs between the GDP-linked Securities and the other bonds issued in the restructuring; rather, it focuses

---

an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future."  IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr. 18, 1994).  There is no such commitment in these Securities.

on provisions of the Trust Indenture that are superseded by the specific terms of the GDP-linked Securities.

Exhibit E mentions Sections 4.1, 4.2, and 4.3 of the Trust Indenture because they address default triggers and acceleration provisions, which do not form part of the entitlements arising under the GDP-linked Securities. J.A. 722. Such entitlements would make little sense in the context of any equity-like instrument (*i.e.*, shares do not "accelerate" upon a default of the issuer, because there is nothing to accelerate). *See supra* at 50–51. The purpose of Exhibit E is to avoid potential confusion and dysfunction from these specific default provisions, not to imply any broader applicability of Section 4.9.

It is also noteworthy that Exhibit E excludes the "Moratorium" event of default, which applies to the other three series of bonds if the Republic declares a moratorium on principal or interest payments. J.A. 659, 722. If Plaintiffs were correct that GDP-linked payments are equivalent to "principal" or "interest," there would be no reason to exempt this default provision from applying to the GDP-linked Securities. This exclusion further underscores that contingent GDP-linked payments are distinct from principal and interest, reinforcing the district court's interpretation.

c.    Plaintiffs argue that "the Republic itself has described" Payment Amounts as interest in the past.  Br. 55.  The Republic's subsequent characterizations of the governing documents (in press releases, annual reports, or unofficial statements) are no substitute for the text of the Global Security and Trust Indenture.  *See In re Teekay Offshore Partners L.P. Common Unitholders Litig.*, 2021 WL 1227415, at *13 (S.D.N.Y. Mar. 31, 2021) (where a partnership agreement "is clear on this issue [of fiduciary duties], the Court will not now look to the SEC filing in question to determine the existence of contractual fiduciary duties.").[12]

---

[12] The annual reports to which Plaintiffs point, Br. 55–56 n.12, also undercut their argument insofar as they elsewhere distinguish between contingent payments under the Securities and the concepts of principal or interest.  For example, when describing the terms of the securities issued in the 2005 Debt Exchange, the Republic's October 10, 2008 Form 18-K refers to the conventional bonds as having an "aggregate principal amount" and "bear[ing] interest at fixed rates," whereas payments under the Securities are described in terms of "notional amount[s]" and "are contingent upon the performance of Argentina's GDP."  Republic of Arg., Annual Report (Form 18-K), at 131 (Oct. 10, 2008); *see also* Republic of Arg., Amended Annual Report (Form 18-K/A), at 140 (Apr. 9, 2010) (similar); Republic of Arg., Annual Report (Form 18-K), at 148–151 (Sept. 30, 2010), (similar); *id.* at 153 ("Argentina included GDP-Linked Securities, which would yield payments based on the amount that GDP exceeded an assumed base rate per annum (and, accordingly, give creditors the right to receive payments in the event of certain improvements in Argentina's economy)."); Republic of Arg., Annual Report (Form 18-K), at 147–149, 152 (Sept. 30, 2011) (similar); Republic of Arg., Annual Report (Form 18-K), at D-154–D-157 (Feb. 26, 2019) (similar).

The cases cited by Plaintiffs, Br. 57, do not help them. In *Krauth* v. *Exec. Telecard, Ltd.*, 890 F. Supp. 269, 294 n.5 (S.D.N.Y. 1995), the court considered a Form 10-Q filing only as "evidence that an agreement between the parties had been reached," and the court in *Oregon RSA No. 6, Inc.* v. *Castle Rock Cellular of Oregon L.P.*, 840 F. Supp. 770, 778 n.7 (D. Or. 1993), used the "admissions in Form 10-Q" "simply to validate defendants' explanation of statements made" and "not . . . as parol evidence to interpret the Partnership Agreement."

d. Finally, Plaintiffs advance an entirely new "industry custom" argument, contending, for the first time, that "[t]reating Payment Amounts as principal or interest is also consistent with how payments under similar debt securities, known as contingent-value rights ('CVRs'), are treated under the Trust Indenture Act of 1939." Br. 58. This argument, which at the first step asks the Court to decide whether the Global Securities are similar to five CVR agreements cited for the first time in footnotes to Plaintiffs' appeal brief, Br. 58–60 & nn. 14–16, is not preserved for appeal. *See Loc. 377, RWDSU, UFCW* v. *1864 Tenants Ass'n*, 533 F.3d 98, 99 (2d Cir. 2008) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.").

Even if it were preserved, this singular example of purported "industry custom" does not even begin to show a pervasive industry custom of "fixed and invariable usage" that the parties "should have been aware of." *SR Int'l Bus. Ins. Co.* v. *World Trade Center Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006). Indeed, the CVRs cited by Plaintiffs all *post-dated* the first issuance of the Republic's GDP-linked Securities in 2005 by at least 10 years. Br. 58 n.14, Br. 59 n.15, Br. 60 n.16. And as Plaintiffs admit, Br. 59 n.15, the TIA does not actually apply to debt issuances by sovereigns such as the Republic. 15 U.S.C. § 77ddd(a)(6).

Moreover, the CVRs cited by Plaintiffs do not even support their assertion that contingent payments under CVRs are treated as principal or interest. Br. 58. Rather, the TIA prohibits impairment of a debtholder's right to receive "principal" and "interest," 15 U.S.C. § 77ppp(b), and the documents cited by Plaintiffs show merely that some CVRs go further than required in implementing the TIA by expressly allowing those holders to enforce their entitlement to all "CVR payment amounts." Br. 59. That does not amount to "treating," Br. 58, CVR payment amounts as principal or interest.

## C.    The Purposes of the No-Action Clause Reinforce the District Court's Interpretation.

The general purposes of no-action clauses buttress the district court's conclusion that *this* No-Action Clause required Plaintiffs to comply with the pre-suit requirements of Section 11. S.A. 85–86. *See Thompson* v. *Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (courts "giv[e] due consideration to the surrounding circumstances [and] apparent purpose which the parties sought to accomplish"); *Newmont Mines Ltd.* v. *Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (contracts should be examined "in light of the business purposes sought to be achieved by the parties").

As Plaintiffs recognize, the function of a no-action clause is to "limit[] the ability to bring certain lawsuits relating to a security." Br. 3; *see also Lovatio*, 2020 WL 5849304, at *3 (no-action clauses are designed to "make it more difficult" to bring individual lawsuits). The No-Action Clause here requires (i) a threshold level of holder participation, (ii) the opportunity for the Trustee to take over the suit, and (iii) if the Trustee does not do so, that the holder proceed only for the "equal, ratable and common benefit of all Holders of the Securities," not merely on its own behalf. J.A. 778 § 11. Together, such provisions prevent Holders from litigating against the "collective economic interest" of all Holders. *SC Note Acquisitions, LLC* v. *Wells Fargo Bank,*

*N.A.*, 934 F. Supp. 2d 516, 531 (E.D.N.Y. 2013); *see Feldbaum* v. *McCrory Corp.*, 1992 WL 119095, at *6 (Del. Ch. June 2, 1992) ("The theory is that if the suit is worthwhile, [a significant percentage] of the debentureholders would be willing to join in sponsoring it," thereby satisfying one threshold requirement) (applying New York law). They also "ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all bondholders." *Quadrant Structured Prods.*, 23 N.Y.3d at 566 (quoting *Feldbaum*, 1992 WL 119095, at *6); *see RBC Cap. Mkts., LLC* v. *Educ. Loan Tr. IV*, 2011 WL 6152282, at *5 (Del. Ch. Dec. 6, 2011) ("[N]o-action clauses ensure that any remedy attained by noteholders for a violation of the trust indenture will be shared equally.") (applying New York law).

Plaintiffs acknowledge that these protections of no-action clauses are meant to govern actions "against the issuer that would affect the security itself, as applied to all holders." Br. 46–47. That is an apt description of Plaintiffs' own lawsuits. If Plaintiffs were to succeed on the merits of their interpretation of the Global Security, it would alter how the Payment Conditions are satisfied going forward. *See infra* Section II.B.4. Plaintiffs' lawsuits could, in short, have dramatic effects on "the security itself." Br. 47. Any relief would therefore implicate the rights of all Holders, and thus falls

comfortably within the category of litigation subject to the No-Action Clause, which must be brought "for the equal, ratable and common benefit of all Holders of the Securities." J.A. 778 § 11.

It is thus irrelevant that "no-action clauses routinely *carve out* (that is, preserve without condition) suits in which a holder seeks to enforce the issuer's payment obligations *to that holder*." Br. 47. The text of the No-Action Clause here does *not* carve out contingent payments on the Securities, *see supra* Section I.A, and the lone case cited by Plaintiffs that involves a no-action clause pertains *only* to suits for principal and interest payments—just like the No-Action Clause here. *MeehanCombs Glob. Credit Opportunities Funds, LP* v. *Caesars Ent. Corp.*, 80 F. Supp. 3d 507, 517 (S.D.N.Y. 2015). This case simply reinforces the point that no-action clauses can include a principal-and-interest exception, just like the one in Section 4.9 of the Trust Indenture.

### D. The Republic Preserved Its Arguments That Plaintiffs Failed to Comply with the No-Action Clause.

For the first time on appeal, Plaintiffs contend that the Republic forfeited the argument that Plaintiffs failed to comply with the No-Action Clause "by electing not to assert it in a motion to dismiss or answer," and "knowingly waived" this issue "by electing to proceed through extensive

litigation for four years." Br. 60. These arguments have not been preserved and are incorrect.

1.      As an initial matter, Plaintiffs have forfeited their own accusations of forfeiture and waiver. Generally, "an appellate court will not consider an issue raised for the first time on appeal." *In re Nortel Networks Corp. Secs. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008). While this rule is "not absolute," this Court has held that it only "may exercise [its] discretion to address such issues when . . . necessary to remedy an obvious injustice." *Solis* v. *Loretto-Oswego Residential Health Care Facility*, 692 F.3d 65, 75 (2d Cir. 2012). Plaintiffs did not raise their waiver argument before the district court and have not identified any "obvious injustice." *See In re Nortel*, 539 F.3d at 133 ("obvious injustice" unlikely to be found where the "arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below"). The Republic raised Plaintiffs' failure to comply with the No-Action Clause as the very first point in its summary judgment brief, S.J.A. 459, and Plaintiffs had 120 pages of summary judgment briefing to respond, including by asserting that this argument had been waived.

2.      In any event, Plaintiffs' preservation arguments are meritless. First, the Republic did not forfeit its arguments by not raising them in its first

responsive filing. The question of whether Plaintiffs complied with *the terms of the contract* before bringing suit on their particular claims goes to the merits of Plaintiffs' contract claims. *See Diesel Props S.r.l.* v. *Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) ("In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence . . . performance of the plaintiff's obligations under the contract."). Courts have confirmed that the "sufficiency of Plaintiff[s'] compliance" with the "no-action clause" is a "contractual issue" that goes to whether Plaintiffs have a cognizable claim. *Penades* v. *Republic of Ecuador*, 2016 WL 5793412, at *2, *5 (S.D.N.Y. Sept. 30, 2016), *aff'd*, 690 Fed. App'x 733, 736 (2d Cir. 2017). Because compliance with a no-action clause is a merits question that goes to Plaintiffs' failure to state a claim, there is no requirement that it be raised in a motion to dismiss or an answer. *See McMahan & Co.* v. *Wherehouse Ent., Inc.*, 859 F. Supp. 743, 748 (S.D.N.Y. 1994) (rejecting argument at summary judgment that "Defendants should be precluded from using the No Action Clause as a defense because it was not raised in their original Rule 12(b)(6) motion to dismiss" because "[t]he No Action Clause defense . . . cannot be waived"); *see also Patel* v. *Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) ("[T]he defense of failure to state a claim is not

waivable"); *Animazing Ent., Inc.* v. *Louis Lofredo Assocs., Inc.*, 88 F. Supp. 2d 265, 268 (S.D.N.Y. 2000) ("rules of waiver are inapplicable" where issue focused on "essential element" of claims). As a result, this Court has repeatedly upheld district court decisions granting summary judgment based on the failure to comply with a no-action clause. *See, e.g.*, *McMahan & Co.* v. *Wherehouse Ent., Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995); *ZBD Constructors, Inc.* v. *Billings Generation, Inc.*, 472 F. App'x 83, 84 (2d Cir. 2012).

Plaintiffs are therefore incorrect that their failure to comply with the No-Action Clause is a "threshold defense" that the Republic had to raise "at the outset of the suit" under Rule 9(a)(2). Br. 61. Rule 9(a) requires defendants to promptly raise the issue of "a party's capacity to sue or be sued." Fed. R. Civ. P. 9(a)(1)–(2). "The capacity to sue or be sued refers to the qualification of a party to litigate in court." Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1292 (4th ed.). Typically, questions of capacity come up for a corporate party when the corporation has been dissolved, *see, e.g.*, *HTI Fin. Solutions Ltd.* v. *Manhattan SMI KG Props. Fin. Ltd.*, 2024 WL 4452295, at *4 (S.D.N.Y. Oct. 9, 2024), or when an individual sues on behalf of a corporation, *see, e.g.*, *Emery Mukendi Wafwana & Assocs., P.C.* v. *Mengara*, 2022 WL 2392510, at *9 (S.D.N.Y. May 19, 2022). In other words, capacity

66

deals with the *personal qualifications* of the individual or entity bringing suit, and "typically is determined without regard to the particular claim or defense being asserted." *Horowitz* v. *148 S. Emerson Assocs. LLC*, 888 F.3d 13, 19 n.4 (2d Cir. 2018). Here, the question under the No-Action Clause is whether Plaintiffs have complied with the terms of the contract for suing on their claims. It is not a capacity argument.

Plaintiffs alternatively assert that this is an issue of "contractual standing," which "is closely analogous to capacity and is treated the same way for pleading purposes." Br. 62. For starters, the failure to comply with a No-Action clause is not a contractual-standing argument. Contractual standing typically arises when the very existence of the contract between the parties is in question. *See SM Kids, LLC* v. *Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (asking whether the plaintiff "enjoyed a contractual relationship" with the defendant at all). The Republic's argument that Plaintiffs failed to comply with the No-Action Clause, in contrast, assumes that Plaintiffs "enjoy[] a contractual relationship" with the Republic, *id.* at 211, and disputes whether they performed under the contract's requirements for bringing suit. Contractual standing is therefore not implicated.

But even if Plaintiffs' failure to comply with the No-Action Clause were a contractual-standing issue, Plaintiffs are wrong that contractual standing is a "defense" that needed to be raised "in [a] responsive pleading." Br. 63. Notably, this Court recently explained that "'standing' . . . is somewhat of a misnomer" because a question about a party's ability to sue under a contract "does not present a standing issue, but simply a question of whether the particular plaintiff *has a cause of action*." *Commerzbank AG* v. *U.S. Bank, N.A.*, 100 F.4th 362, 383 n.30 (2d Cir. 2024) (emphasis added). In other words, "contractual standing" is just a question of "whether a party has the right to enforce a contract." *SM Kids*, 963 F.3d at 210–11. As such, it is not waivable. *Patel*, 259 F.3d at 126.

Tellingly, none of the cases upon which Plaintiffs rely holds that the failure to comply with a no-action clause must be raised in a "responsive pleading." Br. 63. For example, Plaintiffs rely heavily on *Allan Applestein TTEE FBO D.C.A. Grantor Tr.* v. *Province of Buenos Aires*, which did not involve a no-action clause, but instead the issue of whether a plaintiff lacked standing "as a beneficial owner rather than the registered holder of the note." 415 F.3d 242, 243 (2d Cir. 2005). And this Court did not even hold that waiver occurred; it affirmed the district court on the basis that the plaintiff "obtained,

68

as provided in the notes' Offering Memorandum, permission to sue from the registered holder." *Id.* at 245.[13]

Plaintiffs' only in-Circuit case involving a no-action clause is *LCM XXII Ltd.* v. *Serta Simmons Bedding, LLC*, 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022). The district court there did not say anything about the appropriate time to raise arguments about a no-action clause, nor did it hold that a "no-action clause affects a plaintiff's contractual standing to sue," as Plaintiffs misleadingly imply. Br. 63. The court merely held that "Plaintiffs' claims do not fall within [the no-action clause's] proscription," and, "[a]s such, Plaintiffs'

---

[13] Plaintiffs cite several other cases that do not involve no-action clauses. *See, e.g., FDIC* v. *Murex LLC*, 500 F. Supp. 3d 76, 96 (S.D.N.Y. 2020) (evaluating defendant's argument that the plaintiff's predecessor-in-interest had "assigned all rights to bring such a claim" to a third party); *Focus Prods. Grp. Int'l, LLC* v. *Kartri Sales Co.*, 2021 WL 1946756, at *2 (S.D.N.Y. May 14, 2021) (evaluating "whether a party possesses all substantial rights in a patent" such that it has a right to relief in a patent infringement action); *Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 169 (S.D.N.Y. 2015) (analyzing whether a potential purchaser of a security has "rights under the Indenture and . . . standing to enforce it"); *FDIC* v. *Horn*, 2015 WL 1611995, at *10 (E.D.N.Y. Apr. 8, 2015) (declining to address "waiver issue" where defendant claimed the FDIC lacked capacity to bring suit against defendant arising out of the loans sold to Freddie Mac and instead analyzing whether leave to amend was appropriate).

contractual claims are not barred by the Agreement's no-action clause." *LCM XXII Ltd.*, 2022 WL 953109, at *14.[14]

3.      Nor did "the Republic's decision to litigate this case through fact and expert discovery to summary judgment . . . result[] in waiver" under New York law, as Plaintiffs contend. Br. 66. "Under New York law, waiver of a contract right is . . . essentially a matter of intent which must be proved." *Randolph Equities, LLC* v. *Carbon Cap., Inc.*, 648 F. Supp. 2d 507, 516 (S.D.N.Y. 2009) (quoting *Jefpaul Garage Corp.* v. *Presbyterian Hosp.*, 61 N.Y.2d 442, 446 (1984)). "'[M]ere silence, oversight or thoughtlessness in failing to object' to a breach of contract will not support a finding of waiver." *Beth Isr. Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) (quoting *Courtney-Clarke* v. *Rizzoli Int'l Publ'ns, Inc.*, 251 A.D.2d 13, 13 (N.Y. App. Div. 1998)). Plaintiffs have not shown any such "intent" here to support a finding of waiver merely because the Republic raised an argument at summary judgment as it was entitled to do. *See ZBD*

---

[14] Plaintiffs' reference to *Allstate Life Ins. Co.* v. *Robert W. Baird & Co.*, an unpublished out-of-Circuit district court decision, is also inapposite. While defendants in that case challenged the plaintiff's "standing" to bring suit under a no-action clause, the court ultimately found that the no-action clause did not apply to the claims that the plaintiff asserted. 2011 WL 5024269, at *2–3 (D. Ariz. Oct. 21, 2011).

*Constructors, Inc.* v. *Billings Generation, Inc.*, 2011 WL 1327144, at \*8 (S.D.N.Y. Mar. 25, 2011), *aff'd*, 472 F. App'x 83 (applying New York law on waiver to a no-action clause argument and finding no such waiver).

Plaintiffs instead cite three cases involving arbitration provisions that have nothing to do with the situation here. Br. 66–68. A party can waive its option to enforce an arbitration clause if it "draw[s] on the judicial process for a particular advantage," such as by obtaining "pretrial disclosure." *Sherrill* v. *Grayco Builders, Inc.*, 64 N.Y.2d 261, 273–74 (1985). Plaintiffs identify no decision applying this proposition about when a party must move to compel arbitration to when it must assert a defense of a failure to comply with contractual requirements for asserting claims, and for good reason. The rationale for requiring parties to compel arbitration before they take advantage of judicial procedures does not apply to a contractual defense in a litigation in federal court: the Republic was entitled to obtain evidence that Plaintiffs had failed to comply with the No-Action Clause before seeking judgment for failure to do so.[15] The Federal Rules, in any event, expressly

---

[15] Plaintiffs' other cited cases are inapposite. *See Demolition Contractors, Inc.* v. *Westchester Surplus Lines Ins. Co.*, 2009 WL 929014, at \*4–5 (W.D. Mich. Apr. 3, 2009) (applying "Michigan law [of] equitable estoppel" where a defendant insurance company had "admitted in writing [that a claim] was

permit the assertion of contract defenses at summary judgment. *See supra* at 64–70.

## II. THIS COURT CAN AFFIRM THE JUDGMENT ON SEVERAL ALTERNATIVE GROUNDS.

Plaintiffs ask this Court not only to vacate the district court's holding on the No-Action Clause but also to take the extraordinary step of reversing and remanding for entry of judgment in their favor. Br. 68–70. If this Court were to disagree with the Republic on the No-Action Clause, it should not decide the many other issues that were presented in the parties' summary judgment briefing but never addressed by the district court. But if the Court reaches those issues, it should affirm on any of multiple alternative grounds.

1. This Court need not consider the many arguments that the district court did not. The Second Circuit's "settled practice [is] to allow the district court to address arguments in the first instance." *Farricielli* v. *Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000); *Schonfeld*, 218 F.3d at 184 ("[I]t is our distinctly preferred practice to remand [] issues for consideration by the district court in the first instance"). Remand is particularly appropriate where this Court

---

covered under the policy"); *Nassau Tr. Co.* v. *Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 183–84 (1982) (applying estoppel to pre-litigation waiver of "a right to require of the other party certain performance" prior to instituting foreclosure proceedings).

reverses on a "threshold question," like the No-Action Clause.  *See Nat'l Org. for Marriage, Inc.* v. *Walsh*, 714 F.3d 682, 692 (2d Cir. 2013) ("[W]hen we reverse on a threshold question, we typically remand for resolution of any claims the lower courts' error prevented them from addressing.") (quoting *Zivotofsky ex rel. Zivotofsky* v. *Clinton*, 566 U.S. 189, 201 (2012)).

Here, the district court did not reach the Republic's eight other arguments advanced at summary judgment, including that Plaintiffs who bought their Securities after the alleged breach failed to establish that they acquired the right to bring their claims, that certain Plaintiffs' claims were untimely, and that the Republic did not breach the contract because it correctly applied the Adjustment Provision.  Accordingly, even if this Court vacates the district court's summary judgment decision, there is no reason for it to "venture to answer [these] complex question[s] in the first instance." *CILP Assocs., L.P.* v. *PriceWaterhouse Coopers LLP*, 735 F.3d 114, 127 (2d Cir. 2013) (quoting *No Spray Coal.* v. *City of New York*, 351 F.3d 602, 606 (2d Cir. 2003)).

2.    If this Court accepts Plaintiffs' invitation to go beyond the No-Action Clause issues and decide the remaining issues in the first instance, it should affirm the judgment in favor of the Republic on one of several

73

independent grounds. "[I]t is axiomatic that an appellate court may affirm the judgment of the district court on any ground fairly supported by the record," including "for different reasons than those relied upon by the district court." *Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Here, there are other basic defects in Plaintiffs' claims. And with respect to the ultimate disagreement between the parties, the Republic's interpretation of the Global Security (the Constant Factor Approach) is correct as a matter of law, meaning that no payment was due for Reference Year 2013.

## A. Plaintiffs Have Not Established Their Right To Bring Their Claims.

Beyond the No-Action Clause, Plaintiffs' claims suffer from two other threshold flaws. *First*, Plaintiffs that strategically acquired Securities *after* the Republic announced that no payment was due for 2013 were required to prove that they *also* acquired the right to prosecute claims that accrued earlier in time. The vast majority of Plaintiffs, however, have no such evidence. *Second*, WASO and Ape Group Plaintiffs' claims are time-barred under the Securities' five-year prescription period, albeit for different reasons. *See* J.A. 779 § 14. WASO admits that it acquired 80% of its Securities *after* the five-year prescription period expired, and its claims do not "relate back" to its initial acquisition. *See* S.J.A. 817. Ape Group commenced its action after the

74

five-year prescription period expired, and an email message inquiring about a potential tolling agreement did not satisfy the requirement to "mak[e]" a "claim[]" within the five-year period.

### 1. Most Plaintiffs Did Not Carry Their Burden of Proving That They Had the Litigation Rights to These Claims.

The Aurelius, ACP Master, Adona, and 683 Capital Plaintiffs purchased all or the vast majority of their Securities after December 15, 2014, the date the Republic announced that no payment was due under the Securities for 2013. *See* S.J.A. 811–13; J.A. 2293. These Plaintiffs are, therefore, claiming damages that accrued when *someone else* owned the Securities. While New York law allows transfer or assignment of such claims, *see* N.Y. Gen. Oblig. Law § 13-107, it is a plaintiff's burden to prove that the transfer occurred. *See Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 565 (S.D.N.Y. 2022); *Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*, 2017 WL 1331288, at *7 (S.D.N.Y. Apr. 4, 2017). Proof is necessary because it is "common to divorce the litigation rights from the underlying securities." *Royal Park Investments SA/NV* v. *Wells Fargo Bank, N.A.*, 2018 WL 739580, at *14 (S.D.N.Y. Jan. 10, 2018); *see Commerzbank AG*, 100 F.4th at 383 n.29

(explaining that claims "related to the Sold Certificates" must be dismissed where plaintiff "did not expressly reserve its litigation rights").

Plaintiffs thus must prove that for each transfer of the Securities dating back to December 2014, the right to sue was either (i) expressly assigned or (ii) transferred automatically under operation of the governing law.[16]  *See Racepoint Partners LLC* v. *JPMorgan Chase Bank*, 2006 WL 3044416, at *5 (S.D.N.Y. Oct. 26, 2006) (dismissing case where plaintiffs failed to "allege facts to show that New York law governed every prior transfer of the notes at issue . . . such that their transferrers [sic] would have automatically acquired the claims of all the previous noteholders").

During discovery, the Republic requested the relevant evidence, including "information regarding the circumstances of each transaction in the GDP-linked Securities for which Plaintiffs assert damages since the date of the alleged breach of contract."  J.A. 1125–26; *see also* J.A. 1129–30; 1132;

---

[16] This "operation of governing law" inquiry is focused solely on what law governed each transfer or assignment of the Securities from the time of breach to each subsequent holder.  So while the Global Security's choice of law provisions "state that the [Securities] themselves are governed by New York law" this "do[es] not dictate the governing law for the separate contracts transferring these [securities] from one holder to the next."  *Royal Park Invs. SA/NV* v. *HSBC Bank USA, N.A.*, 2018 WL 679495, at *5 (S.D.N.Y. Feb. 1, 2018).

1136–39; 1141–44; 1146–49.  Despite these requests, the Aurelius, ACP Master, Adona, and 683 Capital Plaintiffs did not come forward with *any* evidence to establish that they acquired the right to sue.  *Id.*  Accordingly, this Court can affirm summary judgment as to these Plaintiffs—which are ten of the 17 Plaintiffs in this action.  *Wells Fargo Bank, N.A.*, 2018 WL 739580, at \*14; *Commerzbank AG*, 100 F.4th at 383.

### 2. WASO and Ape Group's Claims Are Barred by the Prescription Clause.

Section 14 of the Global Security, titled "Prescription," provides:  "All claims against the Republic for any amounts due hereunder (including Additional Amounts) shall be prescribed unless made within five years from the date on which such payment first became due, or a shorter period if provided by law."  *See* J.A. 779 § 14.

a.  Plaintiff WASO admits that it acquired 80% of its Securities after the five-year prescription period expired on December 15, 2019:  WASO purchased an additional \$557,750,000 of Securities between September 21, 2020 and October 28, 2020.  *See* S.J.A. 817.  WASO then waited another two months, until December 14, 2020, to assert a claim under these later-purchased Securities, at which time it filed a letter seeking leave to supplement its Amended Complaint.  *See* J.A. 2827–30. WASO, therefore, did

not assert a right to payment on these additional Securities within the five-year prescription period.

In the district court, WASO argued that its claims based on the later-acquired Securities can "relate back" to its initial complaint raising the earlier-acquired securities. S.J.A. 671–73. This is wrong. These later-acquired claims were already time-barred when WASO acquired these Securities. Time-barred claims do not transfer with the sale of a security. *See Diesel Props S.r.l.*, 631 F.3d at 55 ("[A]n assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment.") (quoting *Septembertide Publ'g, B.V.* v. *Stein & Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989)). When WASO filed its initial complaint, it had no existing right to the amount it now seeks to recover associated with its later-acquired Securities. Any other rule would allow a plaintiff who acquired a single dollar's worth of Securities to timely sue and then later acquire and recover for all of the remaining outstanding Securities.

b. The Ape Group plaintiffs sued with respect to *all* of their Securities on December 10, 2020, almost a full year after the five-year prescription period expired on December 15, 2019. *See supra* at 25. The district court, however, let these claims proceed on the theory that the claims

had already been "made" for the purposes of the Prescription Clause because counsel for Ape Group sent a perfunctory email inquiring about the possibility of a tolling agreement to the Republic's counsel on November 4, 2019, within the prescription period.[17] This was error.

i.      The district court interpreted the term "claim" within the Prescription Clause to mean the bare "assertion of a right to payment" and not to "unambiguously require" the commencement of a proceeding.  S.A. 100. But the email which the district court pointed to did not even clear that low bar.  The November 4, 2019 email that supposedly saved its claims conveyed Ape Group's "wish[] to preserve [its] . . . rights . . . without having to bring a suit against Argentina" and "inquire[d] whether Argentina would be willing to enter into a tolling agreement."   J.A. 2896.  That is far short of even the standard the district court set out in its decision—namely, "an assertion of a right to something" or "a demand for something due or believed to be due." S.A. 100–01.  Ape Group did not make any demands or assert any rights

---

[17] *See* J.A. 2896 ("Mr. Romano has become aware of the cases brought by Aurelius Capital and Novoriver with respect to GDP-Linked Securities.  He wishes to preserve his rights while these litigations proceed without having to bring a suit against Argentina.  Accordingly, I am writing on his behalf to inquire whether Argentina would be willing to enter into a tolling agreement.").

against the Republic in this email—it simply said it was aware of claims by others and asked if the Republic would enter into a tolling agreement.

In any event, the Global Security requires that "notices to the Republic with respect to the Securities shall be addressed" to the Ministry of Economy in Buenos Aires. *See* J.A. 779 § 12. These Plaintiffs did not satisfy this notice requirement by sending an informal email to the Republic's outside counsel, and New York law requires strict compliance with "condition precedent-type notice provision[s] setting forth the consequences of a failure to strictly comply." *Northgate Elec. Corp.* v. *Barr & Barr, Inc.*, 877 N.Y.S.2d 36, 37–38 (N.Y. App. Div. 2009); *see Perini Corp.* v. *City of New York*, 18 F. Supp. 2d 287, 294 (S.D.N.Y. 1998) ("'[E]nshrined principle' of New York law requires strict compliance with notice provisions"), *aff'd*, 182 F.3d 901 (2d Cir. 1999).

ii.     The district court also misinterpreted the Prescription Clause by holding that it could be satisfied by mere notice of a potential claim. A "prescription" period—as the relevant clause is titled—is "analogous to a statute of limitations." *St. Pierre* v. *Dyer*, 208 F.3d 394, 398 (2d Cir. 2000); *Songbyrd, Inc.* v. *Est. of Grossman*, 23 F. Supp. 2d 219, 221 n.3 (N.D.N.Y. 1998) ("[P]rescription in civil law jurisdictions . . . is roughly synonymous with . . . a statute of limitations."), *aff'd*, 206 F.3d 172, 175 n.4 (noting "prescription"

is a "type of limitations"). A statute of limitations is not satisfied through notice of a grievance—a party must actually file a lawsuit. *See Barner* v. *Jeffersonville-Youngsville Cent. Sch. Dist.*, 117 A.D.2d 162, 166 n.1 (N.Y. App. Div. 1986) ("filing of a notice of claim . . . neither tolls the Statute of Limitations nor begins anew the time within which review can be sought"). There was no indication in the text of the Prescription Clause that the parties wished to *loosen* the prescription rules to be more permissive than a statute of limitations. To the contrary, the drafters intended the five-year period to be an outside limit on bringing claims, because it only applies if there is no "shorter period . . . provided by law." J.A. 779 § 14. This language confirms that Section 14 was intended to *supersede* the otherwise applicable six-year statute of limitations. And in doing so, the Prescription Clause furthers the "societal interest . . . 'of giving repose to human affairs.'" *H.P.S. Capitol, Inc.* v. *Mobil Oil Corp.*, 588 N.Y.S.2d 29, 30 (1992) (quoting *John J. Kassner & Co.* v. *City of New York*, 46 N.Y.2d 544, 550 (1979)).

In *Ajdler* v. *Province of Mendoza*, this Court held that a similar prescription clause[18] "superseded" the applicable statute of limitations,

---

[18] The prescription clause in *Ajdler* provided: "[a]ll claims against [the Province of Mendoza] for payment of principal of or interest . . . on or in respect

mandating dismissal of claims "file[d]" outside the prescription period. 890 F.3d 95, 98–100 (2d Cir. 2018). The district court "accord[ed] little weight" to this Court's holding in *Ajdler* because it was an alternative holding. S.A. 99. Alternative holdings, however, are *not* dicta. *See Pyett* v. *Pa. Bldg. Co.*, 498 F.3d 88, 93 (2d Cir. 2007) ("An alternative conclusion in an earlier case that is directly relevant to a later case is not dicta"), *rev'd on other grounds sub nom.*, *14 Penn Plaza LLC* v. *Pyett*, 556 U.S. 247 (2009). And other courts have also held that informal communications, like Plaintiffs' email, are not enough to assert a "claim" within the prescribed time period. *See, e.g.*, *Greenwood Nursery, Inc.* v. *Home Depot, U.S.A., Inc.*, 2008 WL 4181186, at *1 (N.D. Ga. Sept. 4, 2008) (finding that "a telephone call" does not satisfy requirement to "'bring any claim or dispute . . . within one year'"), *aff'd*, 312 F. App'x 257 (11th Cir. 2009); *Pulmonary Assocs. of Charleston PLLC* v. *Greenway Health, LLC*, 2020 WL 9073551 (N.D. Ga. June 29, 2020) (informal notice of claim through ante-litem notice "rather than through the filing of a lawsuit" insufficient to satisfy contractual requirement).

---

of the Bonds shall be prescribed unless made within four years from the date on which such payments first became due." *Ajdler*, 890 F.3d at 97.

## B. The Republic's Interpretation of the Adjustment Provision Is Correct as a Matter of Law.

If this Court reaches the question of how to interpret the Adjustment Provision, it should adopt the Republic's "mainstream" Constant Factor Approach. The record before the district court overwhelmingly showed that the Constant Factor Approach is the only reading faithful to the language of the Global Security, especially when read in its entirety and in the context of the Securities' issuance. In particular, by applying a one-time, fixed adjustment to the Base Case GDP figures in the Global Security, the Republic's interpretation ensures that the key economic assumption—the 3% Base Case GDP Growth trigger, derived from the Republic's debt sustainability analysis and understood by all participants in the Securities' issuance—is preserved.

Plaintiffs' interpretation, by contrast, renders the entire Adjustment Provision meaningless, requires reading an unwritten and undisputedly unprecedented covenant into the Securities, and produces commercially unreasonable and absurd results.[19]

_____

[19] On appeal, Plaintiffs do not pursue their theory "that Argentina had breached the contract's implied covenant of good faith and fair dealing by refusing to publish real GDP in 1993 prices in order to frustrate holders' rights

### 1. The Republic's Interpretation Follows the Context and Text of the Securities.

All parties agree that the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." Br. 80 (quoting *Greenfield* v. *Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002)). Yet Plaintiffs ignore this fundamental step—as did the English court's decision on which Plaintiffs rely so heavily.

The undisputed facts before the district court demonstrate that the parties understood that the Securities would pay out only if the Republic's real GDP Growth exceeded an approximately 3% trigger. The plain text of the Securities reflects this context and calls for a single adjustment to the entire Base Case GDP table upon a rebasing. The Constant Factor Approach achieves this basic objective. As explained in memoranda prepared by the Ministry of Economy,[20] in the event of a change in the base year, a single

---

to a 2013 payment." Br. 18–19. And for good reason—after extensive fact discovery, Plaintiffs were unable to point to any evidence to support these claims. *See* S.J.A. 1070–89.

[20] Plaintiffs' claim that "the Republic did not disclose its calculation," Br. 77, has it backwards. The Republic's interpretation was the "mainstream interpretation," whereas Plaintiffs' interpretation was the "alternative interpretation." J.A. 1099–1101; 1109–13. Moreover, the Ministry of Economy's memorandum was also available to Holders of the Securities via a publicly available administrative file through 2021. *See* S.J.A. 987–88 ¶ 162.

Adjustment Fraction is calculated, the numerator of which is Actual Real GDP in the new base year, and the denominator of which is Actual Real GDP in the 1993 base year. *See* S.J.A. 769. This is the only reading of the Securities that makes any sense in light of the relevant context, and is thus the only correct reading as a matter of law.

a. Courts interpret a contract's text by looking at the full context in which the contract was executed, meaning "the entire situation, as it appeared to the parties." Restatement (Second) of Contracts § 202 cmt. b (1981); *see also Subaru Distributors Corp.* v. *Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) ("A court in determining the parties' intention should consider the circumstances surrounding the transaction as well as the actual language of the contract."). The undisputed facts before the district court were that, in the wake of Argentina's economic crisis and default, to avoid future defaults, the Ministry of Economy undertook a debt sustainability analysis to project Argentina's long-term potential GDP. S.J.A. 683–84. This analysis, which looked at the Republic's historical real GDP over the prior century, determined that Argentina's long-term potential annual real GDP growth was approximately 3%. S.J.A. 686–87. This 3% long-term growth rate thus became

the key "macroeconomic assumption" in the debt restructuring. S.J.A. 690–91.

The drafters of the Securities thus started with a baseline 3% Base Case GDP Growth and from there derived the Base Case GDP levels that would need to be met each year in order for payments to be due (and the amount that would be due based on the excess GDP over the pre-set level). S.J.A. 691; *see also* S.J.A. 829–31 ¶¶ 16–19. In the words of Sebastián Katz, the then-Undersecretary of Economic Programming charged with undertaking the debt analysis, "the levels result from the growth rate that we calculated at the sustainable growth rate . . . the methodology was to determine a growth rate—a potential growth rate that Argentina considered was sustainable, and starting from the observed 2004 GDP calculated in 1993 prices applied a growth rate to generate" the Base Case GDP triggers in the Securities. J.A. 2198 at 27:9–16; *see also* J.A. 2198–201 at 27:17–28:18, 38:4–18; *see also* S.J.A. 831–32 ¶¶ 18–21.

The 3% Base Case GDP Growth assumption was no secret. Indeed, the record showed that all parties understood at the time of the Securities' issuance that the Securities were designed around this 3% long-term annual real GDP growth rate.

- In June 2004, the Republic filed an SEC Form 18-K/A, in which it identified the proposed Securities' "Payment trigger" as "Actual GDP (expressed in constant pesos) as of the reference date exceeds the base case GDP, and the annual growth rate exceeds 3%." *See* S.J.A. 691.

- The Republic, in numerous roadshow presentations and offering materials, similarly described the Securities to investors as paying out when real GDP Growth exceeded 3% Base Case GDP Growth. *See* S.J.A. 690–92.

- In addition, numerous analyst reports published at that time also highlighted the 3% annual growth assumption. S.J.A. 715–16. Two analyst reports even conducted historical analyses mirroring that prepared by Katz's team and similarly concluded that the Republic's historical, long-term GDP growth rate was approximately 3%. S.J.A. 692–93.

Plaintiffs themselves, in 2014 and at other times, also understood that the Securities would pay only if the Republic's annual economic growth was at or above 3%. *See* S.J.A. 790–94. For example, when the principal of Novoriver was asked at his deposition whether he expected that "for future years,

Argentina would make a payment *even if economic growth was below 3%*," he answered: "No. Of course, that if the growth was below the trigger point, Argentina had not to pay." S.J.A. 791(emphasis added). When asked the same question at his deposition, the principal of Ape Group answered "[o]bviously not because . . . it would have been against the covenant." S.J.A. 792. And a partner at Redwood Capital, the investment manager for Plaintiffs Erythrina and Mastergen, stated in a June 2014 email (*i.e.*, shortly after the rebasing occurred in March 2014) that the Securities' value "should increase if average GDP exceeds 3% and decline if they are lower than 3%." S.J.A. 793–94. Plaintiffs, on the other hand, have been unable to identify ***a single investor*** who, at the time of the Securities' issuance, understood the Adjustment Provision to modify the 3% Base Case GDP Growth rate in the event of a rebasing. *See, e.g.*, S.J.A. 794; 394 at 97:18–25 (testimony from Luc Dowling, Managing Director of Aurelius, admitting that he "do[esn't] know of said investor" who at the time of issuance espoused Plaintiffs' preferred interpretation of the Adjustment Provision).

b.     Turning to the text of the Securities, the Adjustment Provision and the plain language of the Global Security as a whole confirm that the

parties intended the 3% Base Case GDP Growth threshold to remain constant (*i.e.*, the Constant Factor Approach).

i.     *First*, the definition of "Year of Base Prices" makes clear that the parties intended for only a single base year to be in use at any given time. The Adjustment Provision applies "if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993." J.A. 768. The definition of "Year of Base Prices," in turn, provides that if INDEC employs a base year other than 1993, "then the Year of Base Prices shall mean such other calendar year." J.A. 770. As Plaintiffs recognize, "the contracting parties had anticipated that GDP would be episodically rebased." Br. 15; *see also* Br. 73. Therefore, because there can only be one base year at a time, the contract contemplates that the old base year will have no further function after a rebasing.

*Second*, in the event of a change in the Year of Base Prices, the Adjustment Provision provides that "the Base Case GDP for each Reference Year ***shall be adjusted*** to reflect any ***such change*** in the Year of Base Prices." J.A. 768 (emphasis added). The natural reading of this language is that there is a single adjustment at the time of the "change in the Year of Base Prices." The one-time nature of the adjustment is underscored by the Adjustment

89

Provision's instruction that such adjustment be performed "by multiplying the Base Case GDP for such Reference Year . . . by *a fraction*," *i.e.*, the Adjustment Fraction, which is a single fraction and therefore a constant one. J.A. 768 (emphasis added).

The Constant Factor Approach adheres to both the text of the Global Security and the context surrounding the Securities issuance by (i) performing a one-time adjustment, (ii) using a single Adjustment Fraction, and (iii) preserving the approximately 3% Base Case GDP Growth levels that all investors understood to be one of the Securities' payment triggers.

ii.     Plaintiffs' interpretation, on the other hand, cannot be squared with the plain text of the Adjustment Provision.  They say it requires "that a new Adjustment Fraction be calculated and applied for '*each* Reference Year.'" Br. 75 (emphasis added).  This interpretation, therefore, rests entirely on the word "each" in the 115-word Adjustment Provision and 27-page Global Security.  Br. 75.[21]  But under New York law, courts must "read the document

---

[21] It is ironic that Plaintiffs both insist on a hyper-technical reading of the word "each" in the Adjustment Provision, Br. 75, that would erase the 3% GDP growth target around which the Securities were designed, create an outcome literally no one involved in the Securities expected at the time of issuance, and render the entire clause a nullity, while at the same time arguing that this Court should simply re-write Section 11 of the Global Security because "[t]he drafters of Section 11 undoubtedly had in mind Payment Amounts," Br. 32.

as a whole to ensure that excessive emphasis is not placed upon particular words or phrases." *S. Rd. Assocs., LLC* v. *Int'l Bus. Machines Corp.*, 4 N.Y.3d 272, 277 (2005); *L. Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (similar).

iii.    Plaintiffs argue that the Constant Factor Approach is contrary to the text of the Adjustment Provision because it "requires fabricating a concept called 'an Overlap Year.'"  Br. 88.  But there is nothing "fabricated" or extraordinary about the Overlap Year.  Under the Constant Factor Approach, the inputs for the Adjustment Fraction are selected from a year in which Actual Real GDP in both the old and new Year of Base Prices are available. The Global Security confers discretion on the Republic to perform "[a]ll calculations . . . hereunder," including "[a]ll calculations necessary to determine Excess GDP."  J.A. 768–69.  It also makes the Ministry of Economy's calculations "binding" absent "bad faith, willful misconduct or manifest error."  J.A. 769.  This discretion encompasses choices such as selecting an Overlap Year to adjust the Base Case GDP table.  Indeed, Plaintiffs do not claim that the Republic's election of 2012 as the Overlap Year—the last year for which Actual Real GDP was available in both the 1993

and 2004 base years—was exercised in "bad faith" or reflected "willful misconduct or manifest error."[22]

### 2. Plaintiffs' Interpretation Writes the Adjustment Provision Out of the Contract.

Plaintiffs' interpretation has another serious problem: it would write out of the contract entirely the very language (the Adjustment Provision) designed to ensure that the Securities continue to fulfill their basic economic function (paying out when Argentina's economy is growing). It is black-letter New York law that a "reading of [a] contract should not render any portion meaningless." *Beal Sav. Bank* v. *Sommer*, 8 N.Y.3d 318, 324 (2007); *Corhill Corp.* v. *S. D. Plants, Inc.*, 9 N.Y.2d 595, 599 (1961) ("It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract . . . without force and effect.'"). When faced "with two conflicting interpretations of [a] contract," New York law rejects the reading that renders provisions "superfluous" and "of no effect," even if it is more consistent with the "plain language," and instead follows the

---

[22] Plaintiffs' suggestion that the Republic's interpretation would "allow it to rebase opportunistically . . . to avoid payment," Br. 89, is farfetched. Plaintiffs pointed to no evidence that this was an actual concern of participating creditors at the time of the exchanges. Moreover, rebasing is a complex exercise that takes years; it cannot be done "opportunistically" at the drop of a hat. *See supra* at 15–17.

interpretation "which best accords with the sense of the remainder of the contract." *Galli* v. *Metz*, 973 F.2d 145, 149 (2d Cir. 1992). Therefore, even if this Court considers Plaintiffs' interpretation more consistent with the plain text of the Global Security (it is not), that interpretation must be rejected in favor of the Republic's interpretation.

Plaintiffs do not dispute that the perverse effect of their interpretation is to render the Adjustment Provision (among other clauses in the Global Security) meaningless. The Republic's expert, Dr. Eduardo Borensztein, demonstrated in his opening report that, under Plaintiffs' Variable Factor Approach, all Payment Conditions are "exclusively based on the Republic's real GDP in 1993 base prices, even after the Republic rebased its real GDP." S.J.A. 225 ¶ 50, 258–60; *see also* S.J.A. 291–97 ¶¶ 15–31. Under Plaintiffs' interpretation, Base Case GDP and Base Case GDP Growth are therefore effectively not adjusted at all, and real GDP in the updated base year has no impact on the payment triggers or the Payment Amount. *See* S.J.A. 779–82. Put another way, Plaintiffs' interpretation would tie the Securities to real GDP in 1993 prices, regardless of whether and how many times INDEC rebases GDP. As a consequence, Plaintiffs' interpretation would write out the entirety of not only the Adjustment Provision, but also much of the definitions of Actual

Real GDP Growth and Actual Real GDP, as demonstrated in Appendix A to the Republic's combined summary judgment opposition-and-reply brief.  *See* J.A. 2291–92.

Plaintiffs' expert, Prof. Jonathan Ostry, conceded at his deposition that "the net effect of Plaintiffs' interpretation is that the Level and Growth Conditions will remain a function of real GDP in constant 1993 prices after a rebasing." S.J.A. 268 ¶ 15; S.J.A. 145–46 at 40:18–41:9.  At summary judgment, Plaintiffs also adopted the English Court's concession that, under Plaintiff's interpretation, "rebasing does not make a difference to whether or not the Performance Condition and the Level Condition are satisfied."  S.J.A. 626.

It is thus ironic that Plaintiffs contend that, if INDEC changes the Year of Base Prices, then the Adjustment Provision "***requires*** the figures stated in constant 1993 prices (in the chart) ***to be adjusted***."  Br. 74 (emphasis added).  Plaintiffs' interpretation not only fails their own test, it also gives rise to the obvious question of why the parties would have included a 115-word Adjustment Provision, along with the other deleted provisions shown in Appendix A, if they served no purpose.[23]  New York courts do not "adopt

---

[23] Market analysts picked up on this flaw in the Variable Factor Approach in 2014.  For instance, Bank of America produced a report in which it stated that

. . . interpretation[s] which would leave any provision without force and effect." *Sunrise Mall Assocs.* v. *Imp. Alley of Sunrise Mall, Inc.*, 621 N.Y.S.2d 662, 663 (App. Div. 1995).

> **3.    Plaintiffs' Interpretation Requires Reading an Unprecedented, Unwritten Obligation into the Securities, Which the District Court Correctly Rejected.**

a.    Not only does Plaintiffs' interpretation read the Adjustment Provision *out* of the language of the Global Security, it also requires reading *into* the Global Security an unprecedented obligation:  that the Republic ensure the continued publication of Real GDP in the 1993 base year for the life of the Securities, even after INDEC has rebased.  But, as Plaintiffs concede, Br. 82, the text of the Global Securities contains no such obligation.  The Trust Indenture contains an entire section on covenants where such an obligation would have appeared.  But as the district court correctly recognized, "[b]y their terms, the Global Securities do not require the Republic to compel INDEC to publish data."  S.A. 50.  Plaintiffs "could have bargained for a

---

the Variable Factor Approach "effectively reverts back to the original trigger criteria using the old GDP . . . base year 1993," and thus payment would be "triggered only when the GDP growth under the old methodology exceeds the old trigger."  J.A.1111.  The report concluded that the Variable Factor Approach "makes less economic sense" whereas the Constant Factor Approach "makes complete economic sense."  J.A.1108.

provision requiring INDEC to calculate and publish that data in all circumstances. Yet, the Global Securities do not include such a term." S.A. 51. The fact that Plaintiffs' interpretation requires this obligation, as Plaintiffs' concede, Br. 75, is itself compelling evidence that the parties did not adopt the Variable Factor Approach.

b. Plaintiffs also contend that, even though "[t]he Global Security does not contain a separate term *explicitly* requiring the Republic's INDEC to publish Actual Real GDP measured in constant 1993 prices," such an obligation "quite obviously follows from" the other obligations in the Securities. Br. 82. Not so. New York "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Reiss* v. *Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001). Courts "should be especially 'reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include,'" where, as here, the parties are "'sophisticated, counseled business people.'" *2138747 Ontario, Inc.* v. *Samsung C & T Corp.*, 31 N.Y.3d 372, 381 (2018) (quoting *Vermont Teddy Bear Co.* v. *538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)).

c.     To try to get around this black-letter New York law, Plaintiffs argue that (i) courts may consider "whatever may be reasonably implied" from the "literal language" of a contract, Br. 81 (quoting *Mazzella* v. *Mazzella*, 204 A.D.3d 1114, 1115 (N.Y. App. Div. 2022)), and (ii) that the parties' intent may trump the plain text of the contract, Br. 81–83.  But neither of these wholly unremarkable propositions can save Plaintiffs' implied obligation theory.

*First*, Plaintiffs and their experts have conceded that no country has ever continued to publish GDP in an outdated base year upon publication of GDP in a new base year.  *See supra* at 23.  That bears repeating—it is common ground that the obligation that Plaintiffs seek to imply into the contract is wholly unprecedented in the history of the world.   It thus cannot be "reasonably implied" from the contract that the parties intended to casually include such an unprecedented obligation *sub silentio*.  If they had, the parties were fully aware how to do so—indeed, the Trust Indenture contains an entire section dedicated to covenants.  *See* J.A. 653–58 Art. 3.  They did not.

*Second*, there is no language in the Global Security from which to imply that the parties intended the Republic to assume this obligation.  Plaintiffs contend that the obligation exists because "[t]he Global Security contains a litany of *express provisions* that assign to the Republic the obligation to

perform certain mechanical functions of the securities, including the calculations and generation of data for those calculations." Br. 83. This argument has it exactly backwards. The fact that the Global Security does include express provisions requiring certain calculations but *does not include* any provision requiring publication of real GDP in 1993 prices confirms that the parties did not intend the Republic to assume such an obligation.

Further, the Global Security elsewhere makes clear that only one base year was intended to be published at a time. Indeed, the very definition of "Year of Base Prices" contemplates that INDEC will *transition* from one base year to another, rather than publishing two. J.A. 770 ("[I]f the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, *then the Year of Base Prices shall mean such other calendar year*.") (emphasis added). "Actual Real GDP," in turn, is expressly defined in reference to "*the* Year of Base Prices." J.A. 767 (emphasis added).

d.     Plaintiffs' other arguments in support of their implied obligation theory are equally unpersuasive. *First*, Plaintiffs assert that the Republic, in a presentation to bondholders, "made repeated assurances that it was inconceivable Argentina would ever fail to make the required GDP data

available." Br. 85. The summary judgment record in fact showed that the Republic assured investors that it would continue publishing *real GDP*—which it has done. S.J.A. 920–21. But Plaintiffs point to no evidence that the Republic undertook to do something no country has ever before done: continue publishing its real GDP in an outdated base year.

*Second*, Plaintiffs point to the English courts' rulings "that Argentina must continue publishing the necessary statistics." Br. 84. Those rulings, however, applied *English* law. The English courts assumed—directly contrary to the New York district court's application of *New York* law—that the Securities contained an implied obligation to publish real GDP in the 1993 base year, and thus concluded that the parties "agreed that whatever is necessary will be available." *Palladian Partners* v. *Republic of Arg.*, EWCA [2024] (Civ) 641 [77], *available at* https://caselaw.nationalarchives.gov.uk /ewca/civ/2024/641. The English court's conclusion contradicts New York's categorical prohibition on "add[ing] or excis[ing] term[s]" or "distort[ing] the meaning of those used" to "thereby make a new contract for the parties." *Reiss*, 97 N.Y.2d at 199.

e. Finally, Plaintiffs' argument, Br. 78–80, that the district court erred when it held that Plaintiffs could not state a claim "using alternate

statistics not contemplated by the Global Security's plain terms," S.A. 21, also fails because Plaintiffs cannot read nonexistent terms into the contract. Plaintiffs' cases, Br. 80 n.22, do not support Plaintiffs' argument. Those cases merely hold that parties may "estimate" their damages and that courts have "flexibility" in determining damages. Br. 79–80 n.22. But the district court's holding was about whether Plaintiffs had adequately pled a claim, not damages: "the Global Security neither enumerates nor implies exceptions as to the statistics to be employed in calculating the Adjustment Fraction." S.A. 19.

### 4. Plaintiffs' Interpretation Is Commercially Unreasonable.

As one of Aurelius' own analysts wrote, Plaintiffs' interpretation "leads to some absurd results." S.J.A. 790. Under New York law, "the cardinal principle of contract interpretation [is] that '[a] contract should not be interpreted to produce a result that is absurd . . . commercially unreasonable[,] or contrary to the reasonable expectations of the parties.'" *Natixis Real Est. Cap. Tr. 2007-HE2* v. *Natixis Real Est. Holdings, LLC*, 149 A.D.3d 127, 139 (N.Y. App. Div. 2017) (quoting *In re Lipper Holdings LLC*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003)); *see also Hughes Commc'ns India Private Ltd.* v. *DirecTV Group, Inc.*, 71 F.4th 141, 155 (2d Cir. 2023) (same). Plaintiffs'

interpretation violates this rule because it (i) uncouples the payment triggers and payment amounts in a *GDP-linked security* from the Republic's actual real GDP, and (ii) erroneously and without evidence assumes that investors wanted payments to turn entirely on an increasingly outdated measure of GDP.

a.     As both parties' experts agreed, the fundamental function of a GDP-linked security is to link a country's payment obligations to its real economic performance. *See* S.J.A. 696–99. This linkage ensures that GDP-linked securities are more closely tied to a country's payment capacity. *See* S.J.A. 685–86. Accordingly, when a country's economy is performing well, the country will have the capacity to pay security-holders; when a country's economy is doing poorly, the country will pay less or nothing at all, reducing the risk of default. *See* S.J.A. 700–02. For a GDP-linked security to therefore link a country's payment obligations to its real "economic growth," it must rely on the most up-to-date GDP statistics available.

But under Plaintiffs' interpretation, payment under the Securities would be disconnected from the actual performance of the Republic's current economy. As the Republic's expert Dr. Borensztein explained, "Plaintiffs' interpretation would divorce payments under the Securities from the

Republic's economic reality" by instead tying the payment conditions to the outdated 1993 base year. S.J.A. 225–27 ¶ 51. Even Plaintiffs' expert concedes that "the net effect of Plaintiffs' interpretation" is that the conditions that determine payment under the Securities "will remain a function of real GDP in constant 1993 prices after a rebasing." S.J.A. 781–82. Dr. Borensztein further demonstrated the erratic results of applying Plaintiffs' interpretation to years in which real GDP was available in both 1993 and 2004 prices. While the Base Case GDP Growth trigger used to follow a long-term 3% trend line, "Plaintiffs' interpretation results in an unstable trajectory where the growth rate of Base Case GDP increases and decreases and even displays a *negative growth* rate in 2008." S.J.A. 230–31 ¶ 59 (emphasis added). In other words, under Plaintiffs' interpretation, the Republic would be required to pay in years when the economy is experiencing stagnant or even negative growth. *See* S.J.A. 784. That is contrary to the fundamental purpose of the Securities, which Plaintiffs concede was for investors "to share in [Argentina's] *economic growth*." Br. 7 (emphasis added); *see also* Br. 8 ("Exchanging holders thus provided Argentina many billions of dollars of debt relief in return for some participation in the resulting rejuvenation of its economy.").

b.     Plaintiffs' flawed interpretation also relies on the counterintuitive premise that a rational investor participating in the 2005 or 2010 exchange offers expected or wanted to be tied to GDP in the 1993 base year for the life of the Securities (*i.e.*, through 2035).  As discussed above, the longer a base year is in use, the more distortions are introduced into the GDP estimate.  *See supra* at 15–16.  For that reason, the IMF insisted that the Republic update the 1993 base year in 2014 (if not before).  *See supra* at 15–17.  It is beyond fanciful to assume that investors would want their *GDP-linked* Securities to be tied to anything other than the most up-to-date measure of GDP.  Aurelius recognized the absurdity of this premise in its internal emails, questioning whether "investors really want to be dependent on" an outdated "figure that serves no other purpose."  S.J.A. 338–39.[24]

*                *                *

---

[24] Because the Republic's interpretation of the Adjustment Provision is correct as a matter of law, Plaintiffs' argument that the Republic impermissibly "modified" the Adjustment Provision, Br. 89–90, fails.  Plaintiffs' argument that the Republic "prevented" itself from performing the necessary calculations under the Securities by failing to publish real GDP in the 1993 base year, Br. 85, also fails because the Republic had no obligation to continue publishing outdated GDP statistics (*see supra* Section II.B.3) and, in any event, faithfully performed the adjustment calculations (*see supra* at 20–24).

103

At a minimum, Plaintiffs' request that this Court "remand[] with instructions to enter judgment in Plaintiffs' favor," Br. 69, should be denied. *First*, even if this Court does not reject Plaintiffs' interpretation of the Adjustment Provision, the contract is, at a minimum, ambiguous, and this Court should "remand for the trial court to consider and weigh extrinsic evidence to determine what the parties intended" to resolve the ambiguity. *Collins* v. *Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002). This is particularly necessary here, where key evidence—including testimony from Sebastián Katz, the Republic's Undersecretary of Economic Programming tasked with performing the debt sustainability analysis that was the foundation for the Securities—confirms that the Republic's interpretation of the Adjustment Provision was what was intended at the time of issuance. *See U.S. Fire Ins. Co.* v. *Gen. Reinsurance Corp.*, 949 F.2d 569, 574 (2d Cir. 1991) (where resolving ambiguity requires "decisions . . . [that] turn[] on credibility," district court should make the determination).

*Second*, even if this Court were to accept Plaintiffs' approach to adjusting Base Case GDP, a mixed question of law and fact would remain regarding how to implement Plaintiffs' interpretation for 2013. *See* S.J.A. 1125–1243 ¶¶ 108–19. Plaintiffs concede that their interpretation requires

Actual Real GDP in 1993 prices published by INDEC, Br. 75, but this figure was never calculated or published by INDEC. *See supra* at 16.

*Third*, the Republic pleaded the affirmative defenses of champerty and mutual mistake, *see* S.J.A. 811–16; 1114–18, which would require a trial on disputed issues of fact concerning Plaintiffs' intentions in acquiring the Securities and the parties' understanding of the Securities' terms at the time of issuance, *see Jones* v. *Goodrich Pump & Engine Control Sys., Inc.*, 86 F.4th 1010, 1014, 1020 (2d Cir. 2023) ("[W]e leave questions as to . . . competing factual accounts for resolution in the district court in the first instance.").

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgments for the Republic based on Plaintiffs' failure to satisfy the No-Action Clause or on any of the alternative grounds presented.

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*

Robert J. Giuffra, Jr.
Sergio Galvis
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

Amanda F. Davidoff
Thomas C. White
Elizabeth A. Rose
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Attorneys for the Argentine Republic*

February 14, 2025

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(a) and the Court's order of June 25, 2024, because it contains 23,140 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

February 14, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2025, I filed the foregoing Brief with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ Robert J. Giuffra, Jr.
Robert J. Giuffra, Jr.

February 14, 2025